Provided to Madison C.I. on 04/21/23 for mailing by [initials] JM
Date Initials

AO 241 (Rev. 09/17)

5:23-cv-261BJD PRL

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Middle |
|---|---|
| Name (under which you were convicted): JOHN ANTHONY MOORE, JR | Docket or Case No.: |
| Place of Confinement: MADISON C.I | Prisoner No.: U00034 |
| Petitioner (include the name under which you were convicted): JOHN ANTHONY MOORE | v. Respondent (authorized person having custody of petitioner): SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, ET AL. |
| The Attorney General of the State of: FLORIDA | |

FILED
2023 APR 24 AM 11:10
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging: IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT OF THE STATE OF FLORIDA, IN AND FOR MARION COUNTY.

   (b) Criminal docket or case number (if you know): 2016-CF-2869

2. (a) Date of the judgment of conviction (if you know): July 20, 2018

   (b) Date of sentencing: August 14

3. Length of sentence: COUNT ONE: LIFE; COUNT TWO: 30 yrs.

4. In this case, were you convicted on more than one count or of more than one crime? ☑ Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: COUNT ONE: MURDER IN THE SECOND DEGREE WITH A FIREARM; COUNT TWO: ATTEMPTED SECOND DEGREE MURDER WITH A FIREARM.

6. (a) What was your plea? (Check one)

   ☑ (1) Not guilty ☐ (3) Nolo contendere (no contest)

   ☐ (2) Guilty ☐ (4) Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? N/A

N/A

N/A

N/A

N/A

N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes ☐ No

8. Did you appeal from the judgment of conviction?

☑ Yes ☐ No

9. If you did appeal, answer the following:

(a) Name of court: Fifth District Court of Appeal, Florida

(b) Docket or case number (if you know): 5D18-2946

(c) Result: per curiam affirmed (without opinion)

(d) Date of result (if you know): April 28, 2020

(e) Citation to the case (if you know): 294 So.3d 318

(f) Grounds raised: See (Attachment-B, Grounds raised).

(g) Did you seek further review by a higher state court? ☐ Yes ☑ No

If yes, answer the following:

(1) Name of court: N/A

(2) Docket or case number (if you know): N/A

(3) Result: N/A

N/A

(4) Date of result (if you know): N/A

(5) Citation to the case (if you know): N/A

(6) Grounds raised: N/A

N/A

N/A

N/A

(h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☑ No

If yes, answer the following:

(1) Docket or case number (if you know): N/A

(2) Result: N/A

N/A

(3) Date of result (if you know): N/A

(4) Citation to the case (if you know): N/A

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? ☑ Yes ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Fifth District Court of Appeal, Florida

(2) Docket or case number (if you know): 5D21-0284

(3) Date of filing (if you know): January 22, 2021 (mailbox date)

(4) Nature of the proceeding: IAC: Writ of Habeas Corpus

(5) Grounds raised: Counsel failed to appeal the lower tribunel abuse of discretion in a Nelson hearing, where the court refused to allow Petitioner to represent himself after requested.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☑ No

(7) Result: Denied

(8) Date of result (if you know): June 03, 2021

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: The Fifth Judicial Circuit of Fla.

(2) Docket or case number (if you know): 2016-CF-2869

(3) Date of filing (if you know): June 02, 2021

(4) Nature of the proceeding: IAC: Rule 3.850 Motion

(5) Grounds raised: 1) Counsel failure to object to the forged documents: false arrest affidavit and warrant; 2) Counsel failure to object to the Cronic violation; 3) Counsel failure to timely Petition for Writ of Prohibition; 4) Counsel failure to file "Motion for a Franks Hearing"; 5) Counsel failure to object to the Giglio/Brady violations. (App. B, Postconviction Motion).

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☑ No

(7) Result: Denied

(8) Date of result (if you know): March 18, 2022

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: N/A

(2) Docket or case number (if you know): N/A

(3) Date of filing (if you know): N/A

(4) Nature of the proceeding: N/A

(5) Grounds raised: N/A

N/A

N/A

N/A

N/A

N/A

N/A

N/A

N/A

N/A

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☑ No

(7) Result: N/A

(8) Date of result (if you know): N/A

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: ☑ Yes ☐ No

(2) Second petition: ☑ Yes ☐ No

(3) Third petition: ☑ Yes ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

N/A

N/A

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

GROUND ONE: IAC: Petitioner's counsel was ineffective in failing to object to the Cronic violation.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

On Dec. 6, 2016, an arraignment was held, Petitioner was not present for his arraignment, and had no counsel of record to represent him before the court. Court minutes from that day, revealed his "defense attorney" was "listed" as Ms. Watson, who withdrew long before. (App. B, Ground two in Motion)

(b) If you did not exhaust your state remedies on Ground One, explain why: N/A

N/A

N/A

N/A

N/A

N/A

N/A

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: Ineffective Assistance of counsel issue.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: IAC: Rule 3.850 Motion

Name and location of the court where the motion or petition was filed: The Fifth Judicial Circuit of Florida

Docket or case number (if you know): 2016-CF-2869

Date of the court's decision: March 18, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, order of denial)

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☑ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Florida Court of Appeal, Fifth District

Docket or case number (if you know): 5D 22-1263

Date of the court's decision: August 9, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, per curiam affirmed).

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

N/A

N/A

N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: N/A

N/A

N/A

**GROUND TWO:** IAC: Petitioner's counsel was ineffective in failing to file the "Motion for Franks Hearing."

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

On October 21, 2016, Det. Steckman, knowingly drafted and signed an unsworn probable cause affidavit; in addition to, fabricating the whole content of this alleged affidavit, literally. see (App. B, Ground Four in Motion)

(b) If you did not exhaust your state remedies on Ground Two, explain why: N/A

N/A

N/A

N/A

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: ineffective assistance of counsel issue.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: IAC: Rule 3.850 Motion

Name and location of the court where the motion or petition was filed: The Fifth Judicial Circuit of Florida

Docket or case number (if you know): 2016-CF-2869

AO 241 (Rev. 09/17)

Date of the court's decision: March 18, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, order of denial)

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☑ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Florida Court of Appeal, Fifth District

Docket or case number (if you know): 5D 22-1263

Date of the court's decision: August 9, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, per curiam affirmed)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

N/A

N/A

N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : N/A

N/A

N/A

N/A

**GROUND THREE:** IAC: Petitioner's counsel was ineffective in failing to object to the Gilio/Brady violations.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Detectives Steckman, Buchbinder, and Todd all lied about knowing Petitioner; in addition to, coming in contact with him as a result of criminal investigations, when Petitioner was actually in federal prison, etc. See (App. B, Ground Five in Motion)

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: N/A

N/A

N/A

N/A

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: ineffective assistance of counsel issue....

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: IAC: Rule 3.850 Motion

Name and location of the court where the motion or petition was filed: The Fifth Judicial Circuit of Florida

Docket or case number (if you know): 2016-CF-2869

Date of the court's decision: March 18, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, order of denial)

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☑ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Florida Court of Appeal, Fifth District

Docket or case number (if you know): 5D 22-1263

Date of the court's decision: August 9, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, per curiam affirmed)

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A
N/A
N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: N/A
N/A
N/A

**GROUND FOUR:** IAC: Petitioner's counsel was ineffective in failing to timely petition for writ of Prohibition...

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Petitioner warned his counsel, Mr. Bano, that the Court was not gonna address the merits in the "timely filed Motion to Dismiss," filed on Feb. 12, 2018; so, prepare to Petition for writ of Prohibition. During the hearing on March 19, 2018, Mr. Bano was not allowed to argue the merits, the hearing lasted exactly one-minute. See (App. B, Ground Three in Motion)

(b) If you did not exhaust your state remedies on Ground Four, explain why: N/A
N/A
N/A
N/A
N/A

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: Ineffective Assistance of Counsel issue....

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: IAC: Rule

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed: The Fifth Judicial Circuit of Florida

Docket or case number (if you know): 2016-CF-2869

Date of the court's decision: March 18, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, Order of denial)

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☑ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Florida Court of Appeal, Fifth District

Docket or case number (if you know): 5D 22-1263

Date of the court's decision: August 9, 2022

Result (attach a copy of the court's opinion or order, if available): (App. A, per curiam affirmed)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A
N/A
N/A
N/A
N/A
N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: N/A

N/A
N/A
N/A
N/A
N/A

AO 241 (Rev. 09/17)

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☑ Yes ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: N/A

N/A

N/A

N/A

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

N/A

N/A

N/A

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? ☐ Yes ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. N/A

N/A

N/A

N/A

N/A

N/A

N/A

N/A

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? ☑ Yes ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. 1) Third Judicial circuit, Madison County Florida; 2) No case number yet; 3) Emergency Petition For Writ of Habeas corpus; 4) Petitioner was confined under and by the color of authority of the U.S.; as a consequence, unlawfully confined to Florida D.O.C.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Eneid Bano, Esq., 282 Wilshire Blvd., Suite 209, Casselberry Florida 32707-5349

(b) At arraignment and plea: The Petitioner was not present, and had no counsel to represent him before the court.

(c) At trial: Eneid Bano, Esq.

(d) At sentencing: Eneid Bano, Esq.

(e) On appeal: Deana Marshall, P.A. P.O. Box 1058 Riverview, FL 33568

(f) In any post-conviction proceeding: N/A N/A

(g) On appeal from any ruling against you in a post-conviction proceeding: N/A N/A N/A

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ☐ Yes ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

N/A

N/A

(b) Give the date the other sentence was imposed: N/A

(c) Give the length of the other sentence: N/A

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? ☑ Yes ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: Vacate Petitioner's illegal judgment and sentence order, and without delay-discharge Petitioner from his unlawful commitment.

or any other relief to which petitioner may be entitled.

N/A

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on 4-21-23 (month, date, year).

Executed (signed) on 4-21-23 (date).

John Moore

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

# Attachment – A

Attachment - A

GROUND FIVE: IAC: Petitioner's counsel was ineffective in failing to object to the forged documents: "the false arrest affidavit and warrant."

(a) Supporting facts:

On December 1, 2017, in the Adversary Preliminary Hearing, Detective Todd (photo lineup administrator), testified and conceded to forging his name (signature) on several lines in this "unsworn arrest affidavit," that states: "SWORN to and SUBSCRIBED before me." But Todd conceded to not placing Detective Steckman under oath when Steckman signed as the so-called affiant. Moreover, in this same hearing, Detective Steckman also testified and conceded to not taken oath to the truthfulness of the alleged affidavit; then admitted to being the draftsman of the "arrest warrant," and falsely claimed that he sent the warrant via email to Judge Herndon. See (App. B, Ground One in Motion).

Direct Appeal of Ground Five:

(1) If you appealed from the judgment of conviction, did you raise this issue? A: No.

(2) If you did not raise this issue in your direct appeal, explain why: ineffective assistance of counsel issue...

Post-Conviction Proceedings:

(1) Did you raise this issue through a

post-conviction motion or petition for habeas corpus in a state trial court?
A: Yes.
Type of motion: IAC: Rule 3.850 Motion.
Name and location where the motion was filed: "The Fifth Judicial Circuit of Florida."
Case number: 2016-CF-2869
Date of the court's decision: March 18, 2022.
Result: (App. A, order of denial)
Did you appeal from the denial of your motion? A: Yes.
Name and location of the court where the appeal was filed: Florid Court of Appeal, Fifth District.
Case number: 5D 22-1263
Date of the court's decision: August 9, 2022.
Result: (App. A, per curiam affirmed).

GROUND SIX: IAC: The appellat Court abused its discretion in denying Petitioner's Motions to Supplement an incomplete record on appeal.

(a) Supporting facts:

On May 26, 2022, the clerk of the lower tribunal transmitted his certificate, certifying that he put forth a "complete" transcript of the lower court proceedings in and "inclusion of all such original papers and proceedings in said cause," to the Clerk of the Court for the Fifth District Court of Appeal. However, upon receipt and inspection of the record, the Petitioner discovered that 20 pages (1, 3, 4, 11-16, 23-26, 29, 38, 40-44) was missing from the 47 page Postconviction Motion, and 127 pages from 200 pages of exhibits. See (App. B, Second Amended Motion for Postconviction Relief).

On July 11, 2022, the Petitioner filed a timely Motion to Supplement the Record (the Second Amended Motion for Postconvict Relief);

On July 19, 2022, the appellate court issued an order denying Petitioner Motion to Supplement the Record by asserting that it had a complete copy of the Second Amended Motion for Postconviction Relief.

However, on July 26, 2022, the appellate Court ordered the lower court to file a "Supplemental Record on Appeal" that contains a complete copy of the October 22, 2021, Second Amended Motion for Postconviction Relief, because it was maliciously disassembled (incomplete);
On July 26, 2022, the lower court failed to comply with the appellate court's order by transmitting another incomplete record.
On August 8, 2022 (Mailbox date), the Petitioner filed a Second Motion to Supplement the Record.
On August 9, 2022, the appellate court made a ruling on an incomplete record by per curiam affirming the lower court order of denial of Petitioner's "Second Amended Motion for Postconviction Relief.
On August 16, 2022, the appellate court denied Petitioner's Second Motion to Supplement the Record.
DIRECT APPEAL of GROUND SIX:
(1) If you appealed from the judgment of conviction, did you raise this issue?
A: NO.
(2) If you did not raise this issue in your direct appeal, explain why:
It was an appellate court error...

# Attachment – B

**GROUNDS RAISED ON APPEAL:**

1.) The lower court erred in Denying Petitioner's Motion to Suppress the unduly suggestive identification, which was obtained in contravention of the due process clause in the Fourteenth Amendment.

2.) The lower court erred in denying Petitioner's Motion to Dismiss the information, in contravention of the Fourth and Fourteenth Amendments.

3.) The lower court erred in denying Petitioner's Motion for Judgment of Acquittal when the state's evidence was insufficient to support the convictions and based on the State's failure to rebut Petitioner's reasonable hypothesis of innocence.

4.) The lower court erred in allowing the State to use the cross-exam of Petitioner to repeatedly comment on Petitioner's right to remain silent, in violation of Petitioner's Fifth and Fourteenth Amendment Rights, which constitutes a Fundamental Error.

5.) The lower court erred in allowing the State to make IMPROPER comments during closing argument, which deprived Petitioner of Due Process under the Fourteenth Amendment to the Constitution, and which Constitutes Fundamental Error. [1 of 2]

6.) The lower court abused its discretion in granting the State's Motion in Limine to exclude a 911 call, which was admissible as an exception to the hearsay rule, and which denied Petitioner Due Process under the Fourteenth Amendment.

7.) The lower court abused its discretion in allowing the State to introduce Petitioner's Extradition Documents, which was unduly prejudicial and denied Petitioner Due Process under the Fourteenth Amendment.

8.) The lower court abused its discretion in denying the Motion for Mistrial when a witness violated a court order, which denied Petitioner Due Process under the Fourteenth Amendment.

9.) The lower court abused its discretion in restricting cross-exam of the Lead Detective as impeachment of the State's key witness, which denied Petitioner Due Process under the Fourteenth Amendment.

10.) The lower court abused its discretion in denying the admission of testimony regarding the reason Mr. Boone went to Petitioner's house to impeach Mr. Boone and Demonstrate his bias and motive, which denied Petitioner Due process under the Fourteenth Amendment.

[2 of 2]

# APPENDIX A

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF FILED

JOHN ANTHONY MOORE,

Appellant,

v.

Case No. 5D22-1263
LT Case No. 2016-CF-002869-AX

STATE OF FLORIDA,

Appellee.

_________________________________/

Decision filed August 9, 2022

3.850 Appeal from the Circuit Court
for Marion County,
Robert W. Hodges, Judge.

John A. Moore, Madison, pro se.

Ashley Moody, Attorney General, Tallahassee, and Bonnie Jean Parrish, Assistant Attorney General, Daytona Beach, for Appellee.

PER CURIAM.

AFFIRMED.

WALLIS, EDWARDS and HARRIS, JJ., concur.

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT IN
AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA,

vs. CASE NO.: 2016-CF-2869

JOHN ANTHONY MOORE, JR.,
Defendant.
_______________________/

**ORDER DENYING DEFENDANT'S SECOND AMENDED MOTION FOR POSTCONVICTION RELIEF AND AMENDED GROUND TWO OF DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF**

**THIS CAUSE** is before the Court on Defendant's *pro se* "Second Amended Motion for Postconviction Relief," filed on October 22, 2021. On February 1, 2022, Defendant filed an Amended Ground Two of Defendant's Amended Motion for Postconviction Relief. The Court considered Defendant's Motion and Amendment, the court file, and being otherwise duly advised, finds as follows:

Defendant was charged, by Second Amended Information, with murder in the second degree with a firearm (Count I), attempted second degree murder with a firearm - possible discharge (Count II), and possession of a firearm by felon (Count III). *See, Exhibit A, Second Amended Information.* On July 20, 2018, Defendant proceeded to a jury trial on Counts I and II and the jury found Defendant guilty as charged. *See, Exhibit B, Verdicts.* On August 14, 2018, the Court, through predecessor Judge, Honorable Steven Rogers, adjudicated Defendant guilty with respect to Counts I and II. *See, Exhibit C, Judgment.* The Court sentenced Defendant to a term of imprisonment with the Department of Corrections for a term of natural life for Count I and 30 years for Count II. *See, Exhibit D, Sentence and Special Provisions.* On August 17, 2018, the State filed a *Nolle Prosequi* for Count III. *See, Exhibit E, Nolle Prosequi.* Defendant appealed his

judgment and sentence and the Fifth District Court of Appeal *per curiam* affirmed Defendant's judgment and sentence. *Moore v. State*, 294 So. 3d 318 (Fla. 5th DCA 2020)(Table).

On March 12, 2019, Defendant filed a Motion to Correct Sentencing Error, and the Court granted said motion and amended Defendant's sentence to reflect $100 for the cost of prosecution and $100 for the cost of attorney services. *See, Exhibit F, Order Granting Motion to Correct Sentencing Error.*

As background, on June 8, 2021, Defendant filed a Motion for Postconviction Relief, and the Court filed an Order to Respond directed to the State. Prior to the State responding to said Order, Defendant filed a Motion for Leave to File Amended Motion for Postconviction Relief. On August 5, 2021, the Court vacated the Order to Respond and granted Defendant's Motion for Leave to Amend. On August 26, 2021, Defendant filed an Amended Motion for Postconviction Relief. The Court entered an Order striking the Motion, with leave to amend, because the Motion exceeded the 50-page limit as allowed pursuant to Florida Rules of Criminal Procedure Rule 3.850(d). *See, Exhibit G, Order Striking Defendant's Amended Motion for Postconviction Relief.*

In the Second Amended Motion for Postconviction Relief (hereinafter Second Amended Motion), Defendant raises four grounds for relief. Said grounds are numbered one, three, four, and five. The Court will note the Second Amended Motion contains a "Summary of Claims" that list a ground two, but Defendant fails to argue ground two anywhere within said Motion. Therefore, the Court did not address ground two in the Order entered on December 3, 2021. The Court will now address ground two as argued

in Defendant's Amended Ground Two of Defendant's Amended Motion for Postconviction Relief (hereinafter Amendment).

Florida law establishes claims of ineffective assistance of counsel are reviewed under the standard of review set forth in *Strickland*[1]. In *Strickland*, the Court established a two-pronged standard for determining whether counsel provided legally ineffective assistance. A Defendant must point to specific acts or omissions of counsel that are "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. Second, Defendant must establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* The court "must indulge a strong presumption that counsel's conduct fell within the range of reasonable professional assistance." *Id.*

Defendant bears the burden of satisfying both the performance and prejudice prongs, and ultimately must show a reasonable probability that, but for counsel's errors, Defendant would not have been found guilty at trial. *Id.* Defendant must establish a prima facie case of ineffective assistance of counsel based upon a legally valid claim; mere conclusory allegations are insufficient to meet this burden. *See Kennedy v. State*, 547 So. 2d 912, 913(Fla. 1989).

*Ground One*

In ground one, Defendant claims a *Cronic*[2] violation. Defendant asserts his trial court counsel, Mr. Eneid Bano, Jr. (hereinafter Mr. Bano), failed to object to the Arrest-

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).
[2] *United States v. Cronic*, 466 U.S. 648 (1984).

Warrant Affidavit and Warrant (hereinafter Documents). Defendant asserts the Documents were forged and Mr. Bano should have objected thereto. According to Defendant, Mr. Bano's lack of objection created a *Cronic* per se violation. And Defendant asserts, under *Strickland,* Mr. Bano's inaction demonstrates his ineffectiveness and thus Defendant was prejudiced.

Defendant fails to put forth such an error by Mr. Bano that would have undermined the confidence of the case to the extent that the outcome would have been different. Thus, ground one of Defendant's Second Amended Motion remains facially insufficient.

In arguendo, if the Court were to view Defendant's claim under *Cronic*, the claim would still be denied. In *Chavez v. State*, 12 So.3d 199, 212 (Fla. 2009), the Supreme Court stated a *Cronic* violation is an exception to *Strickland.*

> The *Cronic* standard of per se prejudice, as element of ineffective assistance of counsel, is reserved for situations where the assistance of counsel has been denied entirely or withheld during a critical stage of the proceeding such that the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.

*Crain v. State*, 78 SO. 3d 1025, 1042 n.11 (2011)(*quoting Chavez v. State*, 12 So. 3d 199, 212 (Fla. 2009). Upon review of the record, the Court has set forth evidence herein that demonstrates Defendant was neither denied the assistance of counsel during a critical stage of the proceedings nor was counsel so ineffective as to warrant a *Cronic* per se violation. The Court finds Mr. Bano's performance does not rise to the level of a *Cronic* per se violation or as ineffective assistance of counsel under *Strickland.*

Ground one is denied.

*Ground Two*

In ground two, Defendant claims another *Cronic* per se violation.    More specifically, Defendant asserts he was without representation at his arraignment because Attorney Frances Ann Mouton Watson (hereinafter Ms. Watson) presented to the Court a conflict of interest prior to arraignment.  On November 6, 2016, Ms. Watson filed a Notice of Appearance and Defendant's Plea. *See, Exhibit H, Defendant's Plea.*  Said Plea "waives appearance at arraignment and upon receipt of a copy of the formal charges, enters a plea of NOT GUILTY, waives reading of the charge, and demands a jury trial." *Id.*  On November 28, 2016, Ms. Watson filed a Motion to Withdraw as Counsel due to conflict.  Said Motion to Withdraw as Counsel was filed after the waiver to arraignment.

On December 5, 2016, an Information was filed.  Defendant further claims the filing of the Information after the plea of not guilty invalidates the Plea filed by Ms. Watson. Defendant also alleges the Court lack jurisdiction to accept a plea if formal charges have not been filed.  The Plea filed effectively waives the reading or statement of charges and states that once formal charges are filed Defendant pleads not guilty.

The Court reviewed the Court Minutes, for the alleged arraignment, which states an Arraignment transpired on December 6, 2016, in front of the Honorable Anthony Tatti. *See, Exhibit J, Court Minutes dated December 6, 2016.*  That said, the Court could not locate a Blue Man Recording of the arraignment and will acknowledge irregularities within the Court Minutes.  The Court Minutes do not show a State Attorney was present and lacks the signature of the Deputy Clerk.  Whether arraignment took place on December 6, 2016, or not, Defendant had counsel in all critical proceedings because Ms. Watson waived arraignment prior to the Motion to Withdraw Counsel.  Moreover, Mr. Bano filed a

Waiver of Arraignment and entered a plea of not guilty on January 1, 2017, which is after the Information was filed. *See, Exhibit I, Notice of Appearance/Waiver of Arraignment/Plea of Not Guilty and Request for Jury trial/Demand for Discovery/Request for Copy of Charges. See* Rule 3.160(b), Fla. R. Crim. P. ("Neither a failure to arraign nor an irregularity in the arraignment shall affect the validity of any proceeding in the cause if the defendant pleads to the indictment or information on which the defendant is to be tried or proceeds to trial without objection to such failure or irregularity."). The Court will note Defendant filed a Motion to Dismiss which states the irregularities of the arraignment along with other issues. After a hearing on the Motion to Dismiss, the Court entered an Order denying said Motion.

The Court finds the Court maintained jurisdiction and a *Cronic* per se violation is not present. Ground two of Defendant's Amendment is denied.

*Ground Three*

In ground three, Defendant claims Mr. Bano provided ineffective assistance of counsel because he failed to file a Writ of Prohibition. Said Writ was to address the Court's lacked subject matter jurisdiction to proceed in this case. According to Defendant, "Detective Stedman (lead detective), the author of the arrest-warrant affidavit, testified under oath that he drafted the arrest-warrant affidavit without taking an oath before any judge or any person authorized to administer oaths." *See, Exhibit K, Second Amended Motion for Postconviction Relief.* Attached to Defendant's Second Amended Motion is Exhibit L, a letter from Mr. Bano to Defendant (hereinafter Letter). *Id.* In said Letter Mr. Bano states, "I have received and reviewed your letter about the writ of prohibition, and I do not find the filing of a writ of prohibition with the DCA to be

appropriate in here as there is no good faith basis to pursue it." *Id.* The Court finds Mr. Bano's performance was not deficient. *See Schoenwetter v. State*, 46 So. 3d 535 (Fla. 2010) ("Counsel cannot be deemed ineffective for failing to make a meritless argument."). And Defendant failed to demonstrate how he was prejudiced. Ground three lacks merit and is denied.

*Ground Four*

In ground four, Defendant asserts Mr. Bano was ineffective because he failed to file for a Franks hearing after Defendant informed Mr. Bano that the "arrest-warrant affidavit contained false and misleading information." *See, Exhibit K, Second Amended Motion for Postconviction Relief.* Defendant contends Detective Steckman's statements in the arrest affidavit contained falsehoods and such falsehoods were to cover up a fabricated interview of the victim. Defendant is, once again, attacking the arrest affidavit and probable cause.

A challenge of the probable cause affidavit should have been raised on direct appeal. *See Johnson v. State*, 660 So. 2d 648 (Fla. 1995). Even if this "issue" was properly raised before this Court, the allegation contains no merit. Unlike the burdens of proof in a criminal trial, the obligation to establish probable cause in an affidavit may be met by hearsay, by fleeting observations, or by tips received from unnamed reliable informants whose identities often may not lawfully be disclosed, *Franks v. Delaware*, 438 U.S. 154 (1978), among other reasons. *Johnson*, 660 So. 2d at 654.

In arguendo, Florida law establishes,

> [t]o establish that counsel's performance was deficient, the defendant must sufficiently allege both prongs of the Franks test: (1) that the officer misstated the information knowingly and intentionally, or with a reckless disregard for the truth, rather than through mere negligence or an innocent

> mistake; and (2) that "the remaining allegations are insufficient to support a probable cause finding."

*Conley v. State*, 226 So. 3d 358 (Fla. 2nd DCA 2017)(*quoting State v. Petroni*, 123 So. 3d 62, 64, (Fla. 1st DCA 2013)). On December 8, 2017, an Adversarial Preliminary Hearing transpired. *See, Exhibit L, Transcript of Adversarial Preliminary Hearing.* After hearing testimony and arguments, the Court held probable cause existed. *Id.*, at 59.

Moreover, in the Letter, Mr. Bano states he could not in good faith move for a Franks hearing and thoroughly outlines why such a motion would be deemed frivolous. *Id.* The Court finds Mr. Bano's representation was not ineffective for failing to move for a Franks hearing. *See Schoenwetter v. State*, 46 So. 3d 535 (Fla. 2010) ("Counsel cannot be deemed ineffective for failing to make a meritless argument."). Defendant has failed to demonstrate how he was prejudiced or how Mr. Bano was deficient. Ground four lacks merit and is denied.

*Ground Five*

In ground five, Defendant asserts a *Giglio*[3] violation. Defendant contends Assistant State Attorneys Rebecca Fletcher (hereinafter Ms. Fletcher) and Nicole Munroe knowingly allowed false testimony. Defendant claims Detectives Buchbinder, Steckman, and Todd testified they knew Defendant's legal name and/or nickname prior to Defendant's involvement in the instant action. According to Defendant, such testimony is false because Defendant was imprisoned by the Federal Government until 2014. The Court will note Defendant asserts he was incarcerated until 2014, the incident at issue transpired on or about October 17, 2016, thus there was sufficient time for law enforcement officers to become familiar with Defendant.

---

[3] *Giglio v. U.S.*, 405 U.S. 150 (1972).

As for Defendant's claim of prosecutorial misconduct, such claims are procedurally barred except for *Giglio* violations. *See Routly v. State*, 590 So. 2d 397 (Fla. 1991) ("In raising a *Giglio v. United States*, 405 U.S. 150 (1972) claim, a defendant must show: (1) the testimony was false; (2) the prosecutor knew the testimony was false; and (3) the testimony was material."). In the Letter, Mr. Bano explains

> [i]n your case, the first Judge found probable cause and then after the lengthy adversary preliminary hearing we had the Judge again found probable cause. We have no proof of any deliberate falsehood on the part of the officers. We may have inconsistent statements on their part and we can point all that out to the jury when we go to trial. Even if we were to allege that they are made in reckless disregard for the truth and the Judge were to see it that way, the State still has the statement of Keith Boone saying you shot and killed his cousin and you shot him.

*See, Exhibit K, Second Amended Motion for Postconviction Relief, Exhibit L.* Furthermore, Mr. Bano filed a Motion to Suppress which addressed Defendant's claims herein. *See, Exhibit M, Motion to Suppress.* At the hearing on said Motion, law enforcement officers Steckman and Todd addressed said claims. *See, Exhibit N, Transcript of Motion to Suppress.* The Court reviewed the transcript of the trial, the transcript of the Motion to Suppress hearing, and the Letter. The Court finds Defendant has failed to establish a *Giglio* violation.

Additionally, Defendant's claim that Assistant District Attorney Ms. Fletcher made false statements in her closing argument. The Court instructed the jurors that statements made by attorneys during closing arguments are not evidence or instructions on the law. *See, Exhibit O, Transcript of Jury Trial*, Volume 2, at 752-753; *see also Jenkins v. State*, 189 So. 3d 866,870 (Fla. 4th DCA 2015)(*explaining that the statements of counsel during opening and closing arguments are not evidence*).

Ground five of Defendant's Second Amended Motion lacks merit and is denied.

Based on the foregoing, it is

**ORDERED:**

Defendant's *pro se* Amended Motion for Postconviction Relief and Amended Ground Two of Defendant's Amended Motion for Postconviction Relief are **DENIED**. Defendant may appeal this decision, in the manner permitted under Florida law, within thirty (30) days of rendition of this Order.

**ORDERED** in Ocala, Florida, on this 18th day of March 2022.

ROBERT W. HODGES
Circuit Judge

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true copy of the foregoing has been furnished to the following individuals by U.S. Mail/Florida Court's e-portal this 21 day of November 2022.

John Anthony Moore, Jr.
DC# U00034
Madison Correctional Institution
382 Southwest MCI Way
Madison, FL 32340-4430

Office of the State Attorney
eservicemarion@sao5.org

Judicial Assistant

# APPENDIX B

**IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA**

**STATE OF FLORIDA,**

Case No.: **2016-CF-002869A**
UCN: 422016CF002869AXXX

v.

Provided to Madison C.I. on 10-15-21 for mailing by [initials] SM
Date Initials

**JOHN ANTHONY MOORE,**
*Defendant*
_______________________________________/

**SECOND AMENDED MOTION FOR POSTCONVICTION RELIEF**

**COMES NOW**, the Defendant, **John Anthony Moore**, pursuant to Rule 3.850, Fla. R. Crim. P. (2020), and respectfully moves this Honorable Court to grant any and all postconviction relief to which he may be entitled, including but not limited to a new trial upon the issuance of an order from this Court vacating and setting aside the judgment and sentence that is being collaterally attacked herein.

Furthermore, in the absence of record evidence conclusively refuting Defendant's claims herein, he moves this Court for an evidentiary hearing and requests appointment of postconviction counsel so that he may fully and fairly litigate his claims and present evidence and testimony in support of the relief requested.

The Defendant timely files this postconviction motion in good faith and with a reasonable belief that his claims have merit, are facially and legally sufficient, and have not been previously raised outside of this proceeding.

**PRELIMINARY STATEMENT**

Notice is given pursuant to § 90.202, Fla. Stat. (2019), that the grounds for relief submitted in the instant motion present federal constitutional claims alleging violations of Defendant's due process right to a fair trial and to effective assistance of counsel, as guaranteed in the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

The instant motion has been prepared by the Defendant whom is a layman of the law with the assistance of an inmate law clerk. Therefore, should the State fault the present motion in any respect, the Defendant humbly seeks the Court's indulgence in viewing the instant motion under less stringent standards than formal pleadings drafted by trained attorneys. See *Code v. Montgomery*, 725 F.2d 1316 (11th Cir. 1984); see also *Green v. United States*, 260 F.3d 78, 83 (C.A. 2 (N.Y.) 2001) (holding that *pro se* complaints are "h[e]ld to less stringent standards than formal pleadings drafted by lawyers"). Therefore, should this Court find any pleading deficiency in the instant motion, the Defendant respectfully requests that he be given a fair opportunity to cure such deficiency in good faith pursuant to Fla. R. Crim. P. 3.850(f)(2); *Spera v State*, 971 So.2d 754 (Fla.2007).

Additionally, the Defendant gives notice that he may subsequently expand the Grounds/Claims in this motion with additional facts and/or applicable law which relate back to the original Grounds/Claims presented herein. See *Lanier v. State*, 826 So.2d 460 (Fla. 1st DCA 2013); *Surinach v. State*, 110 So.3d 95 (Fla. 2d DCA 2013); *Cooper v. State*, 126 So.3d 439 (Fla. 4th DCA 2013).

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit – A | First Adversary Preliminary Hearing (12/01/2017) (APH-I) |
| Exhibit – B | Portions of Trial Transcripts (TT) |
| Exhibit – C | Deposition (4/7/2017) |
| Exhibit – D | Arrest Warrant Affidavit (10/21/2016); Warrant (10/21/2016); and Supplemental Report by Det. Steckman (1/23/2017) |
| Exhibit – E | Order Appointing Public Defender (11/4/2016); Defendant's Would've been Plea of Not Guilty (11/10/2016); and Notice of Appearance (11/10/2016) |
| Exhibit – F | Motion to Withdraw as Counsel (11/28/2016); and Ordering Substituting Counsel (12/6/2016) |
| Exhibit – G | Court Minutes (12/6/2016) |
| Exhibit – H | Motion to Withdraw by Regional Counsel (12/6/2016) |
| Exhibit – I | Order Allowing Regional Counsel to Withdraw (12/8/2016); and Notice of Appearance by Mr. Bano (1/1/2017) |
| Exhibit – J | Motion to Dismiss (2/12/2018) |
| Exhibit – K | Order Denying Defendant's Motion to Dismiss the Information (3/26/2018) |
| Exhibit – L | Mr. Bano's Letter (4/18/2018); and Nelson Hearing Motion (10/30/2017) |
| Exhibit – M | First Appearance Findings and Orders (11/4/2016); and CAD Report |
| Exhibit – N | Sgt. Buchbinder's Report (11/4/2016); and Captain Sorolli's Report |
| Exhibit – O | Photos; and Court Docket |

**PROCEDURAL BACKGROUND**

By Information dated December 6, 2016, the Defendant was charged with one count of Second Degree Murder with a Firearm – F.S. §§ 782.04(2); 775.087 (Count-1); one count of Attempted Second Degree Murder – F.S. § 782.04(2) (Count-2); and one count of Possession of a Firearm by a Convicted Felon – F.S. § 790.23 (Count-3). The original Information was amended on April 10, 2017, and again on May 10, 2017, with Counts 1 and 2 remaining unchanged, and Count-3 being severed for trial.

The Defendant pled not guilty and proceeded to a jury trial. He has adamantly maintained his innocence on all charges against him, and of any involvement in the shootings whatsoever since day one. As evidence of his steadfast insistence on his actual innocence, Defendant declined a plea offer made by the State just before the *voir dire* of the jury at the commencement of trial, which involved a 10-year sentence in exchange for a guilty plea.

On July 20, 2018, after five days of trial, the jury returned verdicts of guilty as to counts 1 and 2, with special findings that Defendant possessed and discharged a firearm resulting in the death of Davis, and great bodily harm to Boone.

On August 14, 2018, the Defendant was sentenced pursuant to the PRR statute (§ 775.082(9), Fla. Stat.) to Life in prison for Count-1, and to 30 years in prison for Count-2. The court ordered that Count-2 be served concurrent with Count-1. Subsequently, the State *nolle prossed* Count-3.

The Defendant timely appealed his judgment and sentence to the Fifth District Court of Appeal under case number 5D18-2946.

On April 28, 2020, the Fifth District *per curiam* affirmed the judgment and sentence without a written opinion on the merits. See *Moore v. State*, 294 So.3d 318 (Fla. 5th DCA 2020). The Mandate issued on May 22, 2020.

On January 22, 2021, the Defendant filed a habeas corpus petition alleging ineffective assistance of appellate counsel under Rule 9.141(d), Fla. R. App. P. (Fifth DCA case number 5D18-2946). The claims raised in the habeas petition relate to those herein only so far as they allege trial court error in failing to discharge trial counsel for his ineffectiveness, which is evident on the face of the record, and are also the subject of the claims presented herein.

The Defendant has no other postconviction motions or petitions in connection with this matter in any other state or federal courts.

## STATEMENT OF THE CASE AND FACTS

The State's evidence in this case consisted primarily, if not exclusively, upon the testimony of one witness (Keith Boone), who alleged he was shot by the Defendant on October 17, 2016, in Ocala, Florida, during a shooting where another person (Jordan Davis) was likewise shot. Mr. Davis did not survive.

Significantly, the State, in fact, fully conceded that their case rested upon Mr. Boone's testimony, and admitted as much to the jury during closing argument by stating that indeed there would be no trial without Mr. Boone (**Exhibit – B**, TT 837).

What the State was not willing to concede, and would seek to deny throughout the proceedings, is the evidence clearly indicating that both victims were in fact shot in a drive-by shooting in which Defendant was not involved and which was not only reported by numerous witnesses immediately after the shooting but was also supported by the evidence from the crime scene itself.

Furthermore, it is uncontested that it was not until a second visit by law enforcement to Boone as he recuperated in the hospital that Defendant was identified as a suspect in the shootings; and that it was law enforcement, and not Boone, who first raised Defendant's name as the perpetrator in a suggestive and illicit manner tailored to Boone's fears, and personal jeopardy, at the time (**Exhibit – B,** TT 337-339). At that point, and since that point, Boone maintained that it was Defendant who shot him and Mr. Davis.

That conversation, according to Boone, occurred at the same "initial" meeting where law enforcement discussed not only Boone's extensive prior record (7 felonies), but also serious charges which Boone had pending against him at the time, including lying to police (**Exhibit – B**, TT 70, 130).

While Boone would proclaim, on cross-examination, that he had "no deals" with the State for his testimony, he nonetheless conceded that he had in fact instructed his attorney to meet with the State attorney (Mr. Hunt), to discuss a deal for his pending charges (**Exhibit – B**, TT 70-71). Boone, was facing 15 years in prison, and despite his extensive criminal history, would receive no jail time, serving only a short period of probation for his pending crimes (**Exhibit – B**, TT 129-130).

Although the State would dispute it as coincidence, from that second visit with Boone forward and with the purported "non-deal" in hand for Boone's testimony, Defendant would remain the exclusive suspect in the shootings and the State would mount an almost fanatic, though transparent and flawed effort to keep any evidence of, or even any remote reference to a drive-by shooting from the ears and eyes of the jury.

Instead, the State's case, as presented by its only eyewitness/victim (Boone) was simple: Boone and Davis were standing on or near the front porch of the Defendant's mother's home when Defendant approached and then, without words, reason, or provocation – and directly in front of Defendant's mother, sister and friends sitting on the porch, shot Davis and then calmly shot Boone. The three of them were, by all accounts, not only friends for years (and in the case of Boone, distantly related to Defendant) but had no known or apparent reason, at that time or otherwise, to have a grudge against each other either recent or in the past. In fact, the State conceded in its closing that it simply could not discern any motive whatsoever for Defendant to have shot the victims (**Exhibit – B**, TT 786).

The picture the State painted, therefore, through Boone's testimony, was one in which the 3 participants were standing in close proximity near or on the front porch when Defendant calmly and quietly shot one and then the other. The physical evidence, however, was quite different, and was supported by witness testimony which, as will be demonstrated herein, was either ignored or intentionally discarded by law enforcement; or was left behind by counsel's negligent failures to investigate, develop and present expert and other testimony which was known, available and obvious, and would easily have rebutted the State's case.

From a shooting where the State argued as stationary and occurring with the participants "standing a couple of feet away" from each other (**Exhibit – B**, TT 831), even its own witnesses couldn't buy into the State's theory:

(1) The State M.E. concluded that the victims where "shot from a distance" (**Exhibit – B,** TT 775);

(2) Numerous members of law enforcement including Sgt. Buchbinder (in charge of the investigation), and Det. Steckman (lead detective) overheard or were told by witnesses (including police dispatchers fielding 9-1-1 calls) within minutes of the shooting that it was a "drive-by" involving a "maroon Impala;" also provided by law enforcement was the following key information about the incident:

   (a) The shooter(s) and victims were "all moving" as shots were fired (**Exhibit – B**, TT 199, 385) (Steckman and Buchbinder);

   (b) The shots were fired "from all different directions" and from "a hundred different angles" (**Exhibit – B**, TT 203-204 (Buchbinder);

   (c) The chief investigator admitted that he could not tell "how many weapons were used" (**Exhibit – B**, TT 205) (Buchbinder);

   (d) Boone was "shot from behind" (**Exhibit – B**, TT 154) (Lt. Somer);

(3) Shell casings and bullet holes were literally scattered all about (and beyond) the crime scene. At least 9 shell casings were found on the side of the home. At least 8 bullet holes were found lodged in a house across the street. At least 3 bullet holes were found in vehicles parked on the side of the home.

(4) There were, in addition, 4 other bullets in one victim (Davis), and 2 in Boone.

In short, the State's theory of 3 stationary actors involved in an inexplicable and close proximity shooting by Defendant – where he literally would have been in a position to graze the noses of his beloved mother, sister and others sitting quietly in chairs on the porch – is almost laughable, were its consequences at trial not so tragic for the Defendant. That such evidence and testimony would, in turn, originate from and ultimately rest upon the statement by an alleged victim which was elicited, suggested and directed by law enforcement in what can only be termed a shady interrogation, makes Defendant's conviction even more tragic.

The Defendant challenged the suggestive tactics of Sgt. Steckman in obtaining Boone's statement that it was the Defendant who was the shooter. A motion to suppress was filed and a hearing held on March 19, 2018.

As stated, the Defendant maintained and continues to maintain that Boone was, as Mr. Rush testified, "caught in a crossfire" during the drive-by shooting.

The fact is Boone was not originally intending to name the Defendant as the shooter until Sgt. Steckman threatened him with complicity in the shootings, and with incarceration for serious charges which, at the time, Boone had pending against him. At that point, Steckman, admittedly suggested the name "Squirrel" to Boone, and Boone then jumped at the obvious opportunity to absolve himself of the shooting, and get a deal to reduce his pending charges to boot.

Thereafter, and also an issue raised in the suppression hearing, was the fact that Defendant's arrest warrant was not supported by the sworn testimony of Sgt. Steckman and another detective (Todd). Since the facts in the Probable Cause Affidavit also included the suggestive tactics of Sgt. Steckman in obtaining Boone's statements inculpating the Defendant, and was the primary – if not exclusive – evidence against him, Defendant alleged that it was no coincidence that Sgt. Steckman would not swear to those facts.

To compound matters – and contributing to Defendant's convictions in no small measure – was counsel's all but complete ineffectiveness in exploiting the many holes in the State's case and presenting testimony, both direct and rebuttal, towards an obvious theory of defense. Despite two *Nelson* hearings and countless disparagement by the court, counsel remained as defense counsel throughout the proceedings.

It is counsel's failure to investigate, prepare and present available evidence and testimony that would have severely undermined the State's "flawed" evidence regarding the crime scene, those investigating it, and Boone's "testimony" which form the basis of the instant motion.

## SUMMARY OF CLAIMS

The claims raised by Defendant in the instant motion are premised upon constitutional violations of his right to effective assistance of counsel, which in turn resulted in violations of Defendant's due process right to a fair trial, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, as follows:

(1) Trial counsel's failure to object to the forged documents: arrest-warrant affidavit, and warrant, amounted to ineffective assistance of counsel, falling below an objective standard of reasonableness in the circumstances, in violation of Defendant's Fourth, Fifth, Sixth, and Fourteenth Amendment rights to the United States Constitution.

(2) Trial counsel's failure to object to the *Cronic* violation, where Defendant was completely deprived of his Sixth Amendment right to counsel, during arraignment, amounted to ineffective assistance of counsel, falling below an objective standard of reasonableness, in the circumstances, in violation of Defendant's Fourth, Fifth, Sixth and Fourteenth Amendment rights to the U.S. Constitution.

(3) Trial counsel's failure to timely petition for a writ of prohibition, challenging the trial court's lack of subject matter jurisdiction to proceed with the charges against Defendant, amounted to ineffective assistance of counsel, falling below an objective standard of reasonableness, in the circumstances, in violation of Defendant's Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

(4) Trial counsel's failure to file motion for Franks hearing, when there was overwhelming proof, amounted to ineffective assistance of counsel, failing below an objective standard of reasonableness in the circumstances, in violation of Defendant's Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

(5) Trial counsel's failure to object to the *Giglio/Brady* violations, when it was known to be such, amounted to ineffective assistance of counsel under the circumstances, counsel's performance fell below an objective standard of reasonableness and resulted in a violation of Defendant's Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

The Defendant believes in good faith that counsel's failures fell measurably below the standard for criminal defense attorneys; and such failures led to his conviction and sentence. As such, prejudice is evident where, absent counsel's failures, there is a reasonable probability the outcome of the proceeding would have been different.

**APPLICABLE STANDARD OF REVIEW**

***Ineffective Assistance of Counsel in General***

Generally, "[t]he benchmark for judging any claim of infectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2053 (1984).

In *Strickland*, the U.S. Supreme Court held that to determine whether counsel was ineffective a two-prong test must be applied. First, the defendant must show that counsel made errors so serious that "counsel was not functioning as the counsel guaranteed by the Sixth Amendment;" and second, even if it is established that counsel's performance was deficient, the second prong of the *Strickland* test requires the defendant to show that trial counsel's deficient performance actually resulted in "prejudice."

In order to prove prejudice, the defendant must prove that but for counsel's unprofessional errors, there is a reasonable probability the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Downs v. State*, 453 So.2d 1102, 1108 (Fla. 1984).

Notably, however, for purposes of establishing prejudice, *Strickland* does not "require a defendant to show that counsel more likely than not altered the outcome of the ...proceeding, but rather that he establish '*a probability sufficient to undermine the outcome.*'" *King v. State*, 260 So.3d 985, 994 (Fla. 2018) (internal citations / quotations omitted).

***The Need for an Evidentiary Hearing***

The Defendant is entitled to a "fair adjudication" of his case, and to a proceeding which is free from errors of counsel that "undermine confidence in the outcome of the proceeding. See *Williams v. State*, 175 So.3d 349 (Fla. 3d DCA 2015); *Halliburton v. Singletary*, 691 So.2d 466 (Fla. 1997).

Therefore, upon filing of the instant postconviction motion, the Defendant is entitled to receive an evidentiary hearing unless, (1) the motion, files, and record of the case conclusively show that the defendant is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. See Rule 3.850(f), (4), Fla. R. Crim. P. (2020).

In the event no evidentiary hearing is granted, the sworn factual allegations made by the Defendant in the instant motion for postconviction relief must be accepted as true to the extent that they are not refuted by the record. See *Freeman v. State*, 761 So.2d 1055, 1061 (Fla. 2000).

## GROUND ONE

TRIAL COUNSEL'S FAILURE TO OBJECT TO THE FORGED DOCUMENTS: ARREST-WARRANT AFFIDAVIT, AND WARRANT, AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL, FALLING BELOW AN OBJECTIVE STANDARD OF REASONABLENESS IN THE CIRCUMSTANCES, IN VIOLATION OF DEFENDANT'S FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION.

***Argument & Applicable Law***

On December 1, 2017, in the adversary preliminary hearing, Detective Todd denied signing anything other than the photo lineup admonition form until being confronted with the arrest-warrant affidavit:

**Cross Examination – by Mr. Bano:**

**QUESTION:** Okay. Are you authorized to administer oaths?

**ANSWER:** To administer the oath?

**QUESTION:** Yes. Are you authorized to administer oaths?

**ANSWER:** Yes, sir.

**QUESTION:** **Did Keith Boone or Detective Steckman swear under oath to you at any time?**

**ANSWER:** **Not under oath, they didn't swear to me, sir.**

**QUESTION:** Now, on the photo lineup, the one that was introduced by the state--Same copy--

**MR. FLETCHER:** Um-hum.

**MR. BANO:** May I approach the witness, your Honor?

**THE COURT:** Yes, sir.

**By Mr. Bano:**

**QUESTION:** Is that your signature there on the--

**ANSWER:** Yes, sir.

**QUESTION:** Okay. **Did you sign anything else besides that document in this case?**
(**Exhibit-A**, APH - 1 p.63 (emphasis supplied))

| | |
|---|---|
| **ANSWER:** | **No, sir.** |
| **MR. BANO:** | Your Honor, may I approach the witness? |
| **THE COURT:** | Yes, sir. |

**By Mr. Bano:**

| | |
|---|---|
| **QUESTION:** | I have a copy of **the probable cause report.** It's got a signature on the bottom there. Do you recognize-- |
| **ANSWER:** | **Okay. That's my signature; yes, sir.** |
| **QUESTION:** | That is your signature? |
| **ANSWER:** | That is. |
| **QUESTION:** | And at the top of it says Detective Steckman there; correct? It was Steckman? |
| **ANSWER:** | Yes, sir. |
| **QUESTION:** | Did you sign for him? |
| **ANSWER:** | No. I didn't sign for him, sir. I signed as a certified officer witnessing his signature. |
| **QUESTION:** | **Did you not put Mr.--or Detective Steckman under oath when he signed this; correct?** |
| **ANSWER:** | **Sir, I don't put anyone under oath.** (**Exhibit-A,** APH - 1 p.64 (emphasis supplied)) |

After being confronted with the arrest-warrant affidavit, Detective Todd admitted to forging his signature on an unauthorized document. See 92.50, Florida Statute (the persons authorized to administer oaths). Detective Todd, claimed he just signed as a certified officer witnessing Detective Steckman sign the warrant affidavit, but by what authorization?

Clearly, Detective Todd was not being truthful, because at the bottom of every page of the arrest-warrant affidavit directly beneath the line where Detective Todd signed his name, you'll see [Notary Public - Certified Officer] [Circle One]. Detective Todd circled neither (See **Exhibit – D**, Warrant Affidavit).

Furthermore, a certified officer on an arrest-warrant affidavit – is a certified officer of the court, not a certified police officer, as some of Ocala Police Department documents have.

Nevertheless, Detective Todd has been with the Ocala Police Department since 2003; and police officers are taught these fundamentals in the police academy. "Police officers know that an oath requires the declarant to render himself punishable for perjury for any false statements when he unequivocally attests to the truth of a statement. They know that such an act constitutes that oath-taking which is required by Florida Statutes as well as the Federal and Florida Constitutions." quoting *Moreno - Gonzalez*, 67 So.3d 1020, 1027 (Fla. 2011).

The Moreno-Gonzales's case was quoted as proof that police officers completely understand the intricacies or procedures concerning the arrest-warrant affidavit.

Therefore, Detective Todd knowingly and intentionally acted as an **imposter** by **forging** his signature on an unauthorized arrest-warrant affidavit – **impersonating** – persons authorized to administer oaths, according to Fla. Stat. 92.50(1); which rendered the arrest-warrant affidavit fraudulent: FRAUD ON THE COURT; therefore, null and void. See *Turner v. State*, 444, So.2d 974 (Fla. 3d DCA 1983); *Dobson v. State*, 434 So.2d 332(Fla. 3d DCA 1983).

**Warrant**

Detective Steckman wrote a supplemental report three months and eight days after the incident on October 17, 2016; and one month and eighteen days after the information was filed on December 6, 2016 (**Exhibit – D,** Supplemental Report).

Detective Steckman's purpose for the supplemental report was an attempt to clean up some of the falsity in the arrest-warrant affidavit, but it only placed him deeper into the quagmire.

In this report, Detective Steckman claimed: "On 10/21/16, I drafted a probable cause affidavit for the arrest of John Moore for the charges of second degree murder, attempted second degree murder, and possession of a firearm by a convicted felon. I responded to the State

Attorney's office **and a warrant was drafted**. I sent this warrant to Judge Herndon who signed it. **I then delivered the warrant to the warrants division of the Marion County Jail**" (emphasis added).

The above speaks for itself, but there are several things that made this warrant fraudulent:

(1) The arrest-warrant affidavit was forged; therefore, the ensuing warrant was forged.

(2) Also, on the face of the warrant, it falsely claimed that Detective Steckman himself took oath (**Exhibit D**, Warrant). When this was blatantly untrue, because when Detective Steckman testified under oath on December 1, 2017, in the Adversary Preliminary Hearing, he denied having taken oath before any judge or any persons authorized to administer oaths. (**Exhibit A**, APH-1 Pp. 145-146)

(3) Detective Steckman also, falsely claimed that he sent the arrest-warrant affidavit and the warrant via email to Judge Herndon, but there was no **Portal Stamp** to authenticate the fact that it was sent via email. However, even if Judge Herndon did, in fact, sign the warrant. She abandoned her judicial role because the arrest-warrant affidavit and the warrant was un-sworn. See Fla. R. Crim. P. 3.121; Florida Statutes 933.04 and 933.06.

Clearly, Detective Steckman, and the ASA Heather Atkinson conspired to effect an **illegal arrest**, and in so doing drafted a fraudulent warrant with the intent to deceive the Warrants Division at the Marion County Jail. Take notice. Detective Steckman even hand delivered the warrant to the Marion County Jail.

ASA Heather Atkinson attempted to cover up the forgery by having the clerk file a bench warrant in its stead on the official court file (**Exhibit O**, Court Docket). Clearly, this wasn't the mishap of mislabeling. There was never a bench warrant filed in the Defendant's case.

Florida courts are granddaddy on fraud on the court, which must be extrinsic fraud, deserves no protection and due process requires that every opportunity to expose fraud and obtain relief from it be given. *State v. Glover*, 564 So.2d 191,193 (Fla. 5th DCA 1990); *State v. Burton*, 314 So.2d 136 (Fla. 1975); *Booker v. State*, 503 So.2d 888 (Fla. 1987).

**Deficiency and Prejudice**

Mr. Bano's failure to object to the forged documents resulted in a pure manifest injustice. Had Mr. Bano acted as a competent attorney and had taken the necessary steps to properly address the police officers misconduct, the Defendant would not have been a victim of an illegal arrest, nor a wrongful conviction.

From the very beginning of this case, Mr. Bano knew of the officer's misconduct because the Defendant made it known to him and the record authenticates such claim. Mr. Bano had from the time it was made known to him, to address the fraud on the court, which is an issue that can be raised at any time. However, because of Mr. Bano's deficiency, the Defendant has been deprived of his liberty without due process of law.

Therefore, Defendant contends that under Strickland, he has demonstrated counsel's multiple and inexcusable deficiencies, as well as ensuing prejudice from counsel's failures. As such, the Defendant believes he is entitled to the relief requested herein.

**GROUND TWO**

TRIAL COUNSEL'S FAILURE TO OBJECT TO THE CRONIC VIOLATION, WHERE DEFENDANT WAS COMPLETELY DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL, DURING ARRAIGNMENT, AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL, FALLING BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, IN THE CIRCUMSTANCES, IN VIOLATION OF DEFENDANT'S FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE U.S. CONSTITUTION.

**Argument & Applicable Law**

On November 4, 2016, one day after Defendant's arrest, during First Appearance, Defendant requested appointment of counsel (**Exhibit – E**, Order Appointing Counsel). The Defendant does not know when Assistant Public Defender, Ms. Watson, was appointed to his case because she never mailed a notice, nor visited the Defendant. But, on November 10, 2016, the docket shows, six days after Defendant's arrest, Ms. Watson filed a waiver of appearance, and **upon receipt** of a copy of the formal charges, **enters a plea of not guilty;** *with addition to*, requesting this court to grant the Defendant ten **(10)** days from receipt of the formal charge within which to attack the sufficiency of the charge, pursuant to Fla.R.Crim.P. 3.190(c) and 3.050. See (**Exhibit – E,** Defendant's Plea).

However, before the formal charges were filed with the court, on December 6, 2016, Ms. Watson signed a motion to withdraw as counsel on November 22, 2016. But, it was not filed until November 28, 2016 which was prior to the information being filed (**Exhibit – F**). Thus, invalidating Ms. Watson's would have been plea of not guilty upon receipt of a copy of the formal charges.

(1) Until the charging document is filed with the court, the court does not have jurisdiction to try the case or accept a plea. See *Williams v. State*, 742 So.2d 496 (Fla. App. 1st DCA 1999).

(2) As it has long been recognized that a court is without jurisdiction to accept a plea to a criminal charge before a charging document is issued by the appropriate prosecuting authority. See *State v. Anderson*, 537 So.2d 1373 (Fla. 1989).

On December 6, 2016, the day of arraignment, the Defendant was completely deprived of his Sixth Amendment right to counsel during a critical stage of the criminal proceeding. Court minutes and records from December 6, 2016, revealed that Defendant was "not present" for his arraignment that day and that he had "no counsel" of record to represent him before the Court. In fact, court records reveal that on that date, his "defense attorney" was "listed" as Mr. Watson, who was obviously long gone from the case (**Exhibit – G,** Court Minutes).

Also, the Court records show that the Court's Order substituting counsel was filed after the arraignment was held on December 6, 2016. The Court appointed regional counsel on the very same day. Regional counsel did not file a notice of appearance, but immediately, responded – within hours – to the Court's Order substituting counsel by e-filing a motion to withdraw from the Defendant's case, due to a conflict of interest (**Exhibit – H**).

However, Mr. Bano was not appointed until the following day after Defendant's arraignment on December 7, 2016. But, Mr. Bano was not notified of his appointment to the case until December 23, 2016 (**Exhibit – I**).

Clearly, the Defendant was completely deprived of his Sixth Amendment right to assistance of counsel, during a "critical stage" of the criminal proceeding. See *Sardina v. State*, 168 So.2d 674 (Fla. 1964). This is a classical *Cronic violation*, and such a violation – is without the showing of prejudice.

(1) The Sixth Amendment of the United States Constitution, U.S. Const. Amend. VI, guarantees a defendant that right to be represented by counsel during a [critical stage] in the criminal proceedings. See *Chavez v. State*, 12 So.3d 199 (Fla. 2009).

(2) According to the U.S. Supreme Court, a defendant can show a Sixth Amendment violation without the need to prove prejudice when there is a complete denial of counsel at, or counsel is totally absent from, a critical stage of the proceeding. See *Cronic*, 466 U.S. at 658-59.

(3) The assistance of counsel at the arraignment is an essential of due process. This position is supported by *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L.Ed.2d 299; and

*Hamilton v. Alabama*, 368 U.S. 52, 82 S. Ct. 157, 7 L.Ed.2d 114. *Gideon* does require the assistance of counsel at every critical stage of a felony prosecution unless such assistance is properly waived.

**Deficiency & Prejudice**

When such a violation occurs, so as to render the arraignment presumptively unreasonable, no specific showing of prejudice is required. Nevertheless, the *Cronic* violation was on the face of the record and would not have been missed by a competent attorney. Mr. Bano was deficient for failing to object to the *per se* violation.

Therefore, Defendant contends that, under *Strickland*, he has demonstrated counsel's multiple and inexcusable deficiencies, as well as ensuing prejudice from counsel's failures. Thus, Defendant believes he is entitled to the relief request herein.

## GROUND THREE

TRIAL COUNSEL'S FAILURE TO TIMELY PETITION FOR A WRIT OF PROHIBITION, CHALLENGING THE TRIAL COURT'S LACK OF SUBJECT MATTER JURISDICTION TO PROCEED WITH THE CHARGES AGAINST DEFENDANT, AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL, FALLING BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, IN THE CIRCUMSTANCES, IN VIOLATION OF DEFENDANT'S FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

### Argument & Applicable Law

On February 12, 2018, Defendant's counsel, Mr. Bano, filed a timely motion to dismiss the information that was e-filed on December 5, 2016, for several **independent** reasons. See motion (**Exhibit – J,** paragraph 14).

On this particular ground in the motion to dismiss, was timely filed, under Fla. R. Crim. P. 3.190(c), because not taken oath to an arrest-warrant affidavit before a person authorized to administer oaths – is a **fundamental ground**, which the exception clause of Fla. R. Crim. P. 3.190(c), do apply, and was therefore, timely filed. See *State v. Giardino*, 363 So.2d 201, 202 (Fla. 4TH DCA 1971).

And because of this, the Court lacked subject matter jurisdiction to proceed with the prosecution of the case. The Defendant forewarned Mr. Bano, based on what he was experiencing, prepare to petition for writ of prohibition, because the Marion County Judicial System is not upholding the United States Constitution nor the laws of the United States. The Defendant knew the Court was gonna abuse its discretion by not addressing the merits in the timely filed motion to dismiss.

Nevertheless, after the Court's erroneous ruling on March 26, 2018, for only one of the several independent reasons for filing the motion to dismiss. Mr. Bano refused to petition for writ of prohibition, which was unreasonable, and a blatant denial of the Defendant's constitutional right to effective assistance of counsel.

Mr. Bano claimed that there was no good faith basis for pursuing the writ of prohibition, and it would be frivolous to petition for it (**Exhibit – L,** Mr. Bano's Letter).

Just as there were several independent reasons to dismiss the fundamentally defected information; there were several independent reasons to petition for writ of prohibition.

(1) On December 1, 2017, in the Adversary Preliminary Hearing, Detective Steckman (lead detective), the author of the arrest-warrant affidavit, testified under oath that he drafted the arrest-warrant affidavit without taking an oath before any judge or any person authorized to administer oaths:

**Cross Examination – by Mr. Bano:**

**QUESTION:** Okay. Did you take an oath when you wrote the probable-cause affidavit? Did you swear under oath that the contents of it were true?

**ANSWER:** To the probable-cause affidavit?
(**Exhibit-A,** APH-1 P.145)

**QUESTION:** Yes.

**ANSWER:** **No, sir.** I did not swear anything. I -- I signed at the bottom stating that it's all true, but that's – **I did not physically take an oath to write that; no, sir.**
(**Exhibit-A,** APH-1 P. 145)

Also, Detective Steckman denied knowing who witnessed him sign the probable-cause affidavit:

**Direct Examination – by Mr. Bano:**

**QUESTION:** Okay. Now, the probable-cause affidavit, who witnessed that?

**ANSWER:** Who witnessed it?

**QUESTION:** Yes.

**ANSWER:** Without looking, sir, I don't know. I wrote it. **I don't know who signed it as a witness.**
(APH-1 P. 144)

However, Detective Steckman's denial of knowing who witnessed him sign the arrest-warrant affidavit was not true. Detective Steckman knew his colleague Detective Todd had acted as an imposter by forging his signature on the arrest-warrant affidavit to give the impression that it was sworn before a person authorized to administer oaths. 92.50(1), Fla. Stat. (2009). ("**Oaths...** required or authorized under the laws of this state... **may be taken or administered by or before any judge, clerk, or deputy clerk of any court of record within this state** (emphasis supplied)). *Moreno-Gonzalez v. State*, 67 So.3d 1020 (Fla. 2011).

Furthermore, if the penalty of perjury was not attached to the arrest-warrant affidavit by means of an oath: "Any factual matter recited on the face of the warrant is un-sworn and cannot contribute to establishing probable cause. Apart from the affidavit language on the face of the warrant can have no independent legal significance in establishing the substance of probable cause." see *State v. Gayle*, 573 So.2d 968, 970 (Fla. App. 5th DCA 1991) (quoting *Gamage*, 340 A.2d at 8-9 Me. 1975). Moreover, "an arrest made without probable cause of course violates the Fourth Amendment's prohibition against unreasonable seizures" see *Davis v. Williams*, 451 F.3d 759, 764 (11th Cir. 2006).

Clearly, the above invoked good faith to petition for writ of prohibition because Florida courts have unanimously agreed that a warrant unsupported by an oath is not a mere technicality that good faith can cure. An oath is basic to the validity of the supporting affidavit and ensuing warrant. See *Collins v. State*, 465 So.2d 1266 (Fla. App. 2 Dist. 1985); *Jackson v. State*, 881 So.2d 666 (Fla. App. 5 Dist. 2004); *Crain v. State*, 914 So.2d 1015 (Fla. App. 5th Dist. 2005).

**Deficiency And Prejudice**

Mr. Bano's failure to petition for writ of prohibition caused the Defendant to be tried and convicted for a crime he did not commit.

Clearly the record shows that the Defendant was **illegally arrested** by corrupted police officers who knowingly and intentionally perfected an **illegal arrest**; and by a State Attorneys

Office who knowingly and intentionally facilitated and encouraged such conduct by these police officers.

Had Mr. Bano petitioned for a writ of prohibition the Defendant would not have suffered this complete miscarriage of justice. The Appellate court would have granted the petition because the trial court was without jurisdiction; and would have ordered the trial court to cease its proceeding and rule on the merits of the Defendant's timely Motion to Dismiss, which would have resulted in a dismissal of criminal charges.

Therefore, Defendant contends that under *Strickland*, he has demonstrated Counsel's multiple and inexcusable deficiencies, as well as ensuing prejudice from counsel's failures. Thus, Defendant believes he is entitled to the relief requested herein.

## GROUND FOUR

TRIAL COUNSEL'S FAILURE TO FILE MOTION FOR FRANKS HEARING, WHEN THERE WAS OVERWHELMING PROOF, AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL, FAILING BELOW AN OBJECTIVE STANDARD OF REASONABLENESS IN THE CIRCUMSTANCES, IN VIOLATION OF DEFENDANT'S FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

### Argument & Applicable Law

Mr. Bano was ineffective for failing to file the motion for Franks hearing, especially after the Defendant made it known to him that the arrest-warrant affidavit contained false and misleading information. The Defendant made this known to Mr. Bano from the very beginning of his assignment to the Defendant's case.

However, Mr. Bano refused to file the Franks motion by claiming that it wouldn't be in good faith to file the motion because the pleadings was frivolous (**Exhibit L,** Mr. Bano's Letter**).** But the real reason was because Mr. Bano was constantly being grilled by judges and prosecutors who were dictated to by the former chief prosecutor Brad King. Mr. Bano was grilled on and off the record (**Exhibit A**, p.148-160), and it was because after the first Nelson hearing, Mr. Bano started filing the necessary motions to address and preserve the misconduct of the officers involved. Nevertheless, Brad King's constituents succeeded, and as a result the Defendant was deprived of his Sixth Amendment right to effective assistance of counsel.

In *Franks v. Delaware*, 483 U.S. 154 (1978), the United States Supreme Court held:

(a) To mandate an evidentiary hearing, the challenger's attack must be more than conclusory, and must be supported by more than a mere desire to cross-examine. The allegation of deliberate falsehood or of reckless disregard must point out specifically with supporting reason the portion of the warrant affidavit that is claimed to be false. It also must be accompanied by an offer or proof, including affidavits or sworn or otherwise reliable statements of witnesses, or a satisfactory explanation of their absence.

(b) If these requirements as to allegations and offer of proof are not met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required, but if the remaining content is insufficient, the defendant is entitled under the Fourth and Fourteenth Amendments to a hearing.

On October 21, 2016 Detective Steckman drafted an **un-sworn** arrest-warrant affidavit, and in this warrant affidavit, Detective Steckman fabricated all the information in the four corners of this affidavit, including the alleged interview he had with the alleged victim witness, Keith Boone, during the A.M., on October 18, 2016.

In the following, the Defendant will demonstrate from the face of the record that Detective Steckman knowingly and intentionally falsified all the information in the arrest-warrant affidavit, with reckless disregard for the truth, and the false information was necessary to the finding of probable cause.

Detective Steckman's fabricated interview will be printed in the **boldface**, and the alleged victim witness's statement/testimony will be in the parentheses [( )]:

**Steckman's Warrant-Affidavit:**

**"On October 18, 2016, I responded to Ocala Regional Medical Center and made contact with Boone in the Intensive Care Unit. I was advised Boone had suffered a single gunshot that had entered and exited his body through his chest and back as well as one shot through his arm. I asked him to tell me about this incident and he stated lots of people hang out at 832 NW 15th Ave. He advised he arrived and saw his cousin, Davis** (Boone stated that he did not even know Davis was at the Defendant's mother's house, and denied saying this (**Exhibit** – A, APH-1 p.45, lines 13-24)), **standing in the front yard** (Boone stated Davis was standing on the porch (**Exhibit – A**, APH-1 p.19, lines 20-22; **Exhibit – B**, TT p.88, lines 13-23)).

**He advised he went to Davis and began speaking with him** (Boone stated he never got to say one word to Davis (**Exhibit – A**, APH-1 p.45, lines 13-16)). **He advised he had only been in the yard for approximately 30 seconds or a minute when a B/M began shooting** (Boone stated that he talked to the B/M a few minutes before the shooting (**Exhibit – C**, Depo. p.9, lines 3-4)).

**Boone advised the B/M first shot Davis and then shot him, Boone. Boone advised both he and Davis ran from the residence and split up** (Boone denied ever saying this, and stated that he always said Davis took off one way and he took of another (**Exhibit – A**, APH-1 p.45, lines 5-10; **Exhibit – B**, TT p.131, lines 4-7)).

**He stated there was no yelling or words said by the B/M prior to the shooting** (Boone stated there was a whole conversation with the B/M prior to the shooting (**Exhibit – B**, TT pp.132-133)), **leading him, Boone, to believe the shooting resulted from a possible earlier disagreement between the shooter and Davis** (Boone stated there was never a disagreement between the alleged shooter, him or Davis (**Exhibit – A**, APH-1 p.24, lines 20-25 – p.25, lines 1-8; p.28, lines 1-5; **Exhibit – B**, TT p. 117, lines 18-23; p.131, lines 12-21)).

**Boone stated he had seen the B/M previously, but did not know his name** (Boone stated he knew the alleged shooter name for years (**Exhibit – C**, Depo. p.4, lines 23-25 – p.5, lines 1-3)).

**He stated the B/M frequented the residence at 832 NW 15ht Ave. and described him as skinny, between 6'01" and 6'03", in his 30's, and having a low cut hair style** (Boone adamantly denied ever given these detectives a description of the Defendant (**Exhibit – B**, TT p.134, lines 16-23)).

**I asked if he knew the nickname of the B/M and he stated it was something similar to "Rooster or Duck." I asked if the nickname was the name of an animal and he stated it was. I then asked if it was possibly "Squirrel" and he said it was Squirrel** (Boone stated he

never said "Squirrel" to Detective Steckman, and that he stayed with "Duck" (**Exhibit – B**, TT p.101, lines 16-21; **Exhibit – A**, APH-1 pp.47-48)).

**I asked if he would be able to identify the B/M from a photo line up and he stated he would** (Boone stated that he responded to Detective Steckman's request to identify the Defendant with: **No.** (**Exhibit – B**, TT. p.102, lines 1-9; **Exhibit – D**, Warrant Affidavit p.3)).

The above is the alleged interview, Detective Steckman supposedly had with the alleged victim witness, Keith Boone, during the day (a.m.) of October 18, 2016. But Boone materially denied every word that was allegedly said by him in this interview. Why? Because this interview was fabricated; it was fabricated with the intent to cover up the fact that the Defendant was targeted for prosecution.

The following will further prove that Detective Steckman fabricated the interview in his fraudulent arrest-warrant affidavit. Here's Detective Todd's testimony:

**Cross Examination – by Mr. Bano:**

**QUESTION:** Now, was Detective Steckman in the room when you read the photo lineup admonition, when you read the instruction?

**ANSWER:** No. Not the **first night**. The **second night**, I don't recall.
(**Exhibit-A** , APH-1 p.63)

Unsolicited, Detective Todd made clear that the two encounters took place on two different nights, on the 18th and the 19th of October, 2016, and he confirmed it over and over again during this hearing (**Exhibit – A**, APH-1 pp. 57, 62).

Boone also testified to two encounters, on two different nights:

**Cross Examination – by Mr. Bano:**

**QUESTION:** Okay. Now, **did you begin to shake and cry out of fear and retaliation** when asked to sign the photo lineup admonition?

**ANSWER:** **No.** When **they** came in there with it [photo lineup] the second time [second night of interviewing, on October 19, 2016], I grabbed the pen from **them** and picked him out, **wasn't crying or none of that.**

**QUESTION:** The first time.

**ANSWER:** No. The second--

**QUESTION:** The first--

**ANSWER:** No. The first time?

(**Exhibit-A** , APH-1 p.47 (emphasis added))

**QUESTION:** Yes.

**ANSWER:** The **first** time, **like I just told you**, I told **them** his name was "Quack" or "Duck" because I wasn't sure how I was going to handle the situation. When **they** came back, I grabbed the pen on my own strength and circled his picture and picked him out.

(APH-1 p.48 (emphasis added))

Mr. Bano wanted to believe the fabricated interview, and Boone kept letting him know that on the first night is when he told both detectives it was "Duck" or "Rooster," not during the day (a.m.) like Detective Steckman falsely claimed.

The Court had to intervene and clarify the obvious to Mr. Bano:

**THE COURT:** He explained. The **first night** he didn't sign it. He gave **them** a **different name** because he didn't know how he was going to handle it.

**MR. BANO:** Okay.

**THE COURT:** The **second night** he signed it. So let's try to--this is not a discovery deposition.

(**Exhibit-A** , APH-1 p.49 (emphasis added))

Why is the two different nights so important? It exposes the fabricated interview, and the identification process.

Boone stated that on the night of October 18, 2016, was the very first interview, and in that interview he refused to go along with the detectives' suggestion that the Defendant was the perpetrator and declined to circle the Defendant's photo and told them it was "Duck" or "Rooster" instead, which concluded the interview:

**Cross Examination – by Mr. Bano:**

**QUESTION:** Okay. But before **they** gave you the lineup photographs, did you give them any information what this person looked like?

**ANSWER:** The first time **they** came up there, I told **them** it was "Duck" or "Rooster." **That's the first time they came up there.** The second time is when I grabbed the pen as soon as they came in, without crying or anything, and circled John Moore's picture, the person who shot me and killed my cousin.

**QUESTION:** What--the first time when you told them a physical description? Did you tell them, hey, this person is seven feet tall? What hair color? Build?

**ANSWER:** The first time--the first time **they** came, **all** I told **them** was "Duck" or "Rooster." **I didn't give a physical description.** I didn't do any of that.

(**Exhibit-**B, TT p.134 (emphasis added))

So Detective Steckman, took "Duck" or "Rooster" from the first night of interviewing, on October 18, 2016, and fabricated a whole different interview that took place during the day of the 18th (**Exhibit – B**, TT p.358, lines 5-25); and this fake interview covered up the tainted construction of the photo lineup that included the Defendant's photo, which proves the Defendant was targeted for prosecution, not because he committed the crime.

Boone's testimony also exposed Detective Steckman and Todd's testimony concerning the photo lineup process. (1) Boone denied circling Defendant's photo on the first night (**Exhibit – A**, APH-1 pp.46-48; **Exhibit – B**, TT pp102, 134-35); (2) Boone denied shaking and crying (**Exhibit – A**, APH-1 p.47; **Exhibit – B**, TT p.134); (3) Boone denied ever requesting the detectives to return the following night (**Exhibit – B**, TT pp.130-31) and Detective Steckman confirmed that reluctantly (**Exhibit – B**, TT pp.358, 696).

Detective Steckman also claimed that he arrived prior to Davis being transported to the hospital, but he got the name of the establishment wrong: it wasn't Dollar General but Family Dollar.

He also got the location where Davis collapsed wrong. Is the above a reckless disregard for the truth? No. Detective Steckman fabricated this information also. Detective Steckman arrived well after the incident, along with his supervisors, Sgt. Buchbinder and Captain Sirolli. All three detectives arrived almost at the same time, after Jordan Davis was transported to the hospital, and after all the evidence was located. Detective Steckman allowed this to slip out during trial (**Exhibit – B**, TT p. 375, lines 5-10), but there is also much evidence to prove it.

Detective Steckman claimed that he and Detective Todd, on the morning of October 19, 2016 returned to the hospital and again made contact with Boone, and Boone advised he was ready to sign the admonition form. See (**Exhibit – D**, Affidavit p.3). And this was not a typo, Detective Steckman was the only one claiming that these interviews took place during the day (a.m.), but we have already seen that both Boone and Detective Todd agreed that the two interviews took place on two different nights. Therefore Detective Steckman was not being truthful. Once again, he was trying to cover up the fabricated interview.

Detective Steckman also claimed it was later discovered that Ms. Scott was related to the Defendant, but this too was not true (**Exhibit – B**, TT 368, lines 21-25 – p.369, lines 1-18).

The Franks test also applies when affiants omit material facts "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading" *Reivich*, 793 F.2d at 961. "When a material fact is omitted from the affidavit in support of the probable cause determination, such fact constitutes a material omission if a substantial possibility that the omission would have altered a reasonable magistrates probable cause determination." See *State v. Van Pieterson*, 550 So.2d 1162, 1164 (Fla. 1st DCA 1989).

Truly, the drive-by shooting was a material omission, Detective Steckman and his colleagues did not accomplish what they set out to do, because the evidence of the drive-by shooting remains. The truth cannot be erased.

Detective Steckman, after examining the evidence concluded that there was a drive-by shooting and someone from the yard returned fire (audio interviews of Ms. Scott and Mr. Collins).

Then after conspiring to make a false arrest, Detective Steckman denied ever investigating the crime scene (**Exhibit – A**, APH-1 pp.130-140; **Exhibit – B**, T p.375); therefore, denying the drive-by shooting.

In order to deny the drive by shooting, Detective Steckman had to deny knowing the details about the evidence on the crime scene. Why? Because the evidence of the drive-by shooting was too plentiful.

**Deficiency and Prejudice**

The facts speak for themselves. If Mr. Bano would have filed the motion for Franks hearing, the misconduct of these officers would have been exposed and the warrant would have been voided. But because of Mr. Bano's deficiency, the Defendant was illegally arrested and deprived of his liberty without due process of law.

## GROUND FIVE

TRIAL COUNSEL'S FAILURE TO OBJECT TO THE *GIGLIO/BRADY* VIOLATIONS, WHEN IT WAS KNOWN TO BE SUCH, AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE CIRCUMSTANCES, COUNSEL'S PERFORMANCE FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS AND RESULTED IN A VIOLATION OF DEFENDANT'S FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

### Argument & Applicable Law

In July 2018, during trial Assistant State Attorneys, Rebecca Fletcher and Nicole Munroe, knowingly used perjured testimony to obtain a tainted conviction.

The conduct of Rebecca Fletcher and Nicole Munroe went well beyond improper. The conduct of these two prosecutors cannot be deemed anything other than – outrageous. Not only did they facilitate Ocala Police Department's corruption, but they encouraged it – by partaking in the officer's misconduct.

### *Giglio* Violations

In 2002, the Defendant was indicted and arrested by the Federal Government, and was not released until 2014.

Detectives Buchbinder (supervising detective), Steckman (lead detective), and Todd (lineup administrator) all claimed they knew Defendant and was coming in contact with him at the time when it was materially impossible, because the Defendant was serving a fifteen year sentence in the Federal Bureau of Prisons. And Mr. Bano and ASA Rebecca Fletcher knew these officers' testimonies were false, but Mr. Bano did not object nor did ASA Becky Fletcher make this known to the Court for correction.

Note that Detective Steckman became employed at the Ocala Police Department in 2005, and Detective Todd in 2003; after Defendant had commenced his federal sentence.

However, the claims that these detectives "knew" the Defendant was blatantly false, their testimony painted Defendant as a known criminal – fatally undermined Defendant's due process right to a fair trial.

Specifically, damaging law enforcement testimony included:

(1) **Sgt. Buchbinder** (supervising detective), when asked by the State if he "knew Defendant prior to the incident," and that if he knew "his nickname," responded that he not only knew him prior to that time, but knew his nickname as "Squirrel." He also stated he knew where he lived and provided an exact address (**Exhibit – B**, TT 191).

(2) When pressed further as to the specifics of any prior encounters with Defendant, **Sgt. Buchbinder** responded that he believed the "last encounter" was "5 years ago" (**Exhibit – B**, TT 208).

[**Impossible, the Defendant was at the end of his fifteen year sentence**].

(3) Answering further, **Sgt. Buchbinder** would blurt out that, in fact, his past interactions with Defendant had been the result of "other criminal investigation" (**Exhibit – B**, TT 208 (emphasis added)).

(4) **Detective Steckman** (lead detective), gave similar testimony. In answer to the State's questions, Steckman would likewise state that he "knew" Defendant, knew exactly where he lived and recited the exact address, and that he knew his nickname as well (**Exhibit – B**, TT 330, 692).

(5) In fact, **Detective Steckman** would state that "I've heard his nickname for years" (**Exhibit – B**, TT 371); that he had "met him" previously (**Exhibit – B**, TT 345); that he knew Defendant "specifically" (**Exhibit – B**, TT 355); **but couldn't say when he'd seen him last** (**Exhibit – B**, TT 371).

(6) In one of defense counsel's many inartful questions, Steckman was asked if he had the "police reports" from prior dealing with Defendant to show his last encounter with Defendant, to which Steckman replied that he "didn't work those cases" (Exhibit – B, TT 371).

(7) **Detective Todd**, who was Steckman's accomplice for the line-up charade with Boone at the hospital that resulted in Defendant's arrest, admitted that he knew who Defendant was when his photo was assembled into the array shown to Boone, but that he, allegedly and incredulously, didn't tell his partner (Steckman) that, because "it didn't matter whether he knew the Defendant or not" (**Exhibit – B**, TT 495-96).

(8) **Ms. Fletcher** (the prosecutor), was more than complicit in assuring that the law enforcement witnesses' testimony about the alleged criminal history of Defendant resonated with the jury. Not only did the prosecutor lead her witnesses into such testimony, but she would hammer the issue home to the jury among her final words of closing argument (**Exhibit – B**, TT 827-828):

**MS. FLETCHER:** Clearly Detective Steckman knew who the Defendant was...he clearly knew Defendant and knew he went by "Squirrel" or he never would have brought that up to Keith Boone about John Moore [the Defendant]. *Id.*

The above is obviously preplanned by ASA Becky Fletcher, like many other things that I can demonstrate from the face of the record.

For example, during the suppression hearing on March 19, 2018 ASA Becky Fletcher attacked one of the many evidences that proved the drive-by shooting. After the suppression hearing, meaning after all the witnesses were excused, the Defendant inquired about the eight projectiles lodged in the neighbor's wall, because Defendant knew that the projectiles exonerated him. But this was ASA Becky Fletcher's response:

**MS. FLETCHER:** As far as the other issue goes, one, we would--I don't know-I know at the time of the event, I think maybe the people weren't at home [they were home].

**I obviously have no idea whether any bullets these people have are from that event.** So, I don't know the probative value of bullets in that house. I will say it's not -- the people were shot on the other side of the road, so if it was a drive-by shooting at that house, the two people that got shot wouldn't have got shot.

**So, but I don't -- I don't know whether there are any bullets there or not.** I just don't know if there are, whether we're going to be able to prove at this point **almost two years later** that it is -- had to do with that incident, so. (**Exhibit-A,** MTSH Pp. 59-60 (emphasis added))

During the investigation of this case, no detective never believed the bullets in the wall of the house across the street came from a different incident.

**Detective Steckman's testimony**

**Cross Examination by Mr. Bano:**

**QUESTION:** Okay. And then at some point, there was -- or from your investigation, there were bullet holes in the house across the street?

**ANSWER:** Yes, sir.

**QUESTION:** Okay. In order--**were they related to this incident**?

**ANSWER:** **We believe so.** (**Exhibit-B,** TT. 387 (emphasis added))

Evidence officer, Carol Ballas went a little further by stating there was evidence to prove the bullets across the street came from the night of the incident. But ASA Becky Fletcher wasn't going to allow this truth to stand without making an attempt to do away with the valuable pieces of evidence:

**Direct Examination by Ms. Fletcher:**

QUESTION: Okay. Is there any way to tell where the bullet hole - - whether it was recent or it had been there for a while?

ANSWER: Not really, no. Sometimes, like, by the way the paint is chipped, you can tell if it's a recent, you know - - if there's fresh paint flakes, **but, generally speaking**, it's difficult to tell when it occurred.

QUESTION: Okay. **But there was some kind of evidence that maybe that house had been struck on this night?**

ANSWER: **Yes.**

QUESTION: Okay. At least once, would–

ANSWER: Correct.

(**Exhibit-B,** TT. 254 (emphasis added))

What ASA Becky Fletcher did on March 19, 2018, after the suppression hearing, sparked a flame that permeated the whole trial process, which amounted to prosecutorial misconduct, because she tampered with the State's witnesses:

(1) Detective Buchbinder, has now changed his testimony by claiming that the bullets across the street lodged in the neighbors wall could have come from a different incident (**Exhibit – B,** TT p.195).

(2) Buchbinder even changed his testimony from instructing evidence officer, Carol Ballas to retrieve the bullets at the home owner's permission (**Exhibit – A,** APH-1 p.86), to making the decision on the very first night not to retrieve the bullets from the neighbor's house (**Exhibit – B,** TT pp.196-97).

(3) Evidence officer, Carol Ballas also played into ASA Becky Fletcher's misconduct about the bullets being from a different incident (**Exhibit – B,** TT pp.253-54; pp.269-70).

The above started with ASA Becky Fletcher, during the suppression hearing (**Exhibit –A,** MTSH pp.59-60), and ended with her during closing argument (**Exhibit – B,** TT. p.770, lines 16-23; pp.781-82).

This is similar to the three detectives falsely claiming that they knew the Defendant and were coming in contact with the Defendant when it was materially impossible.

This too, started with ASA Becky Fletcher and ended with her during closing argument.

Not only did Mr. Bano have a responsibility to object to what he knew was false, but ASA Becky Fletcher also had a responsibility to correct what she knew to be false.

However, she used the perjured testimony to obtain a tainted conviction, and Mr. Bano stood idle and made no attempt to object to what he knew was false.

During closing argument, ASA Becky Fletcher continued her impropriety by surgically removing the drive-by shooting evidence from the trial, by means of perjury and by means of aiding and abetting criminal police officers:

**MS. FLETCHER:** She [Ms. Scott] told you that she never saw anybody shooting out of the gun - or shooting a gun out of a car. **That's where this whole drive-by shooting rumor got started and why police were looking for the Impala, because it came from the defendant's mother.**

(**Exhibit-B,** TT 780 (emphasis added))

ASA Becky Fletcher knew the drive-by shooting was not a rumor and she knew that it did not start with the Defendant's mother, Ms. Scott; nevertheless, she succeeded with making the jury believe her falsity, that Defendant's mother was the origin of the drive-by shooting and she [Ms. Scott] fabricated the story to protect her son.

However, Ms. Scott never witnessed anyone firing shots from a vehicle, nor did she tell any officer that:

Detective Buchbinder's (supervising detective) report: "While assessing the scene at 832 NW 15th Avenue. **I heard Mrs. Scott making statements that she didn't know who was shooting.** She added that moments before the shooting began, a red vehicle, possibly an Impala had driven past the house traveling north along NW 15th Avenue. There were **other people** in the front of this residence that stated there may have been a drive-by shooting" (**Exhibit – N,** Buchbinder's report (emphasis added)).

**"EVIDENCE OF THE DRIVE-BY SHOOTING"**

(1) The very first emergency caller, who lead the EMS and the first responding officers to the now deceased, Jordan Davis. This caller witnessed the drive-by shooting from the Family Dollar parking lot, which was on the same street as Ms. Scott's residence, approximately one-hundred yards away. Due to a combination of darkness, panic, and distance, the caller could not determine the model of the vehicle, nor the identity of the shooter, but clearly saw shots being fired from a vehicle (**Exhibit-M**, CAD Report).

NOTE: The above is the call that was dispatched to EMS and the responding officers. It referred to a "drive-by shooting." The Defendant received all the CAD call recordings, except for this one caller. Why? Because the call exonerated the Defendant.

(2) The **group** of people on the roadway in front of Ms. Scott's residence spoke with Captain Siralli and Gauthier. They all stated that a red or maroon Impala **did** the shooting. However, they were unable to identify the shooter (**Exhibit – N**, Capt. Sirolli's report).

NOTE: It's not a coincidence that the caller from Family Dollar saw shots being fired from a vehicle but could not make out the model nor the identity of the shooter; and the group of people on the roadway also saw shots being fired from a vehicle but was able to determine the model and the color of the vehicle.

(3) Detective Steckman (lead detective), believed that the evidence indicated a drive-by shooting with someone from the yard returning fire.

This information only came to light when ASA Becky Fletcher, **after TWO YEARS** handed over during trial an audio recording of two interviews that were conducted by Detective Steckman in his vehicle.

(4) The defense witness, Jamare Rush, also testified that the alleged victim witness Keith Boone told him that shots were fired from the maroon Chevy Impala and someone from the yard returned fire (**Exhibit–A**, APH-1 pp.182-83; **Exhibit – B**, TT p.657, pp.660-64).

Boone also admitted to talking to Jamare Rush (**Exhibit – B**, TT pp.106-07), so Mr. Rush wasn't making up the story to assist the Defendant like ASA Becky Fletcher claimed. Boone told Mr. Rush what happened.

NOTE: The audio recorded interviews that were conducted by Detective Steckman on the night of the incident (October 17, 2016), were handed over to the Defendant's attorney during trial (July 18, 2018). This was two years after Jamare Rush had returned to jail. It's not a coincidence that Mr. Rush's testimony coincides with what evidence on the crime scene revealed to Detective Steckman.

(5) The State's expert witness, Wendy Lavezzi (Medical Examiner), confirmed the drive-by shooting by testifying that the bullets that struck the deceased victim, Jordan Davis, came from the left side of his body, which was from the roadway. Ms. Lavezzi stated that the bullets which penetrated Davis's chest traveled from left to right, in the anatomic position (the victim's left); **and that the bullets traveled from a distance** (**Exhibit – B**, TT pp.304-05; p. 775).

(6) There was a full mushroomed projectile lodged in the left sleeve of Davis's t-shirt, which confirmed the state's expert witness's testimony that the bullets came from the left side of the victim. This particular bullet did not fully penetrate the left sleeve of Davis's t-shirt (**Exhibit – O**, Photos).

ASA Becky Fletcher knew the bullets came from the left side of Jordan Davis. She also knew that the bullet that mushroomed into the left sleeve of Davis's t-shirt **did not penetrate his body**.

But watch how ASA Becky Fletcher strategically cover up this important fact during closing argument:

**MS. FLETCHER:** That bullet hit the sac around his heart, went through his liver, and came out the back. **That bullet was found in the t-shirt** he was wearing that night, that Carol Ballas found when she was drying out the t-shirt.

(**Exhibit – B**, TT 757 (emphasis added)).

NOTE: The evidence shows that if Davis had not been standing where he was, the Defendant's mother, Ms. Scott, would have been shot directly in her face. ASA Becky Fletcher was allowed, without objection from Mr. Bano, to continue her tirade throughout closing arguments by falsely claiming that Ms. Scott made up the story and that there was "**absolutely zero evidence**" of a drive-by shooting (**Exhibit – B** TT 772;780-81; 824-25; and 837).

To establish a Giglio violation, Defendant must show "that: (1) the testimony given was false; (2) the prosecutor knew that testimony was false; and (3) the statement was material." *Moore v. State*, 132 So.3d 718, 724 (Fla. 2013). False testimony is material "If there is any reasonable possibility that it could have affected the jury's verdict." *Id.* (quoting *Tompkins v. State*, 994 So.2d 1071, 1091 (Fla. 2008). "The State... bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt." *Id.* (quoting *Guzman v. State*, 868 So.2d 498, 506 (Fla. 2003).

**BRADY VIOLATIONS**

The Defendant was deprived of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights, because the State prosecutors chose to abandon their **oath of admission** by partaking in corrupt police misconduct.

In so doing, the Defendant was intentionally deprived of exculpatory evidence by members of the Ocala Police Department and by members of the Prosecutor's office. Both conspired as one to obtain a tainted arrest and conviction.

All the exculpatory evidence was related to the drive-by shooting which state actors failed in their attempt to get rid of, despite the false arrest and the wrongful conviction; the misconduct by the state actors is on the face of the record. The evidence of their misconduct is overwhelming.

On January 1, 2017, Mr. Bano filed a notice of appearance and a demand for discovery, but ASA Becky Fletcher refused to fully comply with Mr. Bano's demand for discovery:

**1.** On October 17, 2016, an eyewitness called 911 dispatcher Alexia Hardin and advised her of a gunshot victim lying in the street near Family Dollar. S/he further advised that a vehicle drove by and did the shooting but s/he could not make out the model of the vehicle nor the identity of the shooter.

Therefore, all of the responding officers were dispatched to a drive-by shooting. Nothing about the alleged "anonymous" caller appeared to be speculation like ASA Becky Fletcher claimed. The caller led the responding officers and EMS to Jordan Davis, which almost saved his life.

Two years later, after many requests, Mr. Bano finally brought the audio and video to the Marion County Jail for the Defendant's viewing. To the Defendants disappointment, the 911 call made by the eyewitness was missing. Mr. Bano said that what he had was all the state gave him.

The Defendant received all the CAD call recordings except for the most important recording. The Defendant had made several requests in open court to the State for the eye witness recording, but ASA Becky Fletcher would always respond by stating: "We don't have it." Not only is this recording exculpatory evidence, but the call exonerates the Defendant. This is why the State withheld or discarded the recording, because ASA Becky Fletcher knew, this call would have derailed her already shaky case.

**2.** On July 18, 2018, during trial, ASA Becky Fletcher handed over a key piece of exculpatory evidence: an audio recording of two interviews that were conducted by Detective Steckman himself. He interviewed Ms. Scott and Tony Collins in his patrol vehicle.

Neither Mr. Bano nor the Defendant had any way of knowing that the interviews existed because ASA Becky Fletcher withheld these recordings for two years then handed them over during trial. When the Defendant brought up the interviews during sentencing, ASA Becky Fletcher did not object and say she just received them or they were overlooked, but the look on her face and that of Nicole Munroe told everything. They knew Detective Steckman perjured himself, not only because of the interviews, but because they were co-conspirators.

Nevertheless, the two interviews validated the Defendant's complaints to the "internal affairs" of the Ocala Police Department, the "case integrity review team" of the State Attorney's office, and to ASA Becky Fletcher herself. None of the above responded to the Defendant's complaints. Why? Could it be because everyone was involved?

The interviews exposed Detective Steckman's perjury in his false affidavit and testimony:

(1) The recordings show that Detective Steckman arrived after *all* the evidence was located, and determined that there was a drive-by, and that someone from the yard returned fire.

(2) The recordings show that Detective Steckman considered the occupants of the maroon Chevy Impala to be suspects.

(3) The recordings show that Detective Steckman only interviewed the Defendants mother and Tony Collins once.

(4) The recordings show that Detective Steckman did not know the Defendant's nickname prior to the incident as he claimed.

(5) The recordings show that the Defendant's mother pointed out "Dirty Red" to Detective Steckman but Steckman made no attempt to interview him.

(6) The recordings show that Detective Steckman was suspicious of the Defendant being the shooter from the yard that returned fire.

(7) Ultimately, the recordings show that the Detective believed that the person who returned fire from the yard did nothing wrong. Why? Because shots were being fired into the yard.

The above are the reasons why ASA Becky Fletcher withheld the interviews. She did not want to hand over patently exculpatory evidence which would have benefitted the Defendant, so she held the recordings for two whole years and handed them over to the Defendant during trial. The only thing Mr. Bano could say during sentencing was that he allowed the Defendant to hear them. However, Mr. Bano could have done so much more. The actions of ASA Becky Fletcher demonstrate that this was a tactic based on timing.

**Disclosure** of Brady material **must** be made **early** enough to be of value to the Defendant. See *U.S. v. Aichele*, 941 F.2d 761 (9th Cir. 1991).

NOTE: The interviews may no longer be in evidence, but if they are, there is a great possibility they may have been edited.

**3.** On October 17, 2016, during the investigation of the crime scene on the night of the incident, there were eight bullets lodged in the front wall of the neighbor's house. That residence was located directly across the street from the incident at Ms. Scott's house.

The bullet holes were spread out on the front wall of the neighbor's residence from one end to the other. The evidence is clear that the shooter was firing at a moving target traveling south or north on the street in front of Ms. Scott's residence, 15th Avenue. The only vehicle that was traveling north on 15th Avenue on the night of the incident was the maroon Chevy Impala.

The alleged victim witness, Keith Boone, testified that he ran to the far right of the residence across the street (southeast), which was away from the residence.

Nevertheless, if Boone was still being fired at after he started running, there is no reason for the bullets to have struck the neighbor's house. Boone placed the shooter and himself prior to the shooting to the right of the residence across the street which was struck by bullets. So, if he ran to the far right of the house after being shot, and was still being fired upon; once again, if the shooter was firing at Boone, the house should not have been struck.

This is why Boone **changed** his testimony from "**hearing shots**" after he started running (**Exhibit – C**, Depo. 14:12-21 – 15:7-25; 16:6-12; **Exhibit – A**, APH-1 23:15-21), to "**not hearing shots**" after he started running (**Exhibit – B**, TT 96:13-20; 123-24). Boone realized he made a mistake by revealing too much about what really happened on that night. Therefore he changed his testimony to cover up the fact that the shooter was not firing at him, which protected himself, the occupants of the maroon Chevy Impala, and the crooked cops that helped he and his friends get away with first degree murder along with Boone's then pending charges (**Exhibit – C**, Depo. pp.18-21; **Exhibit – B**, TT 70:6-16).

Boone and his friends were not attempting to rob the Defendant that night, but the very same person who had sold him the cocaine. His story about the cocaine not being good was only an excuse for Boone to try and justify to the Defendant why he committed such an act in the Defendant's mother's yard. This is why Boone never gave the identity of the dealer, because the truth would have came out.

However, Boone was not the only one that changed his testimony concerning the eight bullets lodged in the neighbor's front wall. Detective Buchbinder (supervising detective) also changed his testimony about the bullets to protect himself and his colleagues.

**Cross examination by Mr. Bano:**

**QUESTION:** Did you recover the projectiles?

**ANSWER:** No.

**QUESTION:** Did you attempt to recover them?

**ANSWER:** Personally, no. I did not.

**QUESTION:** **Did you instruct anybody–**

**ANSWER:** **Yes.**

**QUESTION:** -- Who was investigating the case to recover them?

**ANSWER:** **Yeah. There was direction to the field evidence officer, Ballas,** with the--with the permission of the homeowners **to make an attempt to recover the projectiles**; yes.

(**Exhibit-A,** APH-1 86 (emphasis added))

Why? Because the exculpatory value of the eight projectiles was evident. But after ASA Becky Fletcher took the wheel, this testimony had to change during trial.

**Cross Examination by Mr. Bano:**

**QUESTION:** So you wouldn't be able to tell if they were actually fragments or altered until you actually got them?

**ANSWER:** I wouldn't be able to tell one way or the other because I'm not a ballistics expert.

**QUESTION:** Right.

**ANSWER:** But, yes, **if you're asking did I make the decision not to cut their house apart, I did.** (T. 197 (emphasis added))

During closing argument, ASA Becky Fletcher did not waste any time capitalizing off of what she knew to be false (**Exhibit – B**, TT pp.781-82; 827: 1-9).

The changing of testimonies by the alleged victim witness and by Sgt. Buchbinder was all at the behest of ASA Becky Fletcher, who was dictated by former chief prosecutor Brad King. The Defendant was a victim of the "win at all costs and pay the fine later" mindset. This is not just a tactic used for winning elections, it is also the reality of the Marion County Judicial system.

Clearly, the exculpatory value of the bullets lodged in the neighbor's front wall was obvious. However, when certain officers conspired to obtain a false arrest, they purposely abandoned the eight projectiles and ASA Becky Fletcher took the wheel from there. Detective Steckman (lead detective), and Sgt. Buchbinder (supervising detective) started falsely claiming that there was no evidence of the drive-by shooting. **However, the same two detectives denied their responsibility for the investigation of the crime scene. They each pointed the finger at the other**. Why? Because the evidence on the crime scene told a completely different story.

Listen to the audio interviews that ASA Becky Fletcher withheld for two entire years before handing them over to Mr. Bano during trial. You will hear exactly what the evidence revealed to Detective Steckman: a drive-by shooting with someone from the yard returning fire.

The "purpose" of the Brady rule is "to ensure that a miscarriage of justice does not occur." It demands that Brady's protections also extend to actions of other law enforcement officers such as investigating officers. *U.S. v. Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L.Ed.2d 481 (1985); *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

**Deficiency and Prejudice**

Throughout the Defendant's case, Mr. Bano demonstrated on the face of the record his ineffectiveness, and his ineffectiveness was compounded by the intimidation of the Marion County Judicial System, which caused Mr. Bano to completely abandon his judicial role as an Officer of the Court.

Mr. Bano was well aware of the misconduct in the Defendant's case, but he stood by and allowed the miscarriage of justice to take its course. Mr. Bano could have done so much to address the prosecutorial and police misconduct: like objected and moved the Court for a mistrial, or moved the Court for a *Richardson* hearing to address the perjury and the change in witnesses' testimonies. But because of Mr. Bano's deficiency, the Defendant was blatantly deprived of his constitutional rights and wrongfully convicted.

Therefore, Defendant contends that, under *Strickland*, he has demonstrated counsel's multiple and inexcusable deficiencies, as well as ensuing prejudice from counsel's failures. As such, the Defendant believes he is entitled to the relief requested herein.

## CONCLUSION

**WHEREFORE**, based on the foregoing facts, argument and authority, the Defendant respectfully prays this Honorable Court GRANT the relief requested in the instant motion by entering an order that:

(1) Vacates the judgment and sentence entered in criminal case number 42-2016-CF-002869-AXXX, and grants a new trial; or

(2) In the alternative, grants Defendant an evidentiary hearing where Defendant can fully and fairly litigate the merits of his claims by sustaining his burden of production and persuasion; and

(3) Grants any such and further relief as this court deems appropriate under the law.

Respectfully submitted,

John Anthony Moore (U00034)
Madison Correctional Institution
382 SW MCI Way
Madison, FL 32340-4430

DEFENDANT

**DECLARATION OF UNNOTARIZED OATH**

Under penalties of perjury and administrative sanctions from the Department of Corrections, including forfeiture of gain time if this motion is found to be frivolous or made in bad faith, I certify that I understand the contents of the foregoing motion, that the facts contained in the motion are true and correct, and that I have a reasonable belief that the motion is timely filed. I further certify that this motion does not duplicate previous motions that have been disposed of by the court. I also certify that I understand English and have read the foregoing motion or had the motion read to me.

This Declaration is being made on this 15 day of October, 2021, pursuant to § 92.525, Fla. Stat. (2020); and Rules 3.850(n), 3.987, Fla. R. Crim. P. (2020).

John Moore

John Anthony Moore (U00034)
Madison Correctional Institution
382 SW MCI Way
Madison, FL 32340-4430

DEFENDANT

**CERTIFICATE OF SERVICE / MAILING**

**I HEREBY CERTIFY** under penalties of perjury that on this 15 day of October, 2021, I hand-delivered the original and a true and correct copy of the foregoing "*Second Amended Motion for Postconviction Relief*" to an institutional official at the Madison Correctional Institution, for mailing via USPS First Class Mail, postage prepaid, to the following recipients:

Original to:

**CLERK OF THE COURT**
Fifth Judicial Circuit - Marion County
110 N.W. 1st Ave., Ste. 2017
Ocala, FL 34475

Copy to:

**STATE ATTORNEY'S OFFICE**
Fifth Judicial Circuit - Marion County
110 N. W. 1st Ave., Ste. 5000
Ocala, FL 34475

John Moore

John Anthony Moore (U00034)
Madison Correctional Institution
382 SW MCI Way
Madison, FL 32340-4430

DEFENDANT

Exhibit - A

# Exhibit – A

Exhibit - A

Q And what were you talking about; do you recall?

A We were talking about something that I had got from a person that was over there earlier.

Q Drugs?

A Yeah.

Q Okay. And while you were talking to him, did you see your cousin?

A Yeah.

Q And that's Jordan Davis, known as "Kiki".

A Yeah.

Q Where did you see him?

A He walked from, like, around the side, like where the boat at and walked up on the porch --

Q Okay.

A -- where there's, like -- where this window is to the --

Q Right by this side?

A -- yeah, to the right.

Q Okay. Was he standing on the porch or was he standing on the ground?

A On the porch.

Q He was on the porch; okay. And what happened right after you saw your cousin?

A I -- we, like, looked at each other. Both of

them looked at each other.

Q When you say both of them --

A John Moore.

Q Okay.

A And he just shot him.

Q Who shot who?

A John Moore shot "Kiki" --

Q Okay.

A -- for no reason that I could see.

Q All right. And did you see a firearm in John Moore's hand?

A Not until he started shooting. He had his hands behind his back while we were talking.

Q Okay.

A When "Kiki" walked up, then that's when he pulled it out.

Q Okay. Once he pulled it out, you saw a firearm?

A Yeah.

Q And you saw him point it at your cousin?

A Yeah.

Q Did you see whether or not your cousin got shot?

A Yeah.

Q Okay. Did he get shot?

A Straight across the street.

Q Okay. Straight across this way?

A Yeah.

Q Did you run towards this house that's across the street?

A I ran -- I ran that way and ran -- kept running straight behind it.

Q Okay. And were you picked up by a car on a road behind that house?

A Yeah.

Q Okay. Do you --

A Directly behind it.

Q On this road here?

A Yeah.

Q Okay. And when you were running, could you hear gunshots?

A Yes.

Q And you were still being shot at?

A I didn't know if he was shooting at me or not, but I heard the shots.

Q Okay.

A I was just trying to get away.

MS. FLETCHER: I'm showing the Defense what is marked as State's Exhibit A. May I approach the witness, your Honor? I apologize. I forgot

to ask you last time. May I approach?

THE COURT: Sure.

BY MS. FLETCHER:

Q This is State's Exhibit A. Do you recognize the person in this photo?

A Yes.

Q Who is this person?

A Jordan Davis.

Q That's your cousin?

A Yes.

MS. FLETCHER: I don't have any other questions for him, your Honor.

THE COURT: Any cross examination?

MR. BANO: Yes.

CROSS EXAMINATION

BY MR. BANO:

Q Good afternoon, Mr. Boone.

Now, how long have you known Mr. Moore?

A About a year or so.

Q Okay. What was the nature of your relationship with him?

A I mean, we was cool. You could say friends.

Q You hung out at his house?

A Yeah.

Q Okay. Was there any disagreements between

you and him --

A We never --

Q -- about anything?

A We never had no disagreement about nothing.

Q What about between him and your cousin, "Kiki", was -- as far as you know, were there any disagreements or anything that they would fight about?

A I don't know.

Q What about somebody that possibly died from before, was there talk about somebody dying?

A I don't know nothing about nobody dying, nothing about none of that.

Q Okay. So now, let's go back to the day in question here. So you -- how did you get to the house, to John Moore's house, to the house where the shooting occurred?

A I got dropped off.

Q Who dropped you off?

A My friend.

Q What's your friend's name?

A Javon Maxwell.

Q Javon Maxwell. Did Javon Maxwell have a firearm on him?

A No.

Q Did you have a firearm on you?

A No.

Q Did you -- was Javon Maxwell involved in any shooting that night?

A No.

Q The only person who shot that night was John Moore; correct?

A Right.

Q And John Moore only had one gun; correct?

A Right.

Q Would it surprise you to know that there were two types of bullets --

A Oh, there was?

Q -- casings found in the house?

A In the house?

Q Or outside the house?

A Am I surprised?

Q Yes.

A I don't have no reason to be surprised.

Q Okay. You don't believe there was a second shooter that night.

A I know there wasn't a second shooter.

Q There wasn't a setup for a robbery that night between you and Javon Maxwell?

A There wasn't none of that. You can't trick me with that bullshit. Wasn't no -- it wasn't --

MS. FLETCHER: Okay.

THE COURT: Hold on.

THE WITNESS: Listen.

THE COURT: Hold on.

THE WITNESS: Listen. Listen.

THE COURT: Okay.

THE WITNESS: It wasn't no robbery. It wasn't none of that, see what I'm saying? What -- ask -- ask your question. What else you got to ask? Wasn't no robbery.

BY MR. BANO:

Q My question is --

THE COURT: No, no, no, no, no.

THE WITNESS: It wasn't -- it wasn't no setup for no robbery. It wasn't none of that.

THE COURT: Mr. Boone, listen to me a second; okay?

THE WITNESS: Uh-huh.

THE COURT: You're in court. One, we're not going to curse. All right? Two, only answer questions when they're asked. Please don't go off on your own. Okay? You understand?

THE WITNESS: Got it.

THE COURT: Go ahead, sir.

BY MR. BANO:

Q [Pause] I'm not sure if I got the answer really correct. As far as you know, there was no disagreements or beef between Mr. Moore and Jordan Davis, to the best of your knowledge?

A No.

Q Okay. Do you recall stating to Detective Steckman that you believe the shooting was a result of a disagreement between Mr. Moore and Jordan Davis and that Mr. Moore shot you because he knew that you and Jordan Davis -- you and Jordan Davis was -- was cousins -- were cousins and he feared that he -- that you would retaliate?

Do you recall making that statement to Detective Steckman?

A What I said was that I believe it might have been a disagreement before I got there between those two, but I don't know if it was or not. My cousin was already there when I got there, so I don't know what happened before I got there between those two.

Q But now you know for a fact that there was no disagreement between the two of them.

A Like I just said, I don't know what happened before I got there between those two. When I came, they were already there.

Q Well, do you recall the deposition when I

A Like I told you before, as we was talking, he walked up from around the corner, wherever he was and he was -- whatever he was doing. He was by there, you know what I'm saying. That's -- that's what that was.

Q [Pause] Do you recall stating to Detective Steckman that you and Jordan Davis ran together and then you split up?

A I never said that. I always said he took off one way and I took off the other way. I never said that. Show me where I said it.

THE COURT: No. Wait for another question.

BY MR. BANO:

Q And you never talked to Jordan Davis when you arrived to Mr. Moore's house; is that --

A I never got to say a word to him. I ain't even know he was over there.

Q Do you recall telling Detective Steckman that when you went to the house there, you saw your cousin, Jordan Davis, standing in the yard and when you went -- and you went to him and began speaking with him and then the black male started shooting?

Do you recall making that statement to Detective Steckman?

A I never said that.

Q Now, when you initially -- when you

identified Mr. Moore, did you initially describe him as being skinny, between six-one and six-three and in his 30s?

A Say that again?

Q When you -- when you were trying -- when you initially identified Mr. Moore, did you describe him as being skinny, between six-one and six-three and in his 30s?

A I may have said that; yeah.

Q Okay.

A If not in those exact words.

Q Okay. What words did you use?

A I'm not, like, really sure, like, was it that word because he came and talked to me at the hospital. Like, at that time, I'm really not -- you know what I'm saying, I'm really not trying to talk. I'm in a lot of pain and all that. So, you know, so I can't really remember which exact words I described him in.

Q Okay. Did you use -- did you describe him -- did you know his name or did you mention his name when you were first interviewed?

A Yeah. I told them, like, it was like "Quack" or "Duck" or something like that and the reason I told them that was because I wasn't sure how I was going to handle the situation. I knew what his name was the

whole time.

Q Well, wasn't it Detective Steckman that threw out the word, "Squirrel"?

A I knew who he was the whole time. I said that on my own statement.

Q So you said "Squirrel". Detective Steckman didn't initially --

A No. I didn't say "Squirrel". I said it was "Duck" or "Quack" or similar to something like that. And the reason I said that was because I wasn't sure how I was going to handle the situation.

Q How you were going to handle the situation?

A Yeah. Whether I was going to do what I'm doing now or was I going to handle it another way? That's what I mean by that.

Q Okay. Now, did you begin to shake and cry out of fear of retaliation when asked to sign the photo lineup admonition?

A No. When they came in there with it the second time, I grabbed the pen from them and picked him out. Wasn't crying or none of that.

Q The first time.

A No. The second --

Q The first --

A No. The first time?

Q Yes.

A The first time, like I just told you, I told them his name was "Quack" or "Duck" because I wasn't sure how I was going to handle the situation. When they came back, I grabbed the pen on my own strength and circled his picture and picked him out.

Q Okay. Well, I'm referring to the first time, not the second time.

A Okay. What you want to know about the first time?

Q The first time, when they asked you to sign the admonition for the photo lineup, you were crying and shaking.

A When they asked me to sign what?

Q The admonition form with the lineup. There was a six-person lineup there on the first night that you talked to the cops; right?

A Was I shaking or crying?

Q Yes.

A Is that what you're asking me?

Q Yes.

THE COURT: Okay. This has been asked and answered now four times.

MR. BANO: It's a different -- it's two different nights, your Honor.

A The Ocala Police Department.

Q And what's your position there?

A Detective.

Q Okay. Back on October 17th or 18th of 2016, did you go to Ocala Regional Hospital and make contact with a person you learned was Keith Boone?

A Yes, ma'am. I did.

Q And what was the purpose of going there?

A Detective Steckman asked me to show a lineup.

Q Okay. Who constructed the lineup?

A Detective Steckman.

Q All right. And did you know where the possible suspect was in the photos of the -- that was in the photo array?

A Yes, ma'am.

Q You were told which one was the suspect?

A I was not told; no, ma'am. I'm familiar with the Defendant in this case.

Q Okay. So when you went in -- was Keith Boone in the hospital room?

A Yes, ma'am.

Q Okay. Well, did you go there the first night -- or did you go there both nights or just one time?

A I went there twice.

Q Okay. And what happened the first time?

A The first time that I went there, he -- he looked at the -- I read him the admonition form. He looked at the six pictures, circled and initialed, but he didn't want to sign the admonition form. The best that I could tell was out of fear.

Q Okay. And did you go back the second time?

A Yes, ma'am.

Q And did you go -- were you -- the first time were you in the room? Was Detective Steckman in the room as well?

A After the circling, yes, ma'am. I called Detective Steckman in and Detective Steckman was talking to Mr. Boone then.

Q Okay. But while he circled the picture, it was just you --

A Detective Steckman was not in the room, ma'am.

Q Okay. And so did you go back the very next day?

A Yes. At the request of Mr. Boone.

Q Okay. And did -- at that time, did you -- let me back up.

Before you showed him the pictures in the first place, did you read him what's known as the admonition form?

how the bullet, the entry point and the exit point of the bullet was because, again, it's relevant as far as whether, you know, this was a drive-by shooting or this was, you know, my client allegedly shot him.

So those are the --

THE COURT: The second issue is not a -- that's an easy one. I'll -- I mean, no issues about him getting the records from the hospital from the alleged victim on this -- from Mr. Boone's medical records.

You have no issues or problems with that; correct?

MS. FLETCHER: I have no problem.

THE COURT: Okay.

MS. FLETCHER: I'll get -- I'll do that.

THE COURT: Okay.

MS. FLETCHER: As far as the other issue goes, one, we would -- I don't know -- I know at the time of the event, I think maybe the people weren't at home.

I obviously have no idea whether any bullets these people have are from that event. So I don't know the probative value of bullets in that house. I will say it's not -- the people were shot on the

other side of the road, so if it was a drive-by shooting, they were shooting -- and they were shooting at that house, the two people that got shot wouldn't have got shot.

So, but I don't -- I don't know whether there are any bullets there or not. I just don't know if there are, whether we're going to be able to prove at this point almost two years later that it is -- had to do with that incident, so.

THE COURT: Okay. Did file a motion to authorize additional expenditure for investigative costs. Have we had a hearing on that as of yet? Or was an order entered on that?

MR. BANO: It was ordered. I believe there was an order entered the last time we were in court on --

THE COURT: Okay.

MR. BANO: -- in January, I believe, your Honor.

THE COURT: All right. Because the issue I'm looking at is it looks like, you know, this investigative firm, I don't know if they would be one that would want to go and --

MR. BANO: Okay. Maybe I can have --

THE COURT: -- yeah, secure the bullets.

A Yes, sir.

Q Okay. Well, did Detective Steckman say anything to Keith Boone?

A Yes. He did.

Q What did he tell him?

A You'll have to talk to Detective Steckman about that.

Q Were you present when he talked to him?

A I was present; yes, sir.

MS. FLETCHER: Objection. Hearsay.

THE COURT: If he was present and he heard it, he can answer.

BY MR. BANO:

Q Did you hear what he told John Moore?

A I heard what he told Mr. Boone. I don't recall exactly what the words were.

Q Oh, I'm sorry. Mr. Boone. That's fine.

A Yes, sir.

Q Okay. Do you know the nature of what it --

A Yes. Mr. Boone wasn't sure he wanted to go forward in this case.

Q Okay. And you don't know the exact words, but you know roughly what Detective Steckman told him?

A Yes, sir. For the most part.

Q Okay. And what did he tell him?

Supp. Hearing P. 42, lns 16-21

Todd Corroborated Boone's Testimony: Pg 47, lines 16-21; Pg 48, lns 2-6

A Just that if he wanted to go forward, you know, we could move forward with this case. You know, he was pretty much asking him what the reason was and Mr. Boone didn't want to answer any questions. He was crying. He appeared to be fearful. He was shaking.

I know he had just lost his cousin. There seemed to be a lot of emotions going on. At that time, he asked that we come back the next night and talk to him the next day, which we did.

Q Both of you were present the second time; correct?

A Yes, sir.

Q Okay. Now, when will he -- when he was circling the picture on the lineup, was it just you or was it just --

A It was just me.

Q Okay. Detective Steckman walked out of the room?

A That's correct.

Q Was there a reason why he walked out of the room?

A That's normal procedure when we show lineups.

Q One detective only in the room?

A The assigned detective, especially the one who's constructed it, walks out, isn't around during

the identification process.

Q Now, was Detective Steckman in the room when you read the photo lineup admonition, when you read the instructions?

A No. Not the first night. The second night, I don't recall. Pg 57, 22-24; Pg 62, 6-9

Q Okay. Are you authorized to administer oaths?

A To administer the oath?

Q Yes. Are you authorized to administer oaths?

A Yes, sir.

Q Did Keith Boone or Detective Steckman swear under oath to you at any time?

A Not under oath, they didn't swear to me, sir.

Q Now, on the photo lineup, the one that was introduced by the State -- same copy --

MS. FLETCHER: Um-hum.

MR. BANO: May I approach the witness, your Honor?

THE COURT: Yes, sir.

BY MR. BANO:

Q Is that your signature there on the --

A Yes, sir.

Q Okay. Did you sign anything else besides that document in this case?

A No, sir.

[Whereupon, Mr. Bano and Ms. Fletcher confer.]

MR. BANO: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

BY MR. BANO:

Q I have a copy of the probable cause report. It's got a signature on the bottom there. Do you recognize --

A Okay. That's my signature; yes, sir.

Q That is your signature?

A That is.

Q And at the top it says Detective Steckman there; correct? It was Detective Steckman?

A Yes, sir.

Q Did you sign it for him?

A No. I didn't sign for him, sir. I signed as a certified officer witnessing his signature.

Q Did you not put Mr. -- or Detective Steckman under oath when he signed this; correct?

A Sir, I don't put anyone under oath.

MR. BANO: If I can have a second to confer with my client, your Honor.

THE COURT: Sure.

was shot.

Q But is it -- okay. [Pause]

Did anybody make any statements that he was shot or did you discover through your investigation he was shot? On top here, if you look at the house on the right --

A To me, no.

Q Okay. And you said earlier that these bullets were consistent with somebody shooting at the house across the street and somebody running towards that direction; correct?

A Yeah. That does make sense.

Q Okay. Now, let's take a look at the -- [pause]. This is the house in question; correct?

A That house had bullet strikes on the west facing or the front -- front wall; yes.

Q And this is the house -- the other house where there was -- there were bullets; correct?

A That's the house where the casings were collected; yes, sir.

Q Okay. So if -- the bullet holes, were they -- if you're facing this house here, were they to the right or to the left?

A That I can -- that I can remember correctly, the entire front face of the home had bullet strikes on

it, not just focused on one specific area.

Q Okay. Did you get any statement that somebody was running or one of the victims, alleged victims was running towards that house?

A Me, personally, no. I did not.

Q How many bullets were recovered in this house?

A I believe there --

Q Or how many projectiles?

A I believe there were eight bullet -- or strike marks or holes on that wall that were consistent with bullet strikes.

Q Did you recover the projectiles?

A No.

Q Did you attempt to recover them?

A Personally, no. I did not.

Q Did you instruct anybody --

A Yes.

Q -- who was investigating the case to recover them?

A Yeah. There was direction to the field evidence officer, Ballas, with the -- with the permission of the homeowners to make an attempt to recover the projectiles; yes.

Q To your knowledge, was -- were any of them

A That's not what I wrote, sir, but I agree with you that they were -- they looked like they were shot from the south. But that's not what I wrote. That was your own words.

Q And the roadway is to the west of the vehicles.

A No, sir. The roadway was on the east side of the vehicles.

Q Okay. Let's look at the map here and see if we can -- okay. So this is the --

THE COURT: You might want to specify which roadway you're talking about --

MR. BANO: Okay.

THE COURT: -- because there's --

BY MR. BANO:

Q Do you recognize which house --

A Yes, sir.

Q -- the shooting occurred in?

A Yes, sir.

Q Which one is it?

A The -- right here. This is the address of the house that I listed in my report.

Q Okay. And the bullet holes were where in relation --

THE WITNESS: Do you mind if I stand up? Is

that all right?

THE COURT: No. That's okay. You can stand up.

THE WITNESS: The bullet holes were on this side of these vehicles like they had come from this direction and that way. So that's what I'm saying, they came from the south --

MR. BANO: Okay.

THE WITNESS: -- and the roadway is actually on the east of these vehicles.

BY MR. BANO:

Q Okay. Now, the casings were found in this side over here between the fence and the house; is that correct?

A That is correct. I didn't find them, but that's where they were --

Q That's where they were located.

A Yes, sir.

Q Okay. Now, is it possible for somebody to shoot from here and the bullets to be going -- if they're over here, the bullets would be going here?

A If -- if somebody was back here and shot, is it possible to hit the car? No. But casings do shoot out of guns -- come out of guns. Do you understand that?

Q Right.

A And I don't know -- like I said, I didn't find them. I don't know how far back they were found. I just know that it was in that area between the house and the fence, that southern portion of the yard.

Q How many projectiles were found, if you know?

A How many projectiles?

Q Yes.

A Right here?

Q No. Well, how many casings were found there? Yes. How many casings were found?

A I don't know, sir. I didn't --

Q How many projectiles were recovered?

A How many projectiles were recovered?

Q Yes.

A I took part in two projectiles being recovered from the vehicles.

Q Okay.

A I can't speak to how many other projectiles were recovered. I'm not the evidence --

Q Now, were there any bullet holes in the house in front of this house?

A Yes, sir.

Q Okay. What side of the house?

A On this front portion of the house.

No invest.

Q So if you were -- if you were --
A To the left side.
Q -- facing -- if you're facing the house in front of it, would it be to the left or to the right of the house?
A I don't quite understand. They were -- they were in this -- this western face of the house. Is that what you're asking?
Q To the right. So if I'm facing the house, it would be to the right of the house or to the left?
A Are you asking which side of that residence were they on?
THE COURT: I think what he -- I think he -- what I think he's trying to ask you is, on that side of the house --
THE WITNESS: Okay. Were they -- I don't recall. To be honest, I don't.
THE COURT: Yeah.
THE WITNESS: That was -- again, I had left the scene when that stuff was located.
BY MR. BANO:
Q Okay. [Pause] Okay. If I can understand this correctly. So this is to the -- the roadway you're saying in your report, that's to the east of the house; correct?

A Yes, sir. That -- that roadway runs north and south.

Q Okay.

A And --

Q This roadway?

A Yes, sir.

Q What's the name of the roadway?

A It's 15th Avenue.

Q 15th Avenue?

A Northwest 15th Avenue.

Q Okay. And where is Martin Luther King, Jr.?

A It's the bigger road.

Q Is it this road?

A No. No. No. The bigger road on the bottom, the four-lane. That's Martin Luther King.

Q This one? Okay. So this one is north of -- is north in this direction?

A No. North is towards you.

Q Towards -- okay.

A Yes, sir.

Q North, south and the house would be east and that's west?

A No, sir.

Q Or --

A Opposite.

Q -- that's --

A The house is west of the roadway.

Q West.

A That roadway is east of the house.

Q [Pause] Is it possible that shots could have come from the road?

A To hit the vehicles?

Q Either the vehicles or the house?

A I'm -- it's not -- if somebody was shooting from the roadway, it's not likely that they would have hit the house across the street and the vehicles. Is that what you're --

Q Correct.

A -- getting at? Because --

Q Well --

A -- they're in two completely different directions.

Q Did you ever consider there were two shooters possibly involved in this case?

A Okay.

Q Was that a theory that was explored?

A Initially, it was -- it was -- it was believed that it was a drive-by shooting.

Q Okay. Now, the bullets and the projectiles -- the projectiles and the casings that were recovered,

some of them were lead and some of them were copper. Or is that something that --

A I do not know that, sir.

Q Okay. Did you check to see what kind of --

A I did not. I don't -- no, sir. I did not go through the casings and see which ones were lead and which ones were copper.

Q [Pause] Who located the shell casings?

A Who located the shell casings?

Q Yes.

A To my knowledge, it was Detective -- or Sergeant Buchbinder.

Q Okay. Were you there when he located them?

A No, sir. I was not.

Q Do you know if anybody moved the casings?

A I do not.

Q And how many casings were there?

A Again, sir, I don't know. That would be a question for him.

Q Okay. Now, was there a hammer also found in there?

A Yes, sir. I was told there was a hammer found. I did -- I did not find it.

Q Was there also on Marker D involved a spent lead projectile?

A Without seeing what Marker D is, sir, I could not venture a guess. I did not lay out any of the markers.

Q [Pause]

MR. BANO: May I approach the witness?

THE COURT: Yes, sir.

THE WITNESS: Okay. And again, sir, like I said, I did not lay out the markers. I wasn't there when the stuff was collected, so I couldn't -- unless it's a closer-up picture, I couldn't tell you what it is. Again, I found none of the evidence, sir.

[Whereupon, Mr. Bano and the Defendant confer.]

BY MR. BANO:

Q Does that refresh your recollection?

A Okay. I can look at this and tell you that it looks like a spent projectile in this picture. I wasn't there when these markers were out. That's what I'm trying to tell you, sir.

Q Okay. So --

A I did not find the evidence, nor did I collect or mark the evidence.

Q Okay.

A Okay?

Q Well, so you would agree that "D" is a projectile.

A I would agree that in the black-and-white picture, it looks to be a projectile.

Q Okay. And if somebody's shooting --

THE COURT: Can I -- can I see that?

MS. FLETCHER: I will point out, that's not actually in evidence.

THE COURT: [Pause] All right. Go ahead.

BY MR. BANO:

Q Now, if somebody's shooting -- you said earlier that the shooting is consistent with where the casings were found. If somebody shooting from that location, meaning we're here, do you know why a projectile would be there if you're shooting -- somebody was shooting from here?

A No, sir. I don't. That projectile also didn't look like it had -- it didn't look deformed. But, then again, I didn't inspect it on scene, so I'm just going by your picture.

Q Okay. Now, where was -- according to the -- your investigation, where was Mr. Davis shot at in this house?

A I don't believe Mr. Davis was in the house when he was shot.

Q Or outside the house. Where --

A Yeah. I believe he was off to the right.

Q Can you point out where you believe that he --

A I believe he was over here to the right of the house.

Q To the right? Okay.

A That's what I believe; yes, sir.

Q Was he outside the house, in the structure of the house, possibly on the steps of the house as far as your investigation?

A I don't -- I don't -- I believe he was outside of the residence, sir.

Q Okay. And he was shot from this direction?

A That's the only place that we found shell casings.

Q Okay. So the -- and then there's -- so there's bullets going this way and there's bullets going across the street to the house in front; correct?

A Yes, sir.

Q Is that the theory that --

A Yes, sir. There were spent projectiles across the street, as well as in the vehicles; yes, sir.

Q Okay. But you can't account for these

projectiles found --

A The one on the ground, no, sir.

Q -- in the ground -- on the ground?

A No, sir.

The planted evidence

Q Okay.

THE COURT: Where is it -- where is it supposed to be found? You can't tell from this picture where this supposedly is found.

MR. BANO: It's by "D". It's on the --

THE COURT: I know, but -- it's a picture of "D", but there's no indication where "D" is.

MR. BANO: It's on the main -- the other exhibit. "D" is listed on there. [Pause]

THE COURT: I mean, do you have an evidence list that says what "D" is?

MR. BANO: Well, we asked the other witness earlier that collected it and she testified that it was -- "D" was the intact projectile.

THE COURT: Okay. Well --

MR. BANO: She testified --

THE COURT: -- why are we going through all this then if we've already been through this once before?

MR. BANO: Okay.

BY MR. BANO:

Q How many bullet holes were found in the house across the street; do you recall?

A I do not, sir.

Q How many bullet holes in the vehicle?

A I don't recall.

Q Or any of the vehicles?

A I don't know, sir.

Q How many projectiles found in the body of the alleged victim; Mr. Boone?

A I do not know, sir. I did not attend the autopsy.

Q You wrote in the report that based on the number of the casings, the projectiles, that you created a theory of how the shooting occurred, or you established a theory of how the shooting occurred; correct?

A I didn't -- can you direct me to where that -- that I wrote that?

Q [Pause]

MR. BANO: May I approach the witness, your Honor?

THE COURT: Yes, sir.

BY MR. BANO:

Q Reference here, shell casings located -- possible --

Q [Pause] Now, October 21st, 2016, you stated in your report that you responded to the State Attorney's Office and a warrant was drafted.

A Yes, sir.

Q You sent this warrant to Judge Herndon, who signed it. Can you explain if you went in front of the Judge or you just wrote the affidavit and just sent it over?

A No, sir. We send warrants by email.

Q Okay. So you never came into physical contact --

A We do not actually -- did not actually go in front of the Judge.

Q Okay. Did you -- now, when you were talking to Mr. Boone, did you place him under oath?

A No, sir.

Q Is that a normal procedure that you don't place victims --

A Yes, sir.

Q -- of crimes under oath?

A Yes, sir.

Q That's normal procedure for you?

A A hundred percent; yes, sir.

Q And at any point in time, during the three times you encountered him, did you ever place him under

oath?

A No, sir.

[Whereupon, Mr. Bano and the Defendant confer.]

BY MR. BANO:

Q So the warrant that you sent to the Judge to sign --

MR. BANO: May I approach the witness?

THE COURT: Yes, sir.

BY MR. BANO:

Q -- was it this warrant by itself or was there more attachments to it?

A That is the extent of the warrant and then the probable-cause affidavit is attached to it.

Q To this.

A Yes, sir.

Q Okay. Now, the probable-cause affidavit, who witnessed that?

A Who witnessed it?

Q Yes.

A Without looking, sir, I don't know. I wrote it. I don't know who signed it as a witness.

Q Okay.

A If -- if you look at the bottom of it, of the narrative pages, it will have the witness on there.

Q And you didn't say anything else to the judge besides this first back at the warrant and then the probable-cause attached to it; correct?

A Correct. That's how we send to get a warrant. We send that to the judge.

Q Did you ever talk to Mr. Moore?

A No. Not concerning this case.

Q Did you ever try to talk to him?

A No, sir. I went to the residence, but he wasn't there. And then when he was arrested, he was out of state. So, no. I did not.

Q How about after he was arrested, did you ever try to go to the jail and speak with him?

A No, sir. Like I said, he was -- he was arrested out of state. I didn't go to Georgia to interview him and after he --

Q No. I said when he came here to Marion County, did you ever go --

A No, sir. I did not.

Q Is there a reason why you didn't do that?

A At that point, I assumed he had counsel.

Q Okay. Did you take an oath when you wrote the probable-cause affidavit? Did you swear under oath that the contents of it were true?

A To the probable-cause affidavit?

Q Yes.

A No, sir. I did not swear anything. I -- I signed at the bottom stating that it's all true, but that's -- I did not physically take an oath to write that; no, sir.

MR. BANO: No further questions. Thank you.

THE COURT: All right. Thank you. Anything else?

MS. FLETCHER: Yes, sir. Just briefly.

CROSS EXAMINATION

BY MS. FLETCHER:

Q The probable-cause affidavit, you do at the bottom swear that everything in it is the truth; correct?

A Yes, ma'am.

Q Okay. And the only person who gave you any information about a drive-by shooting was Sharon Scott; is that right?

A Yes. She gave the information and then Mr. Collins said he saw a vehicle driving away after the shots had been fired.

Q Okay. Mr. Collins didn't say anything about seeing anyone shooting out of the car?

A No, ma'am.

Q And Sharon Scott is the Defendant's mom?

A That's what she told me.

Q And you were familiar with the Defendant before this?

A Yes, ma'am.

Q And you knew that was his house.

A Yes, ma'am.

Q And was there any evidence found to support a drive-by shooting?

A No, ma'am.

Q And later, Ms. Scott changed her information about that since she didn't actually see anybody shooting from the car; correct?

A Correct. Yes, ma'am.

Q And when you first initially made contact with Keith Boone in the hospital, he didn't want to cooperate with you; did he?

A No, ma'am.

MS. FLETCHER: Nothing further, your Honor.

THE COURT: Have a nice day. Thank you.

THE WITNESS: Thank you, sir.

MR. BANO: Just one recross [sic].

REDIRECT EXAMINATION

BY MR. BANO:

Q Do you recall if it's 15 projectiles and nine shell casings?

A No, sir. I don't -- again, I -- I don't know how many casings there were. I don't know how many projectiles there were.

Q Okay.

A I didn't collect any of that.

THE COURT: Have a nice day. Thank you.

THE WITNESS: Thank you, Judge.

[Witness excused]

THE COURT: Anything else?

MR. BANO: Well, your Honor, I have Justin Arnold and Carmen Sirolli. They were -- Sirolli, I know for sure, was served. Arnold, I'm not too sure. I can look on the efile in the portal here and they're not here.

And then the other witness would be Trevor Barth. That's the one that's in Massachusetts. And then I've got --

THE COURT: What is he going to testify to?

MR. BANO: He's going to testify that he arrested Willie James, which was somebody in the maroon Chevy car.

THE COURT: Arrested him for what?

MR. BANO: For possession of marijuana.

THE COURT: How's that relevant here?

MR. BANO: Well, it's --

THE DEFENDANT: He was --

THE COURT: Well, no, no, no. We're not doing that. How's that relevant in this case?

MR. BANO: Well, it's because he was one of the two people in the car that could possibly be the suspects in the Chevy maroon. He was one of the --

THE COURT: Well, does he have any -- other than he arrested him for possession of marijuana, does he have any relevant testimony to this particular case?

MR. BANO: From looking at his videos, he said he doesn't know anything and -- but there was some inconsistent statements on his part where they were working because he said initially he was working and he was picked up by this other individual --

THE COURT: Well, I don't see --

MR. BANO: -- Javon Maxwell. And the reason, your Honor, Javon Maxwell is relevant is because we had some information that --

THE COURT: Well, look.

MR. BANO: -- he was the second shooter and --

THE COURT: Listen. We're not doing this

based on hearsay and, you know -- if you have relevant evidence, call a witness. I'll hear it. But the fact that a witness has been arrested for some completely unrelated offense, I don't see how that's relevant here.

I mean, unless you can tell he how he was -- I mean, he's been arrested for possession of marijuana.

MR. BANO: Well --

THE COURT: Which puts him in line with about, you know, a thousand people in the county every year. So --

MR. BANO: He -- he --

THE COURT: -- tell me how that's relevant.

MR. BANO: Your Honor, he was -- his statement and Javon Maxwell's statement contradict each other as far as --

THE COURT: Who's --

MR. BANO: Javon Maxwell is the other driver of the car --

THE COURT: Okay.

MR. BANO: -- the Chevy maroon car. Our theory is that Javon Maxwell is another shooter and --

THE COURT: Okay. Well, what evidence do you

have to support that theory?

MR. BANO: Well, there's two -- there's two -- you know, there's lead and copper. There's two different kinds of bullets --

THE COURT: Okay.

MR. BANO: -- projectiles in there. The angles, if you look at the picture --

THE COURT: Well, first of all --

MR. BANO: -- all of the bullets were on the side or all the casings were on the side, yet the shooting is alleged to have occurred here. All the casings are over here. This person being shot over there.

You can't -- if all the casings are here, how can you shoot that person there? It may be consistent with shooting -- Keith Boone going this way. But not --

THE COURT: Well, that's argument. What evidence do you have? I mean, what evidence? I emphasize the word, evidence.

MR. BANO: Well, the projectiles and the location of the projectiles --

THE COURT: That's already -- that's already in. You have a projectile sitting on the ground that nobody has testified was fired from any gun

in this case. You have a projectile sitting on the ground.

MR. BANO: Correct.

THE COURT: Which, first of all, tells me probably, you know, if you fire a projectile from the street, it's not going to be laying there on the ground; is it?

MR. BANO: I --

THE COURT: Not unless it probably passed through somebody; right?

[Whereupon, Mr. Bano and the Defendant confer.]

MR. BANO: Right. And, well, and there's 15 projectiles and nine shell casings, so --

THE COURT: Right.

MR. BANO: -- that's just the physical evidence. We don't have a person that's going to say --

THE COURT: Right. But that's already in evidence.

MR. BANO: Right.

THE COURT: Now you're making argument. What -- and I repeat myself for the last time -- what evidence do you have and what witnesses do you want to call? And I'll -- and I'll be honest with

you. You have about 30 seconds to call your next witness, if he's here or not here. If he's not here, we're moving on.

MR. BANO: Okay. Well, Mr. Arnold is not here. Carmen Sirolli is not here, Judge.

THE COURT: Okay. Well --

MR. BANO: Let's see who else.

THE COURT: -- they're not here.

MR. BANO: And the other one was the one I mentioned earlier that's in Massachusetts, so -- and then -- and then the other witness --

THE COURT: Well, the one in Massachusetts you indicate, you haven't explained to me how he has anything relevant, so.

MR. BANO: Okay. And then Jamare Rush would be the other witness that was --

THE COURT: Well, he's not here because you didn't do a transport order. So, you know, to get someone from the jail here, you've got to do a transport order; okay? That's how you get someone here.

MR. BANO: Well, I called your office, your Honor, and your assistant --

THE COURT: No, no.

MR. BANO: -- advised me to not -- to --

THE COURT: No, no. She did not. Okay? My assistant, who's been working for me for a decade, knows you have to have a transport order. I asked her when I went back there: Did you tell him that he doesn't need a transport order?

She said no. Because she doesn't tell anyone they don't need a transport order. She tells everyone the same thing: Send over a transport order. So I don't know what to tell you. You didn't do a transport order. You want somebody who can do a transport order.

It's the same that we've done here for the last 27 years that I've worked here.

MR. BANO: Your Honor, I'm telling the Court, I had a conversation and I called the jail afterwards. I spoke to classification and they said --

THE COURT: Okay.

MR. BANO: -- fax the request with a letterhead. I did that. That's the only thing I can tell the Court. I --

THE COURT: Um-hum. Well, I can't tell you -- I mean, he's not here. I -- you know, it's not like I can -- he's not here, so.

MR. BANO: Yes, sir.

THE COURT: I mean, you know, if that's what you did, you should have probably double-checked to make sure he's here instead of waiting for the hearing to begin and wait till it's 4:15 to check and see if he's here.

He's not here. But my assistant didn't tell you to do that. I can tell you that.

So, anyways, so you have no other witnesses; right?

[Whereupon, Mr. Bano and the Defendant confer.]

MR. BANO: And my client's telling me, Judge, that they did call Mr. Moore for court --

THE DEFENDANT: Jamare Rush.

MR. BANO: -- Jamare Rush for court this morning and he -- we don't know -- they did get the memo. They called him for court. I'm not sure why he wasn't actually --

THE COURT: What do you want me to do? He's not here.

MR. BANO: I know. Well, I ask the Court to continue the hearing so I can --

THE COURT: Okay. I'll continue the hearing. But I'll be honest with you. You scheduled this hearing for an hour.

MR. BANO: Yes, sir.

THE COURT: We're now at the almost three-hour time period. Please be a little more respectful of my time. Okay? I have now missed something that was important to me to attend. And you guys, you just took your time and you -- you had -- you don't even apologize and say: Hey, it's going to take a little longer than we thought.

You just scheduled it and you just took your time as if it's your time.

MR. BANO: Yes, your Honor.

THE COURT: It's not. It's this Court's time. Not me, everyone here's time. Estimate accurately how long it's going to take. When you've got, like, all these witnesses, you called five or six witnesses yourself, or maybe more, she calls all these witnesses, there's no way this can be done in an hour.

I don't know when you want me to continue it to. When do you want me to continue this to?

MR. BANO: To another court date, your Honor.

THE COURT: No. Your motion to continue is denied. Do you have any other evidence?

MS. FLETCHER: No, sir.

THE COURT: Any other evidence?

MR. BANO: And, your Honor, just for the record, the detectives were served, so Justin Arnold was -- or, I'm sorry, Carmen Sirolli was actually served by the investigator. She told me she was actually served a subpoena, so I don't know why she's not here. I --

THE COURT: I don't know either. I mean --

MS. FLETCHER: It's actually a male.

THE COURT: Why didn't we check this at one o'clock or 1:30 when you scheduled it? Your investigator's been sitting here for two hours. He could have went and looked. Right? I mean, if you want me to reschedule it, I'll reschedule it.

But, I mean, I'll be honest with you, I mean, you know, you're simply just wasting time. Your witnesses aren't here. Your other person's not here. You were just taking your time asking the same questions over and over again.

I'll reschedule it. But tell me when you want me to reschedule it and tell me --

MS. FLETCHER: Your Honor, if I -- may I address the motion to continue?

MR. BANO: An hour, your Honor? And, Judge, just for the -- just for the Court --

THE COURT: No, no. No, no. You scheduled the whole thing for an hour. You're not taking an extra hour. How many more witnesses did you want?

MR. BANO: Jamare Rush, Justin Arnold, Carmen Sirolli.

THE COURT: Now, let me ask you, what is --

MR. BANO: Four witnesses.

THE COURT: What is Jamare Rush going to testify about?

MR. BANO: Well, Jamare Rush was -- as far as the conversation he had with Keith Boone about who did the shooting.

THE COURT: Uh-huh.

MR. BANO: And so it's going to go to the credibility of Keith Boone.

MS. FLETCHER: Your Honor?

THE COURT: Yes, ma'am.

MS. FLETCHER: May I be heard?

THE COURT: Yes, ma'am.

MS. FLETCHER: Your Honor, the purpose of a preliminary adversary hearing is to establish --

THE COURT: I know. I'm familiar with all that.

MS. FLETCHER: -- probable cause. Jamare Rush, we took his deposition. Obviously his

testimony would be relevant at trial. I don't see how it affects the probable cause in this case of holding the Defendant in jail.

And also, the other two witnesses that he wanted to call, I don't think have any information that would affect the probable cause, the purpose of this hearing.

And just so the Court's aware, I didn't realize until yesterday that Mr. Bano had subpoenaed all of these witnesses. I think my portion of the hearing probably lasted 30 minutes or less, so I wasn't expecting the hearing to last this long.

MR. BANO: Your Honor, when I scheduled it, I hadn't disclosed those witnesses. It was after conversation I had with my client and he specifically --

THE COURT: Well, then you should -- you should make -- you know, don't schedule something without actually knowing how long it's going to take you to get it -- how long -- I'll tell you this.

I can do it three o'clock next Friday. That's the only time I have left on my calendar.

MR. BANO: Yes, your Honor. That's --

THE COURT: Don't bother looking at your calendar. You either come here at three o'clock next Friday or you're not.

MR. BANO: I'll be here. I'll be here.

THE COURT: Okay. So three o'clock next Friday we'll finish this thing up. You have 45 minutes and that's it. So ask your questions fast. That's it, 45 minutes. And you've already taken, you know, almost three hours.

MR. BANO: Yes, sir.

THE COURT: So you have 45 minutes left.

MR. BANO: And, your Honor, I can email a copy of the motion to transport for Mr. Rush to your office so we don't have these problems.

THE COURT: That's fine.

MR. BANO: Okay.

MS. FLETCHER: You have to fax it to the jail.

MR. BANO: I can fax the letter, but I guess that's not good enough, so.

MS. FLETCHER: No. You do your own transport order and you fax it to the jail.

MR. BANO: Okay.

MS. FLETCHER: The Judge does not transport people. You have to do that.


Q Mr. Rush, do you know an individual by the name of Keith Boone?

A Yes, sir.

Q How long have you known him for?

A For a little minute, about a long time.

Q Okay. And you know a John Moore; correct?

A Yes, sir.

Q And how long have you known John Moore for?

A For -- since, like, 2014 once he was released from prison.

Q Okay. And you've known Mr. Boone longer than that, I would take it?

A Yes, sir.

Q Okay. Are you in good terms or were you in good terms with Mr. Boone before?

A Yes, sir. We stay on the same road, like, 9th Avenue --

Q Okay.

A -- West Ocala.

Q Now, did Mr. Boone -- did you have any interaction with Mr. Boone regarding the case where John Moore is the Defendant?

A Yes, sir.

Q And can you describe what Mr. Boone told you?

A Well, upon my release from the county jail in

2016, Mr. Keith Boone, when I had got out, he had told me that -- like, about the situation at hand with "Kiki", which is Jordan Davis.

Q Okay.

A And he was, like, telling me that John Moore didn't really do it.

Q Okay.

A And he explained to me the whole situation on how it happened and whatnot.

Q And how did it happen; did he -- do you recall?

A Excuse me. He said that he went over to Mr. Moore's house to confront him about some hearsay about the death of Miss Bracey [ph] to figure out what was being said or whatnot --

Q Okay.

A -- but he drop -- he got dropped off in a barbecue pit --

Q Okay.

A -- next to Mr. Moore's house. And when he got dropped off, he started walking toward the house and as he was walking to the house, I guess people was clutching, like, gripping guns.

Q Okay.

A And the car that dropped him off, the people

that was in the car noticed people clutching.

Q Okay.

A So it was a -- pretty much a big shootout.

Q Okay. And so the people in the car that dropped him off started shooting at the people that were already in the house?

A Yeah. They backed up, left the barbecue pit --

Q Okay.

A -- on -- got on the road and started shooting from the car and people from the yard began shooting at the car. And he said that him and "Kiki" got caught in the crossfire.

Q Did he say anything about -- so he denied that Mr. Moore was the one that actually shot him; correct?

A Yeah. He said that he really didn't do it.

Q Okay.

A He told me that he really did not shoot him.

Q Um-hum.

A He said the only reason why he said that John Moore shot him was because of the simple fact that he went over there to John Moore's house to figure something out and he felt like, you know, by him coming over here, this would have never happened if I would

have came over here.

Q Okay.

A But that was it. He said only one person he knew was a dude named "Duck".

Q "Duck"?

A "Duck".

Q And that was not -- now, you've known Mr. Moore for a while; correct?

A Since 2014, yes.

Q And do you know if Mr. Moore has a nickname?

A Yes.

Q What's his nickname?

A "Jew Boy".

Q Okay. His nickname is not "Duck"; is it?

A No, sir.

MR. BANO: Your Honor, if I could have a moment to confer with my client?

[Whereupon, Mr. Bano and the Defendant confer.]

MR. BANO: No further questions.

THE COURT: Ms. Munroe?

CROSS EXAMINATION

BY MS. MUNROE:

Q Now, Mr. Rush, you were in jail at the time of the shooting; right?

Exhibit - B

# Exhibit – B

Exhibit - B

Q. How many times?

A. Like, seven.

Q. And back in October 2016, did you have any criminal charges pending?

A. Yes.

Q. All right. And when you -- you initially -- you eventually spoke with a law enforcement officer on this case; is that right? After all of this happened, you spoke with a detective?

A. Yeah.

Q. And did you talk to the detective about your pending charges?

A. Yeah.

Q. At -- at the time? Like, when he said -- when he talked to you in the hospital?

A. No, I didn't talk to anybody in the hospital.

Q. Okay. And eventually you came in and you met with a prosecutor at the State Attorney's Office. Do you remember that?

A. Yes.

Q. It was Mr. Hunt?

A. Yes.

Q. And he talked to you about the facts of this event that you're about to testify to; is that correct?

A. Yes.

Q. And did Mr. Hunt ever tell you that you would get any kind of deal if you testified?

A. No.

Q. Did you, in fact, ask your lawyer if he could see if you could get a deal if you testified?

A. I did ask my lawyer.

Q. Okay. And that was long after this event took place, right?

A. Yeah.

Q. All right. And did you, in fact, get a deal to testify today?

A. No.

Q. Have I ever offered you any kind of deal to testify?

A. No.

Q. And you're here testifying because that's what you want to do?

A. Yes.

Q. All right. Do you know John Moore?

A. Yes.

Q. How do you know him?

A. From -- his mom is married to one of my cousin's.

Q. Okay. So his stepdad is your cousin?

A. Right.

A. No. It's, like -- his mom is sitting right here. His sister is right beside her. He's right beside his mom, so Keke gave his sister, like, a cigarette. A cigarette or something. He was standing up in front of her. (Indicating.)

Q. Okay.

A. Dirty Red -- Dirty Red, Kadega, and Keke had just walked from around the corner at the time. I walked up in the yard talking to Squirrel over here. (Indicating.)

Q. Okay.

A. Yeah.

Q. So they were -- the three of them were off the porch?

A. Yeah. No. No. No. They're on the porch. Everybody is on the porch.

Q. Everybody is on the porch?

A. Ain't nobody off the porch but me and Squirrel standing over here talking. (Indicating.)

Q. Okay. Did Keke eventually stand right around this area? (Indicating.)

A. No. He -- Keke didn't leave off the porch until he got shot and took off running.

Q. Okay. So tell the jury what happened as you're talking to John Moore.

Q. Did Keke shoot back?

A. No.

Q. Did you see the gun when the defendant was shooting Keke?

A. Yeah.

Q. And could you tell what kind of gun it was or what color? Could you describe it to the jury?

A. It was, like, gray. Gray. Gray and silver, and, like, a .40 caliber or .45.

Q. Okay. Did you see where he pulled the gun from?

A. Behind his back.

Q. As you were running away, could you hear any more gunshots?

A. I didn't hear any more gunshots.

Q. Okay.

A. When I was running, I didn't hear no more.

Q. Okay. When you first turned to run, do you know whether or not he was still shooting at you?

A. No.

Q. So you said when this happened, all of those people were out front and would have witnessed it as well?

A. (No audible response.)

Q. Okay. Is that a "yes"?

Q. So when they asked you to give a name, what name did you give?

A. Duck.

Q. All right. Do you know anyone named Duck?

A. No.

Q. Why did you say that name?

A. Just because I wasn't trying to -- like I said, I wasn't trying -- I wasn't sure how I was going to handle the situation or really why we even got shot or why -- it was just -- you know what I mean? It was a lot to just handle at the time, and, plus, I -- like I said, testifying or going to the police is something I don't really -- you know what I'm saying -- something I don't live by, so that's why I said the name "Duck" at first.

Q. Okay. And did Detective Steckman say, Could it be Squirrel?

A. Yeah.

Q. All right. And what did you tell him then?

A. I didn't tell him nothing. I didn't tell him it was Squirrel. I just stayed with Duck.

Q. Okay. Did you ever tell him it was Squirrel?

A. Yeah. When he came -- I don't know when. I don't think I ever said the name "Squirrel." I don't think I ever told him. I just circled the picture.

Q. Okay. When he asked you if you would be able to identify -- or did he ask you if you would be able to identify the person that shot you?

A. Yeah.

Q. And you told him that you would be able to do that?

A. No. The second time when he came in, I just circled -- I just grabbed the pen and just circled the picture by myself.

Q. Okay.

A. I already knew who it was.

Q. All right. I'm not talking -- when they're there on -- when you're first talking to him and you tell him the name "Duck" --

A. Yeah.

Q. -- did -- did -- at that point, did he say, If I brought some pictures back, would you be able to identify the person? Or do you remember him saying that?

A. I don't remember.

Q. Okay. Do you remember him coming back with pictures?

A. Yeah.

Q. Okay. And there was a different detective with him at that time?

trust the justice system and not take matters into your own hands?

A. Yeah.

Q. Okay. I'm showing you what was premarked -- or which has been entered into evidence as State's Exhibit A -- State's Exhibit 1. Who is this a picture of?

A. Jordan Davis.

Q. I'm showing you what was premarked as State's Exhibit L. Can you look at this photo and tell me who this is a picture of?

A. Jordan Davis.

MS. FLETCHER: And just for the record, he's identified State's Exhibit L as Jordan Davis. It will be introduced later.

THE COURT: Okay.

BY MS. FLETCHER:

Q. After you got out of the hospital, did you ever tell any person that John Moore was not the person who shot you?

A. I never told anyone that.

Q. Do you know a person named Jamare Rush?

A. Yes.

Q. Okay. Did you see Jamare Rush after you got out of the hospital?

A. Yes.

Q. Did you talk to him about what had happened?

A. I never once talked to Jamare Rush about what happened.

Q. All right. And did you ever tell Jamare Rush that the defendant was not the person who shot you and your cousin?

A. I never told him that.

Q. Okay. Do you see the person in the courtroom that shot you on October 17th?

A. Yes.

Q. And do you see the person in the courtroom who killed your cousin, Jordan -- Keke -- Davis?

A. Yes.

Q. And is that the same person?

A. Yes.

Q. Can you point to him and describe him by an article of clothing that he's wearing?

A. Right there. (Indicating.)

Q. All right.

A. In the red, burgundy, whatever color that is.

MS. FLETCHER: For the record, he's identified the defendant.

THE COURT: So noted.

MS. FLETCHER: May I have one moment, Your

picture. (Indicating.)

Q. Okay.

A. So you did just ask me whether there was people sitting right at this house? (Indicating.)

Q. Right. Correct.

A. You just asked me about this house? (Indicating.)

Q. I'm sorry. This house. The one -- lower.

A. Okay. Can I pick it back up?

Q. Yeah.

A. Yeah. His mother and sister --

Q. Okay.

A. -- and all them -- Dirty Red and all them were sitting on the porch when this happened.

Q. Okay. So Mr. Moore starts -- you talk to him for -- was it a few seconds?

A. Yeah.

Q. Okay. And he has no words? No interactions at all as far as him and Keke, correct?

A. Him and Keke didn't say a word to each other.

Q. Okay. And were you aware of any conflicts between Mr. Moore and Keke previous to this?

A. No, I wasn't. No, I wasn't.

Q. Okay. And -- so Keke comes out next to these people on the porch here, correct?

A. I --

Q. When you take off running, you didn't hear any more shots?

A. I didn't hear any more shots, probably because it was so close when he shot that my ears went numb or something, so I have adrenaline pumping. I'm just trying to get away. But I wasn't counting how many shots. I'm not worried about hearing the shots. I'm trying to get away from the shots.

Q. So when you're sitting stationary -- or when he's sitting stationary, you get shot twice. Did he fire two shots or did he fire more than two shots?

A. Say that again.

Q. When you -- when you say he shot at you twice --

A. Uh-huh.

Q. -- did he fire two shots or did he fire more than two shots and only two hit you?

A. Okay. Listen. After he shot Keke, he turned to me and he shot me. Shot me in my chest. Shot me in my arm.

Q. Okay.

A. Okay? I get up. When he shot me, I dropped to the ground like this and I'm like, Squirrel, what the fuck? Okay. Then I take off running. And then

after that, I don't hear any more shots. I don't remember hearing any more shots. I'm trying to get away. That's what happened.

Q. Okay. And you may have a seat.

MS. MUNROE: And just for the record, those were State's Exhibits 4 and 5.

(The witness returned to the witness stand.)

BY MR. BANO:

Q. Now, there was no plan to come to this house between you, Javon Maxwell, and Willy James to -- to do any robbery on this house?

A. No.

Q. Okay. And Javon Maxwell and this other individual, they were not involved in this shooting in any way, shape, or form; is that your testimony?

A. No. All he did was give me a ride. He didn't have nothing to do with no cocaine purchase, no shooting, no robbery, none of that.

Q. No fires came from that car, correct?

A. Say that again.

Q. No shots were fired from that car?

A. No shots.

Q. And when the shots are happening, the people that are in there, they're still there while the shots are being fired, correct?

THE WITNESS: Repeat the question.

BY MR. BANO:

Q. I said if you don't -- if you don't own a firearm and you can't have a firearm because you're a convicted felon, how are you going to handle it on your own?

A. Well, I could get one. I could get a gun or either, like, Keke -- that's not only my family. He has other family that may want to handle it. It's just me handling it on my own. Like -- you know what I'm saying?

Q. Okay. Now, you -- you had a conversation about this case with a prosecutor by the name of Toby Hunt. Do you recall that? Is that a "yes" or a "no"?

A. Yeah.

Q. Okay. And while you had that conversation -- or before you had that conversation, you were facing some charges here in Marion County; is that correct?

A. Yeah.

Q. Okay. And -- and you had asked your attorney to get in touch with the state attorney, Mr. Toby Hunt, for you to cooperate on this case so you could get some leniency on the other charge you were facing; is that also correct?

A. Yeah, I did ask my attorney that.

Q. Now, that charge, you were looking at 15 years in the Department of Corrections as a maximum; is that correct?
A. I think that might have been the maximum. I'm not sure.
Q. Okay. And you were able to get that case resolved, correct?
A. Yeah.
Q. You didn't go to prison for 15 years, did you?
A. No.
Q. How many felonies have you been convicted of?
A. I think seven.
Q. Do you -- have you been convicted of any crimes of moral dishonest -- crimes of dishonesty?
A. One. False name given to law enforcement.
Q. Okay. Now, just going back a little bit. When you -- when Detective Steckman came back to the hospital to see you, did you call him or did he come back on his own?
A. Say that one more time.
Q. When Detective Steckman came back to give you the photo lineup at the hospital, did you call -- did you reach out to him to come back?
A. I never reached out to Detective Steckman.

Q. He came back on his own, in other words?

A. Anybody who came up there came on there own, including Steckman.

Q. Okay. Now, do you recall telling Detective Steckman that you and Jordan Davis ran together and then you split up after the shooting?

A. I never told anybody that.

MR. BANO: Your Honor, if I can have a moment to confer with my client?

THE COURT: Sure.

BY MR. BANO:

Q. Do you recall telling Detective Steckman that there was some sort of disagreement going on between Mr. Moore and either you or -- and/or Jordan Davis in the yard?

A. Say that again.

Q. Do you recall telling Detective Steckman that there was some sort of disagreement going on prior -- or when you got to the house between Mr. Moore and Jordan Davis and/or yourself?

A. No.

Q. One more question. Do you recall not telling Detective Steckman that there was -- or telling Detective Steckman there was no yelling or words being exchanged between Mr. Moore with either you or Jordan

Davis when the shooting occurred?

A. Say that again.

Q. Do you recall stating there was no yelling or words said by Mr. Moore or the alleged shooter when the shooting occurred?

A. Say that again?

Q. Okay. Do you recall telling Detective Steckman that there was no words or yelling by the black male who did the shooting when the shooting occurred?

A. There wasn't no words.

Q. Okay. But earlier didn't you say he said, Bro, what the fuck, to Jordan Davis?

A. He said that in front of me. I don't know if Jordan Davis heard him. Like I said, Jordan Davis was up on the porch, minding his business. He didn't say anything to us. Didn't come near us. Didn't represent a threat. So, like I said, John Moore did say, Bro, what the fuck? It could have been amongst himself because he didn't yell it out, but that's the only thing he said before he started shooting, so --

Q. But -- okay. And if he said that, then your recollection is -- did you tell that to Detective Steckman?

A. I'm not exactly sure if I did tell it to

Steckman like that. I'm not sure.

Q. So this is not -- or is it possible this is the first time you're saying these words?

A. No, it's not.

Q. Okay. Do you know if you told them to another detective that wasn't Detective Steckman?

A. No. At the time, I -- these detectives and all this stuff was, like, almost two years ago when this first happened, so I can't really recall exactly if I did talk to this detective and tell him everything or if I did or did not.

Q. Okay. Do you recall telling Detective Steckman that you had previously seen the black male previously but did not know his name?

A. Say that again.

Q. Do you recall telling Detective Steckman that you had previously seen the black male but did not know his name?

A. I don't recall that.

Q. Okay. Do you recall telling Detective Steckman a description of the male? A physical description?

A. I don't recall that.

Q. Do you recall giving them anything at all as far as --

A. What I --

Q. -- what this person looked like?

A. What I recall them -- is them coming up there the second time, me grabbing the pen and circling the black male, John Moore, who shot me and killed my cousin. That's what I recall.

Q. Okay. But before they gave you the lineup photographs, did you give them any information what this person looked like?

A. The first time they came up there, I told them it was Duck or Rooster. That's the first time they came up there. The second time is when I grabbed the pen as soon as they came in, without crying or anything, and circled John Moore's picture, the person who shot me and killed my cousin.

Q. What -- the first time when you told them Duck or Rooster, did you give them a physical description? Did you tell them, Hey, this person is seven feet tall? Six feet tall? Like, anything specifically? What hair color? Build?

A. The first time -- the first time they came, all I told them was Duck or Rooster. I didn't give a physical description. I didn't do any of that.

Q. And then Detective Steckman comes back with a picture of John Moore in one of the six --

A. I know two -- I know two detectives came back the second time. As soon as they walked in the room, I told them to give me the pen and I circled it on my own.

Q. Well, how would they get a -- John Moore's picture on there if you didn't give them a description about him? They just picked it out on their own?

A. Like I said, the second time when they came, I told them to let me see the photo lineup they had -- what they had. I grabbed it. I seen his picture on there. And I circled it myself.

Q. Okay. But you wouldn't sign it when you circled it, correct? Is that a "yes" or a "no"?

A. No.

Q. Okay.

MR. BANO: No further questions, Your Honor.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. FLETCHER:

Q. Keith, on this particular day on October 17th, 2016, did you use any drugs that day?

A. I had smoked marijuana and then the drugs that I had purchased from John Moore's house. I had tried it and it wasn't right, so I didn't do any more of it.

here -- I heard him say, It's right here. And then he cut it out.

Q. But the bullet wound, was it from the back?

A. It looked to me. I'm by no means an expert on bullet tracks --

Q. Right.

A. -- once they enter the body. It looked like it entered back here somewhere. (Indicating.)

Q. The back elbow?

A. Yeah. It was back -- like, right at the elbow, just above the elbow.

Q. Okay. Would that be consistent with somebody being shot from -- from the back?

A. Now that would depend. I wouldn't speculate to say. I mean, it could be, but I don't know. I mean --

Q. Okay.

A. -- you could get a ricochet that could come in some way.

Q. Okay. But assuming there's no ricochet, it's just a straight shot, would that be consistent with the bullet coming from --

A. From behind?

Q. -- from behind? Based on your experience dealing with firearms --

majority of your career in a particular district?

A. The majority of my time working for the police department has been in the west district. Now, certainly there have been occasions where I've been assigned elsewhere, but the majority of my time, yes, in the west district.

Q. And by the nature of your work, do you get to know a lot of people in the community where you work?

A. Many, yes.

Q. Prior to this incident, did you know John Moore?

A. Yes.

Q. Did you know a nickname that he went by?

A. Yes.

Q. What was that?

A. Squirrel.

Q. Did you know where John Moore lived?

A. I did.

Q. Where was that?

A. 832 Northwest 15th Avenue.

MS. MUNROE: May I have a moment?

THE COURT: Yes.

MS. MUNROE: Nothing further from the State.

THE COURT: Cross-examination, for Bano?

MR. BANO: Yes.

Q. Was anything sent to -- to a ballistics expert for examination in this case?

A. I'm not certain, sir. I wasn't assigned to investigate the case. I was just the supervisor of the investigation.

Q. Okay. Now, did you go across the street where there were bullet holes at the other house?

A. I was there for a short time, but -- yes, in a short answer, I did.

Q. And did you observe any bullet holes in there?

A. In my opinion, yeah, there were some bullet holes on the front-facing wall of the home. Now, that doesn't definitively mean they were from -- all from this shooting.

Q. Okay.

A. Certainly there are occasions where shooting incidents occur and the police aren't called, so it's possible some or all of them are old damage; it's possible they were all from this incident.

Q. Okay. Did you go inside the house to see if you could retrieve the projectiles?

A. I did not, no. Others did.

Q. Other officers did?

A. Sure.

Q. Did you investigate what the results of their findings were?

A. That I'm aware of -- and, certainly, things I don't do myself, specifically, I'm informed of, only because of positional rank. I am aware that they made attempts to recover some projectiles from inside the home, but it would have caused probably more damage than the actual value of the evidence. When I say "value of the evidence," oftentimes when a gun is fired and a projectile comes out of it, it's defective. If it hits something hard, it's very common for those pieces to fragment. It's very common for those pieces to become almost unrecognizable. So I think in the effort to preserve that family's home, we decided not to cut their walls apart.

Q. Okay. Well, the property value of that -- of those cases would be decided if they came from possibly -- if they were the same caliber -- or the projectiles were the same calibers as the ones that were actually on the other side or that went into the people, wouldn't that be a relative inquiry?

A. I would say, in my training and experience, oftentimes projectiles that travel through multiple walls and/or cars or anything hard are -- are seriously altered, if not fragments or broken apart.

Q. So you wouldn't be able to tell if they were actually fragments or altered until you actually got them?

A. I wouldn't be able to tell one way or the other because I'm not a ballistics expert.

Q. Right.

A. But, yes, if you're asking did I make the decision not to cut their house apart, I did.

Q. Okay. What about the projectiles in the cars? You were able to retrieve a projectile from the cars; isn't that correct?

A. That I'm aware of, yes. A piece of a projectile was recovered from the engine bay to the sedan car that you saw a picture of.

Q. And that's a hard object, I mean, hitting a car?

A. Sure.

Q. Was the projectile damaged?

A. I don't -- I don't recall.

Q. Okay. And it wouldn't strike you -- or it wouldn't be relevant to you to know whether or not there were multiple guns being used or if everything came out of the same gun by looking at the other projectiles that were in the house across the street to compare them with the rest of the projectiles?

projectiles, would it have at least allowed you to compare them to the other projectiles that were recovered from the car or from the body of the alleged -- of the victims?

A. Potentially, yes.

Q. Okay. Now, based on your investigation of the case, the person who was doing the shooting, was he stationary or do you believe he was moving?

A. I would be giving you an opinion, if I -- if that's what you're asking for.

Q. Yeah. What's your thoughts on that?

A. In my opinion, the shooter and the victims were all moving.

Q. Okay. And that the shooting occurred from the south side of the house; is that correct? If I can show you a picture, if that helps, too.

A. No. I don't need the picture to tell you my opinion. Some portion of the shooting occurred along the south side of the home. Now, is it possible that evidence could have been moved or removed prior to the police getting there? Absolutely. So for me to tell you definitively that's the only place anyone was shooting from, I can't say that.

Q. Okay. Now, when you -- when you shoot a gun and the casing -- the shell casing comes out, what

(Indicating.)

A. Well, if -- I don't believe all of the shots were shot in a northern direction. Clearly there were shots that were fired in the northern direction because cars that were on the east side of the property --

Q. Okay?

A. -- on the north side of the driveway were hit. If you recall, there were also bullet strikes on the home directly across the street from there, which would be a west facing wall.

Q. Right.

A. So if the shooting, indeed, started at the back corner of that house in that little alleyway between the home and the fence, then those bullets would have been shot in an eastern direction. And if the shooter were moving, as were the intended targets moving, the direction of those bullets would change.

Q. Now, if you're facing -- the other bullets to the house in front of this house, correct? The bullet holes? The one that you decided not to tear down the walls? (Indicating.)

A. Those were inside the home across the street, yes.

Q. The one in front of this house? Or across? (Indicating.)

A. Across the street, yes.

Q. So in order for those bullets -- if they came from the same incident -- the shooter had to be -- had his back against this house and shooting that direction? Wouldn't that be correct? (Indicating.)

A. Bullets could have been shot into the home across the street from a hundred different angles and probably a hundred different places from that parcel property and the adjoining parcel.

Q. Were the majority of those holes to the right of the house, if you're facing the house?

A. I would have to refer to the photographs taken, the bullet strikes on the home, sir.

Q. Okay. Did you interview any of the -- did you interview any witnesses in this case?

A. No, sir.

Q. All right. Now, the -- as far as projectiles -- were there two projectiles found in the body of Keith Boone?

A. I'm not certain.

Q. What about the body of the decedent, Mr. Davis? Were there four projectiles found in his body?

A. I wouldn't know.

Q. Well, how are you -- what confidence -- or how are you confident that there's only one weapon

fired if you don't know the number of projectiles that were actually in that scene -- or actually found at that scene?

A. I don't know how many weapons were involved in the shooting.

Q. Okay.

A. I don't think any -- that I'm aware of -- I don't know how we could answer that.

Q. So your testimony is that it could have been one or more weapons used in that incident?

A. Possibly, sure.

Q. Okay. Was this case investigated as a drive-by shooting at any point in time?

A. No. Perjury

Q. There was no -- sorry. Was there any -- well, initially, when this -- when this -- when you were dispatched to this, there was no leads that this was a drive-by shooting from a car?

A. That, I'm not aware of. I wasn't specifically dispatched to go there. I was called on the phone. I did overhear part of a conversation at the scene regarding a drive-by shooting, but I wasn't specifically interviewing that person.

Q. Okay.

MR. BANO: Your Honor, if I can have a moment

examine it.

Q. Okay. And the other one -- well, the intact one was the one that was found in the grass, correct?

A. Yes, sir.

Q. Okay. You just observed it? You did not -- you were not the one that actually found it?

A. Correct.

Q. Okay. Was it Officer Ballas that was responsible for the --

A. I'm not sure who the evidence technician was. I know -- clearly this was a murder investigation, so there would have been a number of -- not only investigative efforts, but collection and processing that would have gone on over several hours and/or several days. I'm not sure at what time which evidence officer was doing what.

Q. Okay. Now, you also said that you knew John Moore and his nickname, correct?

A. Yes.

Q. Okay. Had you had any prior encounters with Mr. Moore?

A. Yes.

Q. Okay. How long ago was the last one?

A. It had been a few years, I think, since I had any contacts with Mr. Moore.

Q. How many years? More than 10?

A. I don't know. I don't recall.

Q. I mean, was it a lot of years or was it just a couple of years?

A. I don't know. I -- I've been a sergeant now for almost five years, and I don't believe I had any casual interaction or otherwise with Mr. Moore in that time, so if you want me to guess, five years.

Q. Okay.

A. Or more.

Q. So it wasn't in the recent past that you had come into interaction with Mr. Moore?

A. Not directly. Now, indirectly, yes.

Q. Okay. When you say "indirectly," is it through other officers?

A. Other criminal investigations.

Q. Okay.

MR. BANO: Your Honor, if I can have a moment to confer with my client.

BY MR. BANO:

Q. Officer -- or Detective Buchbinder, do you know the names of the other officers that were with you that night when you discovered those shell casings?

A. The shell casings that were in the home -- the yard?

attempting to get fingerprints off of casings?

A. Yes, I have.

Q. And is there difficulty to do that?

A. Once a bullet has been fired, the heat process that it goes through, it's almost impossible to get fingerprints off of spent casings. It just -- fingerprints are made out of the oils from your skin, and it burns off.

Q. What about DNA?

A. The same would apply with DNA.

Q. While you were there, did you go to the house across the street?

A. I did.

Q. Okay. And did you notice anything about the house across the street?

A. It had multiple -- what appeared to be bullet holes in it.

Q. Okay. And do you recall how many bullet holes you saw at the house across the street?

A. There were eight.

Q. Eight total?

A. Yes.

Q. Okay. And do you have any way of knowing whether all of those bullet holes would have been from this incident?

A. No, I don't.

Q. Okay. Is there any way to tell where the bullet hole -- whether it was recent or it had been there for a while?

A. Not really, no. Sometimes, like, by the way the paint is chipped, you can tell if it's a recent, you know -- if there's fresh paint flakes, but, generally speaking, it's difficult to tell when it occurred.

Q. Okay. But there was some evidence that maybe that house had been struck on this night?

A. Yes.

Q. Okay. At least once, would --

A. Correct.

Q. Okay. Explain to the jury what you did at that residence.

A. I initially located the bullet holes on the outside of the house. I photographed them with a scale. We then proceeded inside the house to try to locate any spent projectiles. .40-caliber bullets are big. Being that they're big, they're slow. They don't -- they -- they have a very big impact when they hit you, but -- or hit a person, but as anything else, something -- the larger the mass, the more resistance it's going to have to air as solid objects. So we went

Q. Okay. We've only got nine?

A. Assuming that the holes in the house across the street were from that day, yes.

Q. Okay. Was there any reason to believe that they were not from that day?

A. It could very well have been that they were not from that day, yes.

Q. Okay. But if they were not from that day, would you have been appraised of that? Would somebody have told you that, Hey, this weren't there -- because you already talked to the homeowner of the place, correct?

A. I did not speak with the homeowner.

Q. Okay.

A. I already stated that.

Q. But did you investigate or were you -- did you talk to the people -- the detective on the scene --

A. Yes.

Q. -- whether or not they had inquired of this homeowner?

A. I did not specifically ask the detective if he inquired of the homeowner if there were previous holes in the house, no.

Q. Okay. But if you discussed possibly cutting the wall or -- that's the way to get those projectiles

out, this definitely would have had to do with this incident versus a previous incident?

A. Correct.

Q. Now, the hammer -- there was also a hammer found on the side there by the casings, correct?

A. Correct.

Q. And the -- was -- were -- was there fingerprint analysis done on the hammer?

A. The hammer, I did not process it. I do believe it was processed for fingerprints and DNA. I don't know the results of that processing. And the hammer was determined not to be relevant. It was just laying in the yard.

Q. Okay. But from your investigation on the case, you weren't made aware that any fingerprints of the defendant were on the hammer, were you?

A. No, I wasn't.

Q. Okay. Was there a firearm recovered?

A. I did not recover a firearm.

MR. BANO: Your Honor, if I can have a moment to confer with my client.

THE COURT: Yes.

BY MR. BANO:

Q. Now, Ms. Ballas, do you recall making a different statement regarding whether or not that

wounds.

Q. Okay. And what was the manner of death?

A. Homicide.

MS. FLETCHER: I have no further questions, Your Honor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BANO:

Q. Good afternoon, Ms. Lavezzi. Do you know what the height of the -- of Mr. Davis was?

A. Yes. He measured 66 inches at our office.

Q. Is that 5-6?

A. Yes.

Q. Five foot, six inches?

A. Yes.

Q. Oh, wait. 66 inches divided by --

A. Sixty-six inches is five feet, six inches.

Q. Five-six?

A. Yes.

Q. Okay. Now, the -- you testified that the bullets, your autopsy, they went in -- they went in from an upward and then they went downwards, correct, from the exit points?

A. The one on the right chest went from front to back, left to right, and downward. The one in the arm

went from back to front, left to right, and downward, if the arm is in the anatomic position.

Q. Okay. Now, in order for it to come downwards, it would have to come -- like, if -- if I'm standing here, I would have to be hit at an angle from the top in order for the bullet to go down? (Indicating.)

A. If you're standing in the anatomic position.

Q. Yes. If you're standing up?

A. If you're standing in the anatomic position, yes. If you're -- if you're bending forward -- you know what I'm saying? I don't know what position the person is in when they're shot.

Q. Okay. Well, even if they're bending forward, wouldn't the -- bending forward, the exit would be higher than the entry? It would go upwards?

A. Not necessarily. They would have to be bent completely forward. Most people don't stand completely still when they're being shot, so I can't tell how they're moving, and the movements can be quite bizarre, so I don't make any prediction on where the person is that shot them or where they are when they were shot.

Q. Okay. But most people, when they bend, usually they bend forward? They don't bend backwards; isn't that --

A. Yes, ma'am.

Q. Now, you said as part of your job in the community, you get to know who people are. Did you know who John Moore was?

A. Yes, ma'am, I did.

Q. Did you also know where he lived?

A. Yes, ma'am.

Q. And where did he live?

A. 832 Northwest 15th Avenue.

Q. Okay. And that was the location of the -- where the crime scene was?

A. Yes, ma'am.

Q. Did you know by -- any nickname that he went by?

A. Yes, ma'am.

Q. What was that?

A. Squirrel.

Q. When you got to that residence, was the defendant there?

A. No, ma'am. Not that --

Q. Did you ever see him that night when you were at the residence investigating this case?

A. No, ma'am.

Q. Did you make contact with anybody at the -- at the scene?

on the following day?

A. Yes, ma'am, I did.

Q. And where was he at at that time?

A. He was in the Intensive Care Unit at ORMC.

Q. Were you able to speak with him?

A. I was.

Q. And prior to speaking to him on October 18th, did you consider the defendant, John Moore, a suspect in this case?

A. No, ma'am.

Q. So when you talked to Keith Boone, did you ask him what happened?

A. I did.

Q. And did he describe the events to you of what had happened to him and his cousin Jordan Davis?

A. Yes, ma'am.

Q. What was his demeanor at the time he was describing those events?

A. When I spoke with him, he was -- he was pretty calm. He had a day to calm down. He was open to talking with me.

Q. Okay. Did it appear to you that he was fully cooperating with you at that time?

A. Yes, ma'am.

Q. Okay. Did you ask him who shot him and his

cousin?

A. I did.

Q. And what did he initially tell you?

A. Initially he told me he didn't know the person's name.

Q. Okay. He described him and I asked about a nickname?

A. All right.

Q. Did he describe what the individual looked like?

A. Yes, ma'am.

Q. Okay. And what description did he give you?

A. I think he said six-one to six-three, black male, skinny, with a low haircut.

Q. Okay. And so when you -- when you asked him the name, he -- he told you -- what did you just say? Duck or Rooster?

A. Well, he -- I asked if he knew a nickname, and he said it was something similar to Duck or Rooster.

Q. Okay.

A. And so then I asked him -- but he said he wasn't certain. I said, Well, is it an animal? And he said it was an animal.

Q. Okay. And did you say anything to him?

A. I did. I asked him if it was Squirrel, and he said, Yes, it was Squirrel.

Q. Why did you ask him -- why did you say the name "Squirrel"?

A. Because the incident happened at the house we knew to be John Moore's family house. I knew John Moore's nickname to be Squirrel, and it's just kind of the way the conversation continued.

Q. Based upon that information, did you ask Keith Boone would he be able to identify there person if he saw photos --

A. Yes, ma'am.

Q. -- a photo lineup?

A. Yes, ma'am.

Q. Okay. And explain to the jury what a photo lineup is.

A. We do photo lineups. It's one piece of paper with six individual pictures. Generally the pictures are similar. They're not, you know, identical twins or anything. It's if you have a white male, 35 years old, then you search for other while males that are similar in age range, within a couple years, similar hair color. You know, similar pictures.

Q. Okay. And did you go to the Ocala Police Department and construct a photo lineup?

those vehicles to the police department?

A. Because they had been shot and we wanted to get the projectiles out of the doors.

Q. Did you make contact with the defendant at his residence on that day?

A. No, ma'am, I did not.

Q. Were you able -- ever able to locate the defendant?

A. No, ma'am.

Q. Did you take part in getting search warrants to search the two cars that were in front of the defendant's residence?

A. I did, yes, ma'am.

Q. Do you know who those cars belonged to?

A. I assume they would belong to Ms. Scott, but I don't recall specifically if they were registered to her or not.

Q. All right. And were you present when those vehicles were searched?

A. I was.

Q. Okay. And was there an evidence technician there?

A. Yes, ma'am.

Q. Did you arrest John Moore in this case?

A. Like, physically placed him under arrest, I

Q. Okay. You don't know when?
A. No, sir.
Q. You don't know where?
A. No, sir.
Q. Have you looked in your notes or your system?
A. No, sir, I -- like I said, I don't think I ever worked a criminal case involving him.
Q. Okay. But how do you know of him?
A. How do I know of him?
Q. How do you know his name, yes.
A. It's my job as a police officer to know people in the area that I work.
Q. All right. So you know everybody that lives in that same neighborhood there?
A. No, sir.
Q. Okay. But you know Mr. Moore, specifically?
A. Yes, sir. I know who Mr. Moore is specifically.
Q. All right. Do you know what his nickname was?
A. I knew that people called him Squirrel, yes, sir.
Q. Do you recall interviewing Mr. Colins?
A. I did speak with Mr. Colins, yes, sir.
Q. Okay. Do you recall telling Mr. Colins

Boone --

A. Yes, sir.

Q. -- where did you first meet with him?

A. At the hospital.

Q. Okay. Was Mr. Boone being cooperative with you?

A. The first time that I met with him on the night of the incident, he did not want to speak with me, no, sir.

Q. Okay. And then the second night -- you went there the following night, correct?

A. It was during the day. It was the following day.

Q. During the day?

A. Yes, sir.

Q. Okay. Did you go there at Mr. Boone's request or on your own?

A. No, sir. On my own.

Q. Okay. And the second day, was Mr. Boone able to tell you who shot --

A. Yes, sir.

Q. Who did he tell you who shot him?

A. That's the conversation we had about -- he didn't know him by name. He said it was an animal nickname. I asked him if it was Squirrel, and he said,

Q. What was the description he gave you?

A. He said a black male, between six foot and six-three, in his 30s, with a low-cut hairstyle and I think skinny.

Q. And the -- Ms. Scott, you said that's the defendant's mother, correct?

A. That's what she told me.

Q. Okay. And how do you know she lives in the house?

A. I think she said that that was her residence.

Q. Okay. When did you discover that?

A. I spoke with her when I was on scene the first time, and then I spoke with her later that evening after I came back from the hospital. I don't recall in which interview she told me she was his son -- or she was his mother.

Q. Did you ask her if the defendant was there at the house at the time of the shooting?

A. I asked her if he was there, yes, ma'am -- or -- I'm sorry -- yes, sir.

Q. And isn't it true that you found out later that Scott is related to and lives with the defendant?

A. I'm sorry?

Q. Isn't it true that you found out later on that Ms. Scott is related to the defendant and lives

with the defendant?

A. I'm -- I knew that night that she was his mother. She told me that that night. I don't know when you're talking about "later." I don't want to answer your question incorrectly, but --

Q. Well, I'm trying to figure out -- because you testified that when you went to see Keith Boone that night, the defendant was not developed as a suspect, correct?

A. Correct.

Q. It wasn't until Keith Boone told you the next day that he was developed as a suspect?

A. Correct.

Q. Okay. But then when did you find out that the defendant lived in the house and was related to Ms. Scott? Was it that night or the next day?

A. No, it was that night. She said that she was his mother and that was her house.

Q. Okay. So when you went to talk to Mr. Boone, did you already have the defendant in the back of your mind as a possible suspect?

A. No. Not specifically, no, sir.

Q. Okay. So the only reason that the "Squirrel" came out was because of the physical description that Mr. Boone gave you?

Q. You just know Squirrel, but you don't know specifically where you found that information, about Squirrel, correct?

A. About his name?

Q. Yeah. About his nickname.

A. I've heard his nickname for years, sir.

Q. You have never -- you don't recall when you last came into contact with him?

A. Correct.

Q. You just hear his name out?

A. Correct. Yes, sir.

Q. Okay. You don't have any police reports or anything of that sort to back up how it is you came up -- came into contact with Mr. Moore?

A. Correct. No, sir.

Q. And that's not because you don't have them here with you today? That's because --

A. Because I've never worked a case involving him, no, sir.

Q. Okay. Do you know where Mr. Moore is from originally?

A. I heard he was --

MS. FLETCHER: Objection. One, relevance. And, two, beyond the scope of his knowledge.

THE COURT: If you know. I mean, if you know

the shell casings, the projectiles in this case?

A. I didn't specifically examine them, no, sir.

Q. Did you look at the markings?

A. No, sir.

Q. Were you there when they were -- put markings?

A. No, sir.

Q. Okay.

A. I responded after the evidence had been marked and located.

Q. Was part of your investigation -- did you look at those and decide the angle of the shooting or how many shooters?

A. Like I said, I would -- there were other detectives on scene as well, so I did not -- your question was did I pay attention to where things were marked. No, I did not.

Q. Okay. You're the one that drafted the probable cause warrant, correct?

A. Probable cause affidavit, yes, sir.

Q. Probable cause affidavit?

A. Yes, sir.

Q. And your testimony is that you did not review this -- where the shell casings were --

A. No, sir.

know what weapon they came from?

Q. What weapon they came from?

A. Correct, sir. I don't know what gun they came from.

Q. Okay. But we do know that they came from the south -- or whoever the shooter was was at the south -- or from the south of the house, correct?

A. Correct, sir. That's the only place we found shell casings.

Q. Okay. And the -- if you're shooting -- if he's -- would you agree that the shooter was stationary or was he moving? Based on your investigation of the house?

A. From looking at the pictures, it looked like he was possibly moving. The shell casings were spread out.

Q. Okay. And there were to the alley -- between the house and the yard -- and the fence --

A. I'm sorry?

Q. The shell casings were between the house -- the wall of the house and the fence, correct?

A. Correct.

Q. They were in different spots? They weren't all in the same spot?

A. Correct.

A. After he did that, he had a hard time. He started crying. His hand started shaking, and he didn't sign it that first trip to the hospital.

Q. Okay. Now, why did you go the second day? Did anybody -- did Detective Steckman tell you to go or --

A. Detective Steckman was requested the next day for the admonition form.

Q. Steckman was requested by whom?

A. I'm sorry. Mr. Boone.

Q. Mr. Boone contacted Detective Steckman to go back the next day?

A. He told us the first day there that he wanted -- he wanted us to come back the next day, and then I believe he contacted Detective Steckman the next day to make sure.

Q. Okay. Keith Boone did, in other words, correct?

A. Yes. That's who I'm referring to.

Q. Now, did you know who the possible suspect was in the pictures?

A. Yes.

Q. Okay. And did you -- isn't there an Ocala Police Department policy that if you know who the -- who the person is, that you're not supposed to

participate in the lineup?

A. The investigator on the case and the person who creates it is not supposed to be the one who shows it.

Q. Okay.

A. Now, under certain circumstances, the department reads that we can still do that. We can -- as the investigator assigned, we can also create it and show the lineup.

Q. Who created this?

A. Detective Steckman.

Q. Okay. Did Detective Ste- -- did you tell Detective Steckman that you knew the defendant?

A. No, sir.

Q. Did he ask you --

A. No, sir.

Q. -- if you -- would it have been proper to tell him that you know him?

A. It didn't matter whether I knew the defendant or not.

Q. Okay. Now, Mr. -- did Keith Boone want to go forward with the case when he signed the admonition form?

A. I would say that him signing the admonition form was him wanting to move forward with the case.

MR. BANO: So you can have 50 counts in one case and --

THE COURT: Right. Right. It is what it is. Okay. All right.

Anything else?

MR. BANO: Just one second, Judge. I want to make sure we're not -- Your Honor, at the adversarial preliminary hearing, he mentioned that it was a big shoot-out. People clutching and all that. I know there was a previous court ruling about the drive-by shooting, so he didn't say "drive-by." He said "shoot out," people clutching --

THE COURT: "Shoot-out" is fine.

MR. BANO: Okay. All right. I just wanted to make sure of that.

THE COURT: And if he was there or he heard this? He heard this?

MR. BANO: Yes. From Boone.

THE COURT: Okay.

MR. BANO: So, yeah, we're ready, Judge.

THE COURT: Okay. Anything else, Ms. Munroe?

MS. MUNROE: No, Judge. And I'm fine with leaving Mr. Rush on the witness stand while the jury comes in.

Q. All right. Now, are you also -- do you know a person by the name of Keith Boone?

A. Yes, sir.

Q. How do you know Keith Boone?

A. He stay right up the road from me.

Q. Okay. How long have you known Keith Boone for?

A. A very long time.

Q. Longer than you've known John Moore?

A. Yes, sir.

Q. Okay. Have you ever had any issues with Keith Boone?

A. No, sir.

Q. Okay. Were you aware of any issues between Keith Boone and John Moore?

A. No, sir.

Q. Okay. Now, the -- at some point in time, were you able to talk to Keith Boone after this case?

A. After this case?

Q. Yes. After the --

A. Incident.

Q. I'm sorry. After the incident on October 17th --

A. Yes.

Q. -- 2016?

A. Yes, sir.

Q. Where did you talk to Keith Boone?

A. In front of his mother's house.

Q. Okay. Do you know what month that was?

A. In November. I had just got out.

Q. Okay.

A. I think it was -- not November. Probably the end of October, beginning of November.

Q. Okay.

A. I had just got out.

Q. Of what year?

A. '16.

Q. Okay. And was anybody else there with you when you talked to Keith Boone?

A. No, sir.

Q. Okay. And what did you talk to him about?

A. About the situation.

Q. About the case involving John Moore?

A. Yes, sir.

Q. Okay. And what did Mr. Boone tell you?

A. Well, he told me that -- well, he told me about how the situation took place and what exactly happened.

Q. All right.

A. He also told me that he -- the reason why he

said what he said about Mr. Moore. He told me that he went over there on the day of the situation --

Q. Okay.

A. -- and that the guy that is known as Keke --

Q. Okay.

A. -- was already there in the yard.

Q. Okay.

A. He went over there and he got dropped off in a car, in a barbecue pit next to Mr. Moore's house.

Q. Okay.

A. And from there, he went over there to talk to Mr. Moore, and I guess the people in the car and some people in the yard -- one guy whom he identified as "Duck" began to have a shoot-out.

Q. Okay.

A. I guess they saw people in the yard clutching. Like, grabbing for pistols or whatnot.

Q. Okay.

A. But none of them was identified as Mr. Moore.

Q. Okay. Now, Duck -- is that a nickname of Mr. Moore?

A. No, sir.

Q. Okay. And -- and then what happened after that?

A. After that, he said he got shot. And Keke

got shot.

Q. Okay. Was it a -- did he mention to you that this was gunfire back and forth, the car and the people in the yard?

A. Yes, sir.

Q. Okay.

A. Like, a shoot-out.

Q. Okay. And he -- did he specifically tell you that John Moore had no involvement in that shoot-out?

A. Yes, sir. He said that John Moore did not shoot. He felt as if pretty much that the reason why he said John Moore did it is because, out of anger, he felt like somebody had to go to jail behind his cousin's death.

Q. Okay. Now, have you been convicted of any felonies?

A. Yes, sir.

Q. How many?

A. Three.

Q. Okay. Do you have any -- you testifying in this case, you're not getting any preferential treatment or anything on any -- on your case, correct?

A. No, sir.

Q. But you are -- you have no stake, whatsoever, in this case, correct?

A. No, sir.

Q. And has anybody told you what to say here today?

A. No, sir.

Q. Okay. And you've never had any issues with Keith Boone in the past, have you?

A. No, sir.

Q. What about Jordan Davis? Have you had any issues with him?

A. No, sir.

Q. Were you aware of any issues between Jordan Davis and John Moore?

A. No, sir.

Q. And just to be clear, the -- you live in the same neighborhood that -- where the shooting occurred, correct?

A. Yes, sir.

Q. Okay. So you've known -- you know people in the neighborhood pretty well, correct?

A. Yes, sir.

Q. How long have you lived there for?

A. Almost all my life.

Q. Okay. And what about Keith Boone? Was he living there as well?

A. No, sir. Like, Keith moved there when his

license.

Q. All right. Did you look up any public records as far as who the owner of the house was?

A. No, sir, I did not.

Q. Had you ever -- had you ever been to that residence in the past?

A. I know I have been to the residence in the past, yes, sir.

Q. Okay. Do you know when?

A. No, sir. I don't recall specifically.

Q. Now, you did not -- did you know the nickname of Mr. Moore?

A. Yes, sir.

Q. And what was that?

A. Squirrel.

Q. Okay. Do you recall making the statement, when you were interviewing Mr. Colins, that you did not know Mr. Moore's nickname?

A. No, sir. That's incorrect.

Q. That's incorrect?

A. Yes, sir. I listened to the statement again this morning because you brought it up yesterday. That is --

Q. Okay.

A. -- completely incorrect.

Q. Now, did -- did -- the day that you went to Keith Boone, the second day -- or the third day --

A. When --

Q. -- when you went to the hospital --

A. The third day when he signed the lineup paperwork?

Q. Correct.

A. Yes, sir.

Q. Did -- did Keith -- did you go there on your own volition, or were you called by Mr. Boone?

MS. FLETCHER: Objection. Asked and answered when he was on direct yesterday.

THE COURT: Overruled. He can answer the question. You can answer the question.

THE WITNESS: On the third time that I went to speak with him, we went on our own because he had not signed the lineup paperwork the day before, so I went on my own. But I decided that Detective Todd and I would go back to have him sign the lineup paperwork.

BY MR. BANO:

Q. Okay. But what about the second day? Did you go there on your own?

A. Yes, sir. It was my decision to go. Mr. Boone did not summon me.

The projectiles found at Marker D, found in Keith Boone's left arm, found in Jordan Davis's left arm, found in Jordan Davis's T-shirt, found in the Ford Expedition driver's door, found in the Ford Crown Victoria driver's door, were all fired from the same .40-caliber firearm. One firearm.

Now, she's not able to compare the projectiles to the casings because that's -- you're not able to do that. But common sense tells you that these projectiles and casings go together. They are both .40 caliber; they're both on the scene; they're both -- all of these projectiles are found consistent with what Keith Boone told you happened and as well as the casings. Common sense tells you those are all related and all together.

So how many shots were actually fired? Well, we know Keke got hit two times, Keith got hit two times, the car got hit three times, and the projectile on the ground. The house across the street, eight times. But we don't know whether or not all of those are from this particular incident. But there's a total of 16 possible times that the defendant fired the firearm.

You heard from a couple of the witnesses that .40-caliber semiautomatics have magazines that can

light or something with -- with her daughter. The only thing Sharon Scott is not going to tell you is that she saw her son murder Jordan Davis. She said she didn't know what happened. She was sitting right there. But everything else she tells you is consistent with what Keith Boone told you.

Why should you believe Keith Boone? It's uncontradicted by any other evidence in this case, other than the defendant saying he was in his room at the time. There is absolutely zero evidence that there was a drive-by shooting. There's no casings in the roadway, no casings in that car, no projectiles found anywhere on the Scotts' residence, the defendant's house, no -- on the fence, anywhere else that would indicate that someone is shooting from the roadway at that house as Jamare Rush testified that Keith Boone told him. And I'm going to talk to you about Jamare Rush in a little bit.

Why should you believe Keith Boone? He knew that there were several witnesses at the scene. He didn't know what they told law enforcement. He didn't know whether they cooperated or didn't cooperate or didn't say anything. Why would he lie if there were people who could contradict him?

in answering Mr. Bano's questions. And he -- he told you a lot of things he didn't have to tell you.

Let's talk about he had charges pending at the time that this incident happened. We wouldn't have any way to know what he asked his lawyer. He was honest with you about that. Yeah, I asked my lawyer if I could get a deal. Why wouldn't he try to get a deal? But he didn't get a deal, and he testified anyway. But he didn't have to tell you that. We would have no way of knowing what he told his lawyer.

Does the witness's testimony agree with the other testimony and other evidence in this case? And I've already went through all the physical evidence at the scene. It's absolutely consistent with what Keith Boone told you. And, also, the medical examiner. What she told you, that Jordan Davis was shot from a distance. He was shot directly in the chest, which would mean he was facing the person who shot him, which is consistent with the way Keith Boone tells you this happened.

P. 307, 4-11

Now, the medical examiner also talked about you can't tell -- Mr. Bano was questioning her about, Well, if he was standing on the porch,

witnesses? Because the people who saw it were the defendant's family or it's people who just don't want to get involved. People don't want to cooperate. People in that town -- in that area of town don't speak to police. They don't get involved. It doesn't mean that the crime didn't happen and it doesn't mean that the defendant isn't the person that did it. So we don't have to have an abundance of evidence. It's the quality of evidence that we talked about on Monday. So there isn't a lack of evidence in this case, because you have a eyewitness and you have physical evidence to corroborate what he told you. It's to the evidence introduced in this trial and to it alone that you are to look to for that proof.

And Mr. Bano has talked a lot about a drive-by shooting. And Sharon Scott said, Yeah, I told the police that it was a drive-by shooting, but she told you today that that wasn't the truth. Perjury She told you that she never saw anybody shooting out of the gun -- or shooting a gun out of a car. That's where this whole drive-by shooting rumor got started and why police were looking for the Impala, Perjury because it came from the defendant's mother. She told you today that wasn't the truth. So that is

in evidence in this case that there's -- there's no evidence of a drive-by shooting, so you would have to look at the evidence that was introduced in this case to determine whether or not there's a reasonable doubt.

Let's talk about what does not rise to the level of reasonable doubt. Remember I told you at jury selection you might have questions at the end of this trial. If they're not questions related to the elements, it doesn't rise to the level of reasonable doubt.

So let's talk about these projectiles across the street. Why don't we have them? Well, they would have to tear those people's house apart to get those projectiles. So there's eight bullet holes. They would have to take a saw and saw apart eight different sections in the front of that house. Now, if you know anything about construction, houses have insulation and they have wires and I think Carol Ballas tells you, We don't know if there are wires there. And also they have spaces in them where it would just drop to the ground. So it's not as easy as cutting holes out and seeing if you can find a projectile. It would be to tear that house apart.

So what would we learn about those projectiles? What would they prove? All right. We might -- let's say we tear her house apart. We get all eight of them. They are sent to the Florida Department of Law Enforcement. We find that they are from the same firearm, which is consistent with one shooter. Let's say we find out some are from a firearm, some are from a different firearm. What does that prove? Maybe the ones not from the same firearm were from a different event. Different day. Not from this incident. Maybe they were all from a different firearm. So if you believe there's a second shooter, the second shooter is only shooting at this house. Because all the projectiles found on the other side of the road are from the same shooter. So the evidentiary value of tearing down these people's house to get these projectiles to determine what they mean and where they come from is pretty low when you consider what it would actually mean.

What doesn't rise to reasonable doubt? This mysterious item on the ground between Marker D and E. Is it a shell casing? Is it a cigar butt?

Carol Ballas -- you saw her testimony. She did a good job in this case looking for all the

put in place for people who don't know the suspect, because you don't want to have detectives accidentally kind of pointing out or doing anything that would lead them to who to pick. Now, Keith Boone knew -- he knew the defendant, so there's nothing about Detective Todd showing the photo lineup that should cause you concern, and it certainly doesn't rise to the level of reasonable doubt. It has nothing to do with the elements of this case.

Motive. Why did this happen? I told you on Monday, we might not know. And there's no evidence of why it happened. It just did. But I don't have to prove that, and just because you don't know doesn't mean it didn't happen, it doesn't mean the defendant didn't do it. Just because there were questions answered doesn't mean it rises to reasonable doubt unless it involves the elements of the charge.

A reasonable doubt is not a mere possible doubt, a speculative, imaginary, or a forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt. It can't be imaginary, possible, speculative. Drive-by shooting. That's

testify or that they just wouldn't cooperate with law enforcement like most people in that area don't do. So John Moore was counting on that, but Keith Boone did come in and he did cooperate and he did testify. So there is evidence that the defendant did it.

And I talked to you on jury selection on Monday; testimony from the stand is evidence. Why aren't the others here testifying? I already talked to you about that. Because they're the defendant's family. That's why the others aren't here testifying, other than his mother.

And his mother, Sharon Scott, told you -- she told the seven of you that the drive-by shooting story was a lie. It didn't happen. She never saw anybody shooting out of a car. I specifically asked her about that maroon Impala. Did you see anybody shooting out of the maroon Impala? And she said, No. Tony Colins said he didn't see a car. Even the defendant said he came outside and he didn't see a car.

There is absolutely zero evidence about this imaginary made-up story about a drive-by shooting. There's more evidence that the house across the street was a victim of a drive-by shooting than

Perjury

this house right here. There is zero evidence that anybody was shooting at this house.

Think about what got shot. And let's talk about -- I'm only going to touch on these casings for a second. The defendant is standing right here. Keith Boone told you that if this is the house, the defendant is standing with his -- this way, to the house, and Keith Boone is -- is this way. So the defendant's back is to the house. So as he's firing, these casings are to the right of where he would be shooting. If he's standing right here -- the defendant is facing the roadway and Keith Boone is facing him -- that's -- all these casings are consistent with that and the casings in the back are consistent with him walking backwards as he's shooting at Keith Boone as he runs away. Some of those projectiles probably hit that house across the street.

The casings are going to hit -- fly off, hit that wooden face there, and go back. So the positioning of the casings are not enough to rise to the level of a reasonable doubt. But when you look at this picture -- you have this picture in evidence. It won't be this big one. It will be this small one. You can look at it. Where Keke is

the -- and he was on vacation. It was already decided on the night of this event that there was no reason to tear the house apart to get the projectiles, and I've already talked to you why those projectiles are really not that important in this case. Those projectiles don't even prove what the defense wants you to believe happened. It doesn't prove that anybody was shooting at the direction of Sharon Scott's house.

Perjury

911 was called when Keke was found at the Family Dollar. So he had to run all the way to the Family Dollar, which might have taken a little bit of time, but an officer got to the scene 16 minutes after 911 was called -- got to the house afterwards. So at least 16 minutes goes by. And we don't know about the casings that are missing. We don't know if someone started cleaning up, and when police got there, they stopped. But like I told you earlier, that doesn't lead to reasonable doubt.

This whole issue about whether Detective Steckman knew the defendant or didn't know the defendant, didn't know his nickname, didn't tell his nickname to Michael -- or Tony Colins when he talked to him -- clearly Detective Steckman knew

who the defendant was. Wouldn't he just say "Squirrel" just coincidentally? That's the defendant's name? He clearly knew the defendant and knew he went by "Squirrel," or he never would have brought that up to John Moore -- I mean -- I'm sorry -- to Keith Boone about John Moore.

Just because someone had the nickname "Duck" over nine years ago doesn't discredit what Keith Boone told you. And he told you the reason why he threw out "Duck."

This mysterious item that is on the ground that Mr. Bano spoke with every witness, asked them, Isn't this a casing? Isn't this a casing? Now he's telling you it's a projectile. Well, some of the witnesses say that could be a casing. Not one witness said, That looks like a projectile. And projectiles don't just fall down after they're fired. If it happened to be a projectile, there would have been -- it's not that it went -- came from the road and just dropped on the ground. That's not going to happen. It's going to keep going until it hits something. And it wasn't a projectile or it would have been picked up by the evidence technician whose job is to look for every piece of evidence she can find on the scene, and

that way.

And what did he tell you? Keith said -- I quote -- somebody had to go to jail for his cousin's death. Well, wouldn't Keith want the "somebody" that killed his cousin to go to jail for his cousin's death? Why Keith -- why John Moore? Why would he just want to pick John Moore? And I agree with what Mr. Bano said, that, why would Keith Boone blame Duck when it wasn't Duck? I agree. But we know why he said "Duck." Why would he say "Squirrel" -- John Moore -- why would he come in here today and say that man did it if that wasn't true? Why would he want this other person -- Keith Boone knows who shot him. He was standing right there. And whether he had anything to drink or any drugs, he knows who shot him. He was standing a couple feet away from him. Why would he come in here and say it was John Moore if it wasn't? That doesn't make any sense at all. Why would he want to have somebody go to jail for his cousin's death that wasn't the right person?

You can disbelieve everything Jamare Rush said because everything he said is inconsistent with the rest of the testimony in this case.

Now, the defendant took the stand and

won't even test for those things anymore because it's so unlikely to get. So we can never prove cases beyond all doubt, but that's not my burden. I have to prove it beyond a reasonable doubt. Not speculative. Not stories about drive-by shootings, that there's zero evidence of.

You-all agreed that if I proved this case beyond a reasonable doubt you would return a verdict of guilty. And I have done that.

Sometimes witnesses don't come forward. Sometimes they don't come forward at all. If Keith Boone had said, I'm not coming forward, I'm not saying anything, we wouldn't be here today. And that happens sometimes, but he did come forward. And he had every instinct in his body not to because that's just not the way he lives. That's not the world that he lives in. But he has every incentive to make sure that the person who committed this crime is held responsible. There is no reason why he would accuse someone who didn't do it. And you weren't given any reason why he would accuse John Moore if John Moore didn't do it. We know that other people witnessed it. We know it's the defendant's family.

The only common-sense reason for Keith Boone

Exhibit - C

# Exhibit – C

Exhibit - C

IN THE CIRCUIT COURT
OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

CASE NO.: 2016-CF-2869-A

STATE OF FLORIDA,

vs.

JOHN ANTHONY MOORE,

Defendant.

ORIGINAL

DEPOSITION OF: KEITH BOONE

DATE: April 7, 2017

TIME: 10:39 - 11:05 a.m.

LOCATION: Office of the State Attorney
19 Northwest First Avenue
Suite 5000
Ocala, Florida 34475

REPORTER: Katrenia L. Horiski, RPR, FPR

A P P E A R A N C E S

REBECCA FLETCHER, ESQUIRE
Assistant State Attorney
110 Northwest 1st Avenue
Suite 5000
Ocala, Florida 34475

On behalf of the State of Florida

ENEID BANO, ESQUIRE
Bano Law Firm
274 Wilshire Boulevard
Suite 237
Casselberry, Florida 32707

On behalf of the Defendant

* * * * * *

I N D E X

TESTIMONY OF KEITH BOONE PAGE

Direct Examination by Mr. Bano........................4
Cross-Examination by Ms. Fletcher.....................24
Redirect Examination by Mr. Bano......................25

Certificate of Oath...................................28
Reporter's Certificate................................29

* * * * * *

(NO EXHIBITS MARKED)

* * * * * *

S T I P U L A T I O N S

It is hereby agreed and so stipulated by and between the parties hereto, through their respective counsel, that the reading and signing of the transcript be waived by the Deponent.

P R O C E E D I N G S

THE REPORTER: Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE REPORTER: Thank you.

KEITH BOONE,

a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BANO.

Q. State your name for the record, please.

A. Keith Boone.

Q. Mr. Boone, where do you currently reside?

A. What's my address?

Q. Yes, your address.

A. 230 Northwest Ninth Avenue.

Q. Ocala?

A. Yeah.

Q. Okay. Who do you live there with?

A. My mom.

Q. Do you know a Mr. John Moore?

A. Yeah.

Q. How long have you known John Moore?

A. It be, like, two years.
Q. Two years?
A. A year and a half, two years.
Q. Are you related to John Moore?
A. Uh-uh.
Q. Is that a yes or a no?
A. No, no, no.
MS. FLETCHER: You have to say yes or no, because if you say uh-huh or uh-uh they look just exactly the same when they're transcribed, so it looks confusing.
BY MR. BANO:
Q. What about his -- have you been to John Moore's house?
A. Yeah.
Q. Okay. Do you know where his house is at?
A. Yeah.
Q. Where is that at?
A. I don't know the exact address, but by the Family Dollar right next door to Ms. Green's Barbecue.
Q. Okay. Now, what about his -- do you have any relation to his father or stepfather?
A. Yeah, that's my cousin.
Q. Who is your cousin?
A. His stepfather.

Q. His stepfather?
A. Yeah.
Q. Have you been to John Moore's house since John Moore has been arrested for this crime?
A. No.
Q. You weren't there a couple weeks ago?
A. They don't stay there no more.
Q. Who is they?
A. His mom at the same house by Family Dollar.
Q. His mom is Sharon Scott?
A. I know her by Fay.
Q. Faith?
A. Fay.
Q. Faith?
A. Fay, F-A-Y.
Q. Who's Fay?
A. That's his mom. That's what I know her by
Q. What about a Ms. Scott, do you know her?
A. I mean, my cousins is Scott, so if they're married, then, yeah. I know her by Fay, like I said. I don't know a Sharon.
Q. How old is Fay?
A. I don't know.
Q. What does she look like?
A. She wears glasses.

Q. Okay. So my question, were you there about two weeks ago at her house or at John Moore's house?
A. I don't look at it as his house. We went over there to holler at my cousin, yeah.
Q. But John Moore used to live there before he went to jail?
A. No, they don't stay in that same house, like I just told you.
Q. Where does John Moore stay then?
A. I don't know where John Moore stays at. I know where my cousin, Pop, stays at, who goes with John Moore's mother.
Q. Okay. Does he live in that house?
A. Does who live in the house?
Q. Pops.
A. That's whose house we went to.
Q. Okay. And that's where his wife or this lady by the name of Fay lives as well, correct?
A. I guess so.
Q. Is that the same house where this incident took place?
A. No.
Q. Okay. Now, where did this incident take place, what house?
A. By the Family Dollar.

Q. Okay. Whose house is that?
A. My cousin, Pop.
Q. Was that the place where John Moore lived as well?
A. At the time, yeah, when the incident occurred.
Q. And have you had any problems with John Moore prior to this?
A. No.
Q. Any beef about any previous homicides?
A. No.
Q. And on that date and time were you -- what were you doing at that house?
A. At the time I was shot?
Q. Yes.
A. Going to watch football.
Q. Going to watch football?
A. Yeah.
Q. Did you actually start watching it or were you just --
A. I didn't get a chance to.
Q. Who were you there with?
A. Nobody. I had just came by myself.
Q. Were there other people in there?
A. We was outside, yeah. There was people over

Affidavit

there hanging out.

Q. Okay. And then what happened?

A. As soon as I got there me and him talked for a few minutes.

Q. Who is him?

A. John Moore. And that's when he shoots me and my cousin Jordan Davis.

Q. So you went from you just talking normally to him shooting you?

A. Yeah. We wasn't arguing or none of that.

Q. What were you talking about?

A. We was actually talking about an incident that occurred with -- well, not even an incident, but you know what I'm saying -- some other dinner that I had with someone else over there at the time. And that's all we got to talking about.

Q. Was there any -- was Mr. Moore getting angry or agitated?

A. No, we was talking fine. It wasn't no problem between me and Mr. Moore.

Q. So is he close to you when he's talking to you?

A. Yeah.

Q. And what about Jordan Davis, was he engaging in the conversation as well?

A. Not at all.

Q. He was just hanging out?

A. Yeah, you could say that. He walked up and he shot him. John Moore shot him when Jordan Davis walked up. He didn't walk up on us, though. He walked a couple feet away and...

Q. How many times did he shoot him?

A. I mean, at least two or three times.

Q. What kind of gun did John Moore have?

A. Like a .40 or .45.

Q. Do you know what kind of brand?

A. No, I don't know what kind of brand.

Q. Do you know what color the gun was?

A. Grayish silver.

Q. Where did he pull the gun from?

A. Behind his back.

Q. Did you see that he had a gun prior to talking to him?

A. No, because it was behind his back.

Q. And then as he's shooting your cousin, what are you doing at that point?

A. I didn't know who he was shooting at the time. I'm still trying to figure out who he's shooting at.

Q. Well, you're next to him, right?

A. Yeah, I'm next to him, but I don't know, like, what is you shooting at. We talking and he just goes to shooting. You know what I'm saying?

Q. What do you do when you hear the shots?

A. I'm trying to figure out who he's shooting at. I didn't realize he shot my cousin until he took off running. Do you know what I'm saying? It's a porch full of people. I don't even know who he's shooting at.

Q. But at some point you figure out he's shooting at your cousin?

A. Once he took off running, yeah.

Q. So he shot at --

A. He's shooting in his direction, so, you know what I'm saying.

Q. Did he hit him or miss?

A. Listen, man, at this time, all us moving like -- you know what I'm saying? So, I see my cousin body, like, jump a little bit or whatever, whatever. But like I say, it's moving so fast. You feel me?

Q. And your cousin is running, right?

A. He started to take off running, yeah.

Q. So do you think he's been hit by any bullets when he's running or you can't really tell?

A. Do I think he's being hit by bullets?

Q. Yeah. Did you see him getting hit --

A. John Moore shot my cousin, man.

Q. Okay. But --

A. John Moore shot -- I seen John Moore shoot my cousin. That's what I seen.

Q. Okay. But did you see the bullet hit your cousin?

A. Yeah, I did. I did.

Q. Where did the bullet hit him?

A. I did. It had hit him in the chest because I seen his body motioning like this (indicating). Then he took off running.

Q. Did you see any blood coming out of his chest?

A. I didn't see all of that. He took off running.

Q. Is it possible he was moving his body to avoid being hit?

A. No, he was getting hit. I even seen him stumble as he was running, as he was taking off, as he ran off the porch.

Q. Okay. And then what happened to your cousin? You said he took off running. Was he running for a while?

A. I don't know. I got shot right after that.

I don't know. [handwritten: Aff. (split up)]

Q. Okay. So after you see your cousin getting hit and running, what do you do? [handwritten: aff.]

A. Look at John Moore and at the same time I'm looking at him, he shoots me.

Q. Where did he shoot you?

A. In my chest and in my arm.

Q. How many times did he shoot you?

A. Twice.

Q. Okay. Was John Moore saying anything when he was shooting you?

A. No.

Q. Now, there were other people there in the vicinity, correct?

A. Yeah.

Q. How many other people were there, approximately?

A. His mother, one.

Q. Fay?

A. Fay. Both of his sisters.

Q. Trina is one of them? Is Trina one of his sisters?

A. I know Quack and Jaynicia. They were on the porch.

Q. Jaynicia. What's the other one?

A. Quack.

Q. How do you say that? How do you spell that?

A. I don't know how you spell it, like, duck, like, Quack.

Q. Q-U-A-C-K?

A. Yeah, you can write it like that. I know I call her Quack. That's what they call her.

Q. That's her nickname, right? It's not a real name. Okay. Who else was there?

A. That's all I remember seeing on the porch. I didn't get to make it farther than to the porch.

Q. Okay. So you got shot. Are you running when you got shot?

A. No. I didn't take off running until after I got shot.

Q. Then after you got shot you took off running, correct?

A. Yes.

Q. After you were running, was he still shooting at you? [handwritten: compare Pg 23, lns 15-21]

A. Yeah.

Q. Okay. So let's get this correct. The first shot, was in the chest or on your legs when you got hit?

A. Say that again.

Q. The first shot that hit you, where was it? Was it in your chest or on your lower part?

A. I just told you I got shot in my chest and then my arm.

Q. Okay. Was that before you took off running?

A. Yes.

Q. So you got shot twice. And then you're running, correct?

A. Yes.

Q. And then after that was he still shooting at you?

A. Yeah.

Q. Okay. And he did not hit you after you were hit the first two times?

A. No. I only got shot two times and I took off running.

Q. Okay. How many times was he -- do you think he was shooting at you?

A. I was trying to get away. I'm not counting the shots. I'm trying to get away.

Q. Okay. Now, was he able to change the magazine after he shot your cousin and then started shooting at you?

A. No.

Q. It was the same magazine?

A. Yeah.

Q. Okay. And approximately how many shots did he fire at your cousin?

A. At least four or five shots that I recall, four or five shots. [handwritten: two or three times (Pg 10)]

Q. And then after that he shot at least twice at you, correct?

A. He shot me two times. I don't know how many he fired after I took off running.

Q. And this was all continuous; there was no break in action, correct?

A. No.

Q. And what did you do after you were running?

A. I run through to the back yard of the house that's across the street and I knocked on someone's door trying to get them to call 911. And at that time that's when one of my friends came by looking for me. And I got in the car and rushed to the hospital.

Q. And the police got a chance to talk to you, correct?

A. When?

Q After you went to the hospital.

A. You mean that same night, a couple days? When are you talking about?

Q. Well, that night, did you talk to the police?

A. No.
Q. Okay. What about afterwards?
A. Yeah, I talked to the police and I identified him.
Q. How did you identify him? Did you identify him by name?
A. Yeah, circled him.
Q. Did John Moore have a nickname?
A. Yeah.
Q. What was his nickname?
A. Squirrel.
Q. At the time when the police were talking to you, you didn't tell them Squirrel, did you?
A. I'm in so much pain, I don't want to talk, man. I'm trying to figure out what's going on. At the time I didn't want to talk. I wanted everybody out of my face, so that's the cause of that.
Q. You told them it was the Rooster or Duck. Do you recall telling them that?
A. Not wanting to tell them at first, yeah.
Q. Okay.
A. Because I wasn't sure if I wanted to let the law handle it or handle it in my own hands.
Q. Okay. So were you confused as to --
A. No. I know exactly who shot me from the time

I got shot. I know exactly who shot me and my cousin.
Q. And you knew his nickname was The Squirrel, correct?
A. Right.
Q. And you didn't tell the police it was The Squirrel?
A. Because I also didn't want to cooperate with the police because that's not exactly how I live. So when I made up in my mind that I wanted to cooperate with the police, that's when I positively identified John Moore as the shooter. Not true
Q. When did you make up your mind to do that?
A. I don't remember exactly which day it was. A couple of days after I had been in the hospital.
Q. And did you also try to cooperate with the police and the State after you were charged with possession of a firearm by a convicted felon?
A. No, I've been charged with -- I had that charge in, like, 2015, way before this incident.
Q. And you were -- there were some discussions between your attorney and the state attorney and the police for you to cooperate on this charge so you can get some lenience on that charge?
A. I asked them for it, yeah.
Q. Okay. And on that charge you were sentenced

Pg 50, lns 2-12

to five years' probation, correct?
A. Yeah.
Q. And the original offer was 11 months and 29 days in jail?
A. No.
Q. You were never offered that?
A. For possession of a firearm?
Q. Yes.
A. Hell, no.
Q. You're looking at 15 years on that charge, correct?
A. The maximum.
Q. Did anything come out of your discussions with your attorney to have a deal so you could testify against John Moore so you could get a better offer on --
A. Did he ask me to do that?
Q. No, no. Did that happen? Did you get a chance to meet with the prosecutor or with the police to talk to them about John Moore's case?
A. Yeah.
Q. Okay. When was that?
MS. FLETCHER: You're asking him if he spoke with the State regarding a deal to testify. That's what he's asking you.

MR. BANO: Yes.
MS. FLETCHER: Did you ever speak with the state attorney's office regarding your charge, your possession of a firearm by convicted? Did you ever meet with anyone from the State about that?
THE WITNESS: Yeah.
BY MR. BANO:
Q. Okay. Who did you meet with?
A. Was it Toby Hunt when I came up here with my attorney? That's the only person --
THE WITNESS: Before I talked to you, that's the only person I talked to is Toby Hunt.
BY MR. BANO:
Q. Okay. And when did you talk to Toby Hunt?
A. I don't remember exactly what day it was.
Q. Was it a month ago, more than a month ago?
A. A couple months ago.
Q. Did you give any testimony to Toby Hunt?
A. Yeah, I gave him -- I had to tell him what had went on in order for him to be able to hold John Moore -- to be able to have a case on him. So I was subpoenaed to come in.
Q. And you came in?
A. (Witness nods head.)
Q. And your case was still pending -- your

possession of a firearm by a convicted felon case was still pending at the time, correct?

A. Yeah, yeah, yeah.

Q. Okay.

A. I was still going to court for it.

Q. Okay. And you were hoping to get a better resolution on that case because of your cooperation on this case, correct?

A. Yeah.

Q. Okay. Now, when you talked to Toby Hunt did he record you? Did you give him a sworn statement?

A. I'm not really sure. I can't really recall that he recorded it or not.

Q. Okay. Now, was there another -- the incident that you say you were talking to John Moore about, was it about another homicide that had gone on --

A. No, I don't know nothing about no homicide, man.

Q. Okay. Nothing that John Moore is involved in and you and your friends accusing John Moore of committing that homicide?

A. No, I don't know nothing about that.

Q. What about -- so you don't associate with any people that are involved in homicides; is that what you're telling me?

A. I mean, if they are I don't know about it. I don't have no dealings in it.

Q. Okay. Now, anybody, you or your friends have gone up to Fay recently and told her not to testify in John Moore's trial? Are you aware of that?

A. No, I don't know nothing about that.

Q. Okay. None of your associates have gone up to her house and told her that they would kill her if she testifies for John Moore?

A. If they did, it wasn't on my -- like I say, my cousin got killed also. So, you know what I mean? This is bigger than me. I haven't had no words with Fay about doing anything to her.

Q. Are you aware of any of your associates or your friends --

A. Like I said, no, I'm not.

Q. What about his sisters, anybody having a conversation with his sisters about possibly testifying on his behalf?

A. No.

Q. Now, how many prior felonies have you been convicted of?

A. At least seven.

Q. Ever been to prison before?

A. No.

Q. And how many crimes of dishonesty, like petty thefts?

A. No, I don't have no petty thefts.

Q. Okay. So just seven felonies?

A. And like false name to law enforcement, misdemeanor.

Q. How many misdemeanors?

A. One, I believe. I believe one.

Q. One misdemeanor? In your entire life?

A. Yeah, that I remember. Yeah, I got one false name to a law enforcement officer.

Q. Is that including your juvenile record?

A. I ain't got a juvenile records.

Q. You never got charged as a juvenile?

A. No.

Q. What is your Social Security number for purposes of me running a background search? And we can keep this confidential just for purposes of me having -- so I can run an investigation, background check?

MS. FLETCHER: Can you just keep it off the record?

MR. BANO: Yeah, we can keep it off the record.

MS. FLETCHER: Off the record.

(Discussion off the record.)

Wow

MR. BANO: I don't have any further questions.

CROSS-EXAMINATION

BY MS. FLETCHER:

Q. I just want to clarify. When you came in -- you got subpoenaed to come in to meet with Toby Hunt. Do you remember that?

A. Uh-huh.

Q. And that was to discuss what happened in this case with John Moore?

A. Uh-huh.

Q. Is that a yes?

A. Right. Yes.

Q. Did Toby Hunt tell you that you would get a better deal on your case?

A. No, no, that's not what he told me. He didn't tell me that. He said he couldn't promise me anything and that they -- you know what I mean. They needed me to be able to identify, to tell my story and all that to be able to have a case against John Moore. That's what he told me. He didn't promise me anything.

Q. All right. So your meeting with Toby was about this case, not about your case?

A. Yes, it was about this case with John Moore.

Q. Okay. That's all I have.

MR. BANO: One quick question.

REDIRECT EXAMINATION

BY MR. BANO:

Q. When this happened, was it daylight or nighttime?

A. This was nighttime.

Q. Around what time?

A. Like, close to 8:00. Close to 8:00.

Q. P.M.?

A. Yeah, close to 8:00.

Q. Was there lights at the house?

A. Was there lights on the house?

Q. Yeah, was it light -- was it visible? Would you see the house or was it dark?

A. Porch lights. Yeah, porch lights.

Q. So the other people that were there, they would have been able to see what happened, correct?

A. Those who were on that porch, yeah.

Q. Including Fay and his sisters?

A. Yeah, yean, all of them.

Q. Was there anybody there that was not related to John Moore besides you and Jordan?

A. Like I said, I didn't get a chance to make it past the porch, so I don't know who was all behind the house or on the side of the house.

Q. What about any neighbors, anybody across the street? Was there anybody out that you could see?

A. No, I don't remember all that. Like I say, I got dropped off to John Moore's house going to watch some football when this stopped that from happening.

Q. Did it surprise you that nobody else besides you -- you're the only person that claims John Moore did this even though there were people --

A. Not really because those who actually know what happened is his mother and his sister. And so, of course, they're going to try to defend him. So, no, it don't really surprise me.

MR. BANO: All right. No further questions.

MS. FLETCHER: No questions.

THE REPORTER: Read or waive?

MS. FLETCHER: This is -- we probably don't have time, but if she types it up, which she probably will, you have the right to read it before it's given -- if it's typed up I will be able to give you a copy before trial. But most people waive their right to read it before it's sent out.

If you want to waive that right I'll just give you a copy once we get it, otherwise you will have to meet up with her sometime before Wednesday.

THE WITNESS: You say, if I wanted a copy of

this?

MS. FLETCHER: If you want to read it before she gives us a copy, then you have to meet up with her before then and we will need this copy by Wednesday, so that gives you a short time

Most people waive that right. You will get a copy whether you waive or not.

THE WITNESS: I'll waive.

(Witness excused.)

(Deposition was concluded at 11:05 a.m.)

C E R T I F I C A T E O F O A T H

STATE OF FLORIDA)
COUNTY OF MARION)

In my capacity as a Notary Public of the State of Florida, I certify that on the 7th day of April, 2017, at 10:39 a.m. KEITH BOONE personally appeared before me and took an oath for the purpose of giving testimony in the matter: State of Florida vs. John Anthony Moore

Identification:

Produced Identification

Type of Identification Produced: Florida Driver License

KATRENIA LEE HORISKI
Commission # FF 147755
Expires November 15, 2018

KATRENIA L. HORISKI, RPR
Notary Public-State of Florida

Commission #FF 147755
Expires November 15, 2018

C E R T I F I C A T E

STATE OF FLORIDA )
COUNTY OF MARION )

I, KATRENIA L. HORISKI, a Notary Public for the State of Florida and Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of KEITH BOONE; that a review of the transcript was not requested; and that pages 4 through 27, is a true record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Signed and dated this 7th day of September, 2017.

Katrenia L. Horiski

KATRENIA L HORISKI, RPR, FPR

Exhibit - D

# Exhibit – D

Exhibit - D

16-CF-2869

# CIRCUIT WARRANT TO ARREST

STATE OF FLORIDA

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT, OF THE STATE OF FLORIDA, IN AND FOR MARION COUNTY

vs

AGENCY CASE NUMBER: OCPD 2016213567

JOHN ANTHONY MOORE

S.S.: 255355390
D.L.: M600461800940
D.O.B.: 03/14/1980
SEX: M
RACE: B

HEIGHT: 6'2"
WEIGHT: 165 lbs.
HAIR: BLACK
EYES: BROWN

LKA: 832 NW 15th Ave
Ocala, FL 34475

IN THE NAME OF THE STATE OF FLORIDA, TO ALL AND SINGULAR THE SHERIFFS OF FLORIDA, SPECIAL AGENTS OF THE FLORIDA DEPARTMENT OF LAW ENFORCEMENT AND FLORIDA STATE ATTORNEYS INVESTIGATORS:

WHEREAS, Detective M. Steckman has made oath that in the County and State aforesaid, JOHN ANTHONY MOORE (R/G: B/M, DOB: 03/14/1980, SSN: 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) in the County of Marion, and the State of Florida, on or about the 17th day of October in the year of Our Lord, twenty-sixteen:

## COUNT I
MURDER IN THE SECOND DEGREE - NO PREMEDITATION (F1L)
782.04(2)
BOND AMOUNT NO BOND

did unlawfully, by an act imminently dangerous to another, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, kill and murder JORDAN MARQUIS DAVIS, a human being, by shooting a firearm, in violation of Florida Statute 782.04(2);

## COUNT II
ATTEMPTED SECOND DEGREE MURDER (F2)
782.04(2) and 777.04(1)
BOND AMOUNT NO BOND

and that on or about the 17th day of October in the year of Our Lord, twenty-sixteen, in the County and State aforesaid, one JOHN ANTHONY MOORE (R/G: B/M, DOB: 03/14/1980, SSN: 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)

did unlawfully, by an act imminently dangerous to another, and evincing a depraved mind, regardless of

human life, although without any premeditated design to effect the death of any particular individual, attempt to kill or murder KEITH L BOONE, a human being, by shooting a firearm, in violation of Florida Statutes 782.04(2) and 777.04(1);

**COUNT III**
**POSSESSION OF FIREARM BY FELON - POSS (F2)**
790.23 and 775.087(2)(a)1
BOND AMOUNT $10,000.00

and that on or about the 17th day of October in the year of Our Lord, twenty-sixteen, in the County and State aforesaid, one JOHN ANTHONY MOORE (R/G: B/M, DOB: 03/14/1980, SSN: 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)

did, having been convicted of a felony, unlawfully have in his actual possession a "firearm", as that term is defined in s. 790.001, in violation of Florida Statutes 790.23 and 775.087(2)(a)1;

Contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Florida.

THESE ARE, THEREFORE, to command you to arrest and bring the above named defendant before the CIRCUIT Judge to be dealt with according to law.

THE UNDERSIGNED HEREBY ENDORSES BAIL IN THE AMOUNT OF NO BOND AND DOES/DOES NOT AUTHORIZE MODIFICATIONS OF THIS BAIL BY THE JUDGE PRESIDING AT FIRST APPEARANCE.

Given under my hand and seal this 21st day of October, 2016.

CIRCUIT JUDGE

Page 3
CIRCUIT JUDGES WARRANT
STATE OF FLORIDA VS. JOHN ANTHONY MOORE
AGENCY NUMBER: OCPD 2016213567

SERVED
JOHN MOORE
11-3-16
MONTH DAY YEAR
TIME: 11 30 AM PM
EMERY GAINEY, SHERIFF
MARION COUNTY, FLORIDA
I. PALAN #5563
DEPUTY SHERIFF

ATTENTION
IMMEDIATELY UPON SERVICE OF THIS WARRANT, PLEASE NOTIFY

______________________
OF THE
______________________
PHONE - (352)______________

M-2016-43264



**Ocala Police Department**
**402 S. Pine Avenue**
**Ocala, FL 34471**
**352-369-7000**

**SUPPLEMENTAL REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: Detective Steckman**

On 10/17/16, I was serving as the on call detective. I was notified a call for service had just been dispatched concerning a shooting with one person lying in the roadway near the Dollar General at the intersection of NW 10th St. and Martin Luther King Ave. I then responded toward the area of the NW 10th St. and MLK Ave. While I was responding, on the police radio I heard of a second person with a gunshot wound who had been brought to Ocala Regional Medical Center.

Upon arrival near Dollar General, I observed a black male, later identified as Jordan Davis, lying on the ground in the 900 block of MLK Ave. receiving treatment from EMS personnel. I did not speak with the black male, as he was receiving treatment. A large crowd of on lookers had gathered. I walked through this crowd asking if there was anyone who witnessed what had taken place, but no one volunteered any information.

I then continued southbound, looking for a crime scene. As I came to the 800 block of NW 15th Ave.. I was advised patrol officers had potentially located a crime scene at 832 NW 15th Ave. I made contact with officers in that area who advised they were being told of a possible drive by shooting. In the yard of the residence, I observed a Ford Crown Victoria and a Ford Expedition parked facing westward, towards the residence from the roadway, with multiple bullet holes in their driver side, showing the shots were made from south of the vehicles.

I spoke with Sharon Scott, who resides at the residence. She advised she was sitting on her front porch when a maroon Impala drove northbound on the street in front of her residence. She advised she heard several shots fired from the vehicle. She was unable to tell me who had fired the shots. She claimed this incident was involving her family's close relationship with the family of Rizaki Johnson, who had recently been murdered.

I also spoke with Tony Collins, who stated Scott was his mother and he lived at the residence. He stated he was inside the residence at the time of the shooting and when he heard the shots he ran to the porch, where Scott had been. He stated he observed a maroon Chevy Impala driving away from the residence. He was unable to tell me who the people in the vehicle were, but described the driver as a black male wearing a black tank top and having dreadlocks and a thin beard. He described the front passenger as being a black male with a low cut haircut. He also described the rear passenger to be brown skinned and wearing a white t-shirt and sunglasses.

I was then advised of a vehicle matching this description having arrived at ORMC with a person who had been shot. I responded and made contact with officers on scene who were in the company of the person who had sustained the gunshot wound, later identified as Keith Boone. I introduced myself to the two men who were identified as Willie James and Javon Maxwell. Both were transported to the police department to be interviewed. While at the hospital. I attempted to speak with Boone in the trauma room, however he did not wish to speak with me at that time. I also spoke with the owner of the vehicle, Stephanie Osorio outside the hospital. She advised she



**Ocala Police Department**
**402 S. Pine Avenue**
**Ocala, FL 34471**
**352-369-7000**

**SUPPLEMENTAL REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: Detective Steckman**

allowed Maxwell, her boyfriend, to drive the car that day because his car was broke down, and she is usually the only driver. She stated he called her and told her he was at the hospital because a "friend got shot." She advised he told her nothing further about the incident. I requested the patrol officers on scene have the Impala towed to the police department and placed in the evidence section so it could be examined later.

I then spoke with both Maxwell and James individually at the police department. Both stated they had been riding in the car when they came across Boone running down the street. They advised they picked him up and he advised he had been shot and to take him to the hospital. They both advised he did not say who shot him.

I then returned to Scott's residence. I was advised Sgt. Buchbinder had located shell casings in the southern portion of Scott's yard, which were not consistent with being fired in a drive by shooting. I spoke further with Scott in my vehicle. She again stated she was seated on the porch and a maroon Impala drove by. She stated as the vehicle was driving by she heard shots, but could not say if they came from the vehicle or not. She stated it sounded as if the shots came from the south of her. In speaking with Scott, I asked her if her son, John Moore, known as Squirrel, was there. She stated he had been there earlier in the evening but was not there at the time of the shooting.

I was advised Jordan Davis died from his injuries in the early morning hours of 10/18/17. His body was taken to the District 5 Medical Examiner's Office and I was advised an autopsy was performed by Dr. Lavezzi. I received a cause and manner of death form which stated the cause of death was multiple gunshot wounds and the manner was homicide.

On 10/18/16, I responded to the intensive care unit of ORMC. I made contact with Boone in a private room there. I was advised Boone suffered a single gunshot wound that entered and exited his body through his chest and back as well as one shot through his arm. I then asked him to tell me what had happened. He stated lots of people hang out at the house where this happened. He advised he arrived and saw his cousin, Davis, standing in the front yard. He advised he went to speak with him when a black male began shooting at them. He advised he had only been in the yard approximately 30 seconds when they began to be shot at. He advised the black male first shot Davis and then shot him, Boone. He advised he and Davis both ran from the yard and split up. He stated the black male who was shooting at them said no words, leading him to believe this involved a prior disagreement between Davis and the black male. He stated he believed he, Boone, was shot because the black male knew he and Davis were cousins and feared he would retaliate. He stated he had seen the black male before but didn't know his name. He stated the black male was frequently at the residence at 832 NW 15th Ave. and described him as being skinny, between 6'01" and 6'03", in his 30s, and having a low cut hairstyle. I asked if he knew the nickname of the black male and he stated it was something similar to "Rooster or Duck." I asked him if the nickname was some type of animal and he stated it was. I asked him if it was



**Ocala Police Department**
**402 S. Pine Avenue**
**Ocala, FL 34471**
**352-369-7000**

**SUPPLEMENTAL REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: Detective Steckman**

possibly Squirrel and he stated it was Squirrel. I then asked if he would be able to identify the black male in a lineup and he stated he would.

I then returned to the police department and constructed a computer generated photo lineup which contained one picture of John Moore and five pictures of similar looking individuals. I returned to the hospital with Detective Todd and made contact with Boone. I then exited the hospital room so Detective Todd could show the photo lineup. Todd later advised he read the admonition for to Boone and then showed him the lineup. He advised Boone circled a picture, which I observed to be of John Moore, and initialed the picture he had circled, however when asked to sign the admonition form he, Boone, began to cry and shake out of fear of retaliation. Boone asked if we could return the next day.

On 10/19/16, Stephanie Osorio came to the police department and gave written consent to search the 2001 maroon Chevy Impala, which bore FL tag GRCT45. Osorio was present while the search was conducted. Inside the vehicle, I observed a large amount of dried blood on the back seat. I requested an evidence officer photograph the vehicle and obtain a swab of the blood. I found nothing else of evidentiary value in the vehicle so it was released to Osorio.

Detective Todd and I then returned to the hospital and again made contact with Boone. Boone stated he was now ready to sign the admonition form and did so.

A criminal history check was conducted on John Moore and I observed he had been convicted of numerous felonies in the state of Florida, to include aggravated assault with a deadly weapon on 08/21/00.

On 10/21/16 I drafted a probable cause affidavit for the arrest of John Moore for the charges of second degree murder, attempted second degree murder, and possession of a firearm by a convicted felon. I responded to the State Attorney's Office and a warrant was drafted. I sent this warrant to Judge Herndon who signed it. I then delivered the warrant to the warrants division of the Marion County Jail.

I then drove to 832 NW 15th Ave. and observed the Crown Victoria and Expedition to be parked in the same places I had seen them on the night of the shooting. I again made contact with Scott and asked about the whereabouts of Moore. She stated she had not seen him since the night of the shooting and assumed he left because rumors had been circling that he was the shooter. I did not tell her of the warrant, but did ask if she saw him to have him call me. I did not receive a call from Moore. I then advised her I would be having the vehicles towed to the Ocala Police Department to be searched for evidence. The vehicles were then towed and secured in the evidence section.

On October 27th, search warrants were written for each vehicle and were signed by Judge Cragg. In the search warrants, the potential evidence listed to he searched for was spent



Ocala Police Department
402 S. Pine Avenue
Ocala, FL 34471
352-369-7000

**SUPPLEMENTAL REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: Detective Steckman**

bullets/projectiles. On November 4th, I executed these search warrants with assistance from an evidence officer and Detective Bowman. Bowman located one spent projectile in the Crown Victoria. I located one spent projectile in the driver door of the Expedition.

On 10/27/16, I was notified Moore had been placed under arrest in Georgia for the warrant obtained in this case.

Case Status: Closed by Arrest

Typed by Detective Steckman 01/23/17

ORIGINAL

ARREST AFFIDAVIT/FIRST APPEARANCE FORM

OCALA POLICE DEPARTMENT

OBTS # 4 2012 47921

Agency ORI # FL 042 0100

Court Case Number: 16-CF-2869

Felony X Misdemeanor ___ County or Municipal Ordinance ___ Traffic ___ Juvenile ___ Warrant ___ CAPIAS ___

Agency Case Number: 16036486 ~~0-1-6-2-1-3-5-6-7~~

| Defendant's Name: Last | First | Middle | DOB | SEX | RACE | HGT | WGT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|
| Moore | John | A | 03 14 80 (Mo Dy Yr) | M | B | 6'02" | | Black | Brown |

Mailing Address: St./P.O. Box 832 NW 15th Ave.
City Ocala State FL Zip 34475

Scars-Marks-Tattoos-Amputations (describe each):

St. Add. (if different): Street
City State Zip

Phone: Res. (352) 304-2531

Place of Birth: Georgia

Alias: Squirrel

Place of Employment: Street
City State Zip

Phone: Bus. ( )

Occupation:

Social Security No. 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

Driver Lic. No.: M600-461-80-094-0
State: FL

Veh. towed by

Hold on Vehicle Yes ☐ No ☐
Agency:

Arrest Suffix 01

Arrest Date: 11-3-16 (Mo. Day Year)

Arrest Time: 1130

Arrest Location: MCJ

U.S. Citizen (Y) N U N/A

Residence Type: (1. City) 2. County 3. Florida 4. Out-of-Florida

Activity: F. Forgery, O. Counterfeit, A. Fraud, X. Stolen Property, T. Traffic, P. Possess, S. Sell, B. Buy, R. Smuggle, D. Deliver, U. Use, M Manufacture/Produce/Cultivate, Z. Other, K. Dispense/Distribute, N. N/A

Type: A. Amphetamine, B. Barbiturate, C. Cocaine, P. Heroin, H. Hallucinogen, M. Marijuana, O. Opium/Deriv, S. Synthetic, U. Unknown, P Paraphernalia/Equipment, U. Unknown, 2. Other, N. N/A

CHARGES

| Description | Counts | Activity | Type | NCIC | CIS | Statute | Bond Amount | In Accordance to Bond Schedule |
|---|---|---|---|---|---|---|---|---|
| Murder - 2nd degree | 1 | N | N | | | 782.04(2) | No Bond | Y ☐ N ☒ |
| Attempted murder - 2nd degree | 1 | N | N | | | 782.04(2) | No Bond | Y ☐ N ☒ |
| Possession of a firearm by convicted felon | 1 | N | N | | | 790.23(1) | $10,000.00 | Y ☒ N ☐ |
| | | | | | | | | Y ☐ N ☐ |
| | | | | | | | | Y ☐ N ☐ |

Indication of:
Alcohol Influence Y☐ N☐ Unk☐
Drug Influence Y☐ N☐ Unk☐

Weapon Seized/Type Y☐ N☐

Juvenile Disposition
1. Handled/Processed Within Dept. and Released
2. Turned Over to HRS/CYF
3. Incarcerated (County Jail)

JAIL LOG: (To be completed by booking Officer)

Jail Inmate Number:

Date Booked 11-3-16

Time Booked 1220 AM PM

Booking Officer 5163

Fingerprinted By: 5849

Photographed By: 5849

Bin Number

Advised of Rights By: 5163

Check for Warrant(s) NCIC☐ FCIC☐ Local☐

Holds Yes☐ No☐

Agency of Hold:

Attorney (if known)

Religion PROT. J☐ Pr☐ C☐ Other☐

Marital Status S☒ M☐ D☐ Sep☐

Telephone call logged Time AM PM #

Next of Kin/PARENTS OF JUVENILE (for emergency) SHARON FAYA. SCOTT

Relation MOM

Address

Phone 352 426-0168

Bond Date / /

Returnable Court Date

Returnable Court Time AM PM

Release Date / /

Release Time AM PM

Releasing Officer

BOND. Charge A

Charge B

Charge C

Charge D

Charge E

Bond Type: ROR☐ SURETY☐ Cash☐ Bail Bond☐ Cert☐ Other☐

NAME AND ADDRESS OF BONDSMAN:

RECEIVED NOV - 4 2016

Approving Officer Signature:

OPD Form 020A - Rev. Mar.'98

Page 1

| Complaint/Arrest Affidavit Continuation | Court Case No. | Agency Case No. 0-16-213567 |
|---|---|---|
| Defendant Name: Last Moore First John Middle A | | Date of Birth 03-14-80 |

ORIGINAL

PROBABLE CAUSE AFFIDAVIT:
(specify probable cause for each charge)

Before Me, the undersigned authority personally appeared Detective M. Steckman who being duly sworn, alleged on information and belief, that on the 17th day of October, 20 16, in Marion County, Florida, the defendant did:

knowingly and unlawfully violate Florida State Statutes 782.04(2) and 790.23(1) and attempt to violate Florida State Statute 782.04(2) while at 832 NW 15th Avenue, Ocala, Marion County, Florida to wit:

On the evening of 10/17/16, officers of the Ocala Police Department responded to the area of the Dollar General, located at 990 NW 15th Ave., reference numerous calls of shots fired and a subject on the ground in front of the location. Upon arrival, Officer Ferguson located B/M Jordan Davis lying on the ground in the entrance to the business' parking lot off Martin Luther King Ave. Ferguson rendered aid to Davis, who was in and out of consciousness. Ferguson found Davis had suffered a gunshot wound to his chest. It was later discovered he had also been shot on his left forearm. Davis was transported from the scene to Ocala Regional Medical Center by ambulance.

I was serving as the on call detective and responded to assist. I arrived on scene prior to Davis being transported, but was unable to speak with him due to his receiving medical treatment. While I was responding, it was stated over the police radio another person, later identified as Keith Boone, had arrived by personal vehicle at Ocala Regional Medical Center with an apparent gunshot wound.

I was advised a potential crime scene had been located at 832 NW 15th Ave., and responded there. In the yard of this residence, I observed two vehicles with bullet holes in their driver's sides. These vehicles were parked perpendicular to the residence facing west. In examining the bullet holes, it appeared the bullets had been shot from directly south of the vehicles, and not from the roadway, which was to the west of the vehicles. Multiple bullet holes were located in the west side of the residence located directly east of 832 NW 15th Ave. (827 NW 15th Ave.). While searching the yard of 832 NW 15th Ave., Sgt. Buchbinder located 11 spent 40 caliber shell casings on the south side of the residence between the residence and a wooden privacy fence. The location of these casings was consistent with the possible location of shots fired causing damage to the vehicles and the residence across the street.

It should be noted, the residence located at 832 NW 15th Ave. is known by members of the Ocala Police Department to be the residence of John Moore, also known as Squirrel, the defendant, a person previously involved in criminal activity.

I then spoke with Sharon Scott, who resides at the residence. She advised she was sitting on the front porch of the residence and numerous people were outside. She advised a maroon Chevy Impala drove northbound on the street in front of the residence and she heard several shots fired. She stated she did not see who fired the shots, or if they were shot from the vehicle, but did say the shots sounded as if they came from the south side of the residence. I asked her if the defendant had been there at the time of the shooting and she stated he had been there earlier, but she did not see him at the time of the shooting. It should be noted, it was later discovered Scott is related to and lives with the defendant.

Attempts were made to locate any people in the area of the residence who had witnessed the shooting and could provide more information, however these attempts yielded negative results.

(Continued on Next Page)

ORIGINAL

SWORN to and SUBSCRIBED before me this 21 day of OCTOBER 20 16

[signature] AFFIANT

[signature] DC3
Notary Public - Certified Officer
(circle one)

Ocala Police Department
ARRESTING AGENCY

SEAL

ORIGINAL

| Complaint/Arrest Affidavit Continuation | Court Case No. | Agency Case No. 0-16-213567 |
|---|---|---|
| Defendant Name: Last First Middle<br>Moore John A | | Date of Birth 03-14-80 |

PROBABLE CAUSE AFFIDAVIT:
(specify probable cause for each charge)

Before Me, the undersigned authority personally appeared Detective M. Steckman who being duly sworn, alleged on information and belief, that on the 17th day of October, 20 16, in Marion County, Florida, the defendant did:

(Continued)

I then responded to Ocala Regional Medical Center and made contact with officers in the parking lot. I was advised Boone had been brought to the hospital in a maroon Chevy Impala, as described by Scott. I made contact with the two individuals, identified as Willie James and Javon Maxwell, who had brought Boone to the hospital in the Maroon vehicle. I spoke with both of them individually at the Ocala Police Department and each stated they had picked Boone up as he was running in the area of the residence on 15th Ave. They advised he told them he had been shot and to take him to the hospital.

During the early morning hours of 10/18/16, Davis died at Ocala Regional Medical Center. An autopsy was conducted that morning by Dr. Lavezzi at the District 5 Medical Examiner's Office. The cause and manner of death resulting from this autopsy listed the cause of death as multiple gunshot wounds and the manner was listed as homicide.

On 10/18/16, I responded to Ocala Regional Medical Center and made contact with Boone in the Intensive Care Unit. I was advised Boone had suffered a single gunshot that had entered and exited his body through his chest and back as well as one shot through his arm. I asked him to tell me about this incident and he stated lots of people hang out at 832 NW 15th Ave. He advised he arrived and saw his cousin, Davis, standing in the front yard. He advised he went to Davis and began speaking with him. He advised he had only been in the yard for approximately 30 seconds or a minute when a B/M began shooting. Boone advised the B/M first shot Davis and then shot him, Boone. Boone advised both he and Davis ran from the residence and split up. He stated there was no yelling or words said by the B/M prior to the shooting, leading him, Boone, to believe the shooting resulted from a possible earlier disagreement between the shooter and Davis. Boone stated he had seen the B/M previously, but did not know his name. He stated the B/M frequented the residence at 832 NW 15th Ave. and described him as being skinny, between 6'01" and 6'03", in his 30's, and having a low cut hair style. I asked if he knew the nickname of the B/M and he stated it was something similar to "Rooster or duck." I asked if the nickname was the name of an animal and he stated it was. I then asked if it was possibly "Squirrel" and he stated it was Squirrel. I asked if he would be able to identify the B/M from a photo lineup and he stated he would.

I then returned to the Ocala Police Department and constructed a computer generated photo lineup which contained a picture of the defendant as well as five other similar looking individuals. I returned to Ocala Regional Medical Center with Detective Todd and together we made contact with Boone. I then exited the room and Todd read the photo lineup admonition form to Boone and showed him the photo lineup. Boone circled the picture of the defendant and initialed his selection, however when Todd asked him to sign the admonition he began to shake and cry out of fear of retaliation. He then asked if we could return the next day.

On the morning of 10/19/16, Todd and I returned to the hospital and again made contact with Boone. He advised he was ready to sign the admonition form, and did so. He then reiterated his depiction of the incident as he had told me the previous day.

(Continued on Next Page)

ORIGINAL

SWORN to and SUBSCRIBED before me this 21 day of October 20 16

[signature] AFFIANT

[signature] Notary Public - Certified Officer (circle one)

Ocala Police Department
ARRESTING AGENCY

SEAL

Complaint/Arrest Affidavit Continuation | Court Case No. | Agency Case No. O-16-213567

Defendant Name: Last Moore First John Middle A | Date of Birth 03-14-80

PROBABLE CAUSE AFFIDAVIT:
(specify probable cause for each charge)

Before Me, the undersigned authority personally appeared Detective M. Steckman who being duly sworn, alleged on information and belief, that on the 17th day of October, 20 16, in Marion County, Florida, the defendant did:

(Continued)

A criminal history check of the defendant revealed on 02/08/01 and 12/14/01 he had been convicted of two separate charges of felony fleeing or eluding a police officer, on 08/21/00 he had been convicted of aggravated assault with a deadly weapon, and on 11/10/98 he had been convicted of possession of cocaine, all felonies in the state of Florida.

It should be noted, numerous anonymous calls were received pertaining to this incident stating John Moore had fled to Georgia to avoided being arrested in this case.

Due to these facts, there is probable cause for the arrest of John Anthony Moore for the charges of 2nd degree murder, attempted 2nd degree murder, and possession of a firearm by a convicted felon.

WARRANT SERVED 11-3-16 AT 1130 HOURS BY I. PALAN #5563 AT MCJ.

ORIGINAL

SWORN to and SUBSCRIBED before me this 21 day of OCTOBER 20 16

[signature] 013
Notary Public - Certified Officer
(circle one)

[signature]
AFFIANT

Ocala Police Department
ARRESTING AGENCY

SEAL

Exhibit - E

# Exhibit – E

Exhibit - E

IN THE CIRCUIT/COUNTY COURT OF THE 5th JUDICIAL CIRCUIT IN AND FOR MARION COUNTY, FLORIDA

CASE NO. 16-2869-CF

IN THE INTEREST OF:
or
STATE OF FLORIDA
vs
John Anthony Moore
Defendant/Child

## ORDER APPOINTING PUBLIC DEFENDER OR CONFLICT COUNSEL

THIS CAUSE has come before the Court because the defendant/child has requested the appointment of the Public Defender and has filed an affidavit of indigent status pursuant to Sec. 27.52, Florida Statutes.

____The Court understands that the administrative review of the defendant/child's affidavit of indigent status is incomplete. It is therefore provisionally ORDERED that the Public Defender/private Conflict Counsel is temporarily appointed to represent the defendant/child and will continue to act as court appointed counsel of record herein, subject to the following:

a. the appointment of the Public Defender/private Conflict Counsel shall become permanent upon administrative review and approval of indigent status by the Clerk; or

b. the appointment of the Public Defender/private Conflict Counsel shall be withdrawn upon administrative review by the Clerk of defendant/child's indigent status, determination by the Clerk that defendant/child is not indigent, Clerk's notice to defendant/child of the Clerk's administrative determination and final determination of non-indigent status by the Court.

X The Court understands that the defendant/child's affidavit for indigent status has been filed with the Clerk, with a determination of **indigent** status. It is therefore ORDERED that the Public Defender/Private Attorney is appointed to represent the above-named defendant/child.

____The Court understands that the defendant/child's affidavit for indigent status has been filed with the Clerk, with a determination of **not indigent** status. The Public Defender is Hereby Appointed Notwithstanding the Clerk's Finding.

The defendant/child shall pay the $50.00 Public Defender Application Fee to the Clerk of the Court within seven (7) days, if not already paid. This fee is an application fee shall be paid whether the Public defender is appointed, not appointed, or later withdrawn.

**DONE AND ORDERED** in Ocala, Marion County, Florida this 4th day of November, 2016.

Circuit Judge

County Judge

COPIES TO:
Original - Court File
Yellow - Public Defender/Court Appointed Counsel
Pink - State Attorney/Department
Goldenrod - Defendant/Parent

Filing # 48748518 E-Filed 11/10/2016 12:02:07 PM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT, IN AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA

CASE NO.16-CF-002869-A-W

vs.

JOHN ANTHONY MOORE,
Defendant.
_______________________________/

**DEFENDANT'S PLEA**

The Defendant in the above-styled cause, through the undersigned attorney, and pursuant to Fla. R.Crim.P. 3.160(a) and 3.170(a), waives appearance at arraignment and upon receipt of a copy of the formal charges, enters a plea of NOT GUILTY, waives reading of the charge, and demands a jury trial.

Additionally, the accused, pursuant to Fla.R.Crim.P. 3.190(c) and 3.050, respectfully requests this Honorable Court to grant the defendant ten (10) days from receipt of the formal charge within which to attack the sufficiency of the charge.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a truc and accuratc copy of thc forcgoing has bccn furnishcd to the State Attorney's Office, 110 NORTH WEST 1ST AVENUE, SUITE 5000, OCALA, FL 34475 , by hand, mail and/or e-service this 10th day of November, 2016.

**Office of Michael A. Graves**
**Public Defender**
**Fifth Judicial Circuit**

*s/ FRANCES ANN MOUTON WATSON*
FRANCES ANN MOUTON WATSON
Assistant Public Defender
Florida Bar No. 106517
204 N. W. 3Rd Avenue
Ocala, FL 34475-6634
(352) 671-5454
E-Service Email: E-Marion@Pdo5.org
Other Email: fmouton@pdo5.org

Filing # 48748522 E-Filed 11/10/2016 12:02:14 PM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT, IN AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA

CASE NO. 16-CF-002869-A-W

vs.

JOHN ANTHONY MOORE,

Defendant.

_______________________________________/

**NOTICE OF APPEARANCE**

The Office of the Public Defender, pursuant to Rule 3.030, Florida Rules of Criminal Procedure, and the Order of Appointment entered herein, enters this Notice of Appearance as attorney of record for the Defendant, JOHN ANTHONY MOORE, requests copies of all motions, pleadings, orders, notices, demands and similar papers filed herein.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been furnished to the State Attorney's Office, 110 NORTH WEST 1ST AVENUE, SUITE 5000, OCALA, FL 34475, by hand, mail and/or e-service, this 10th day of November, 2016.

**Office of Michael A. Graves**
**Public Defender**
**Fifth Judicial Circuit**

*s/ FRANCES ANN MOUTON WATSON*

FRANCES ANN MOUTON WATSON
Assistant Public Defender
Florida Bar No. 106517
204 N. W. 3Rd Avenue
Ocala, FL 34475-6634
(352) 671-5454
E-Service Email: E-Marion@Pdo5.org
Other Email: fmouton@pdo5.org

Exhibit - F

# Exhibit – F

Exhibit - F

Filing # 49301485 E-Filed 11/28/2016 09:50:04 AM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT, IN AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA

CASE NO. 16-CF-002869-A-W

vs.

JOHN ANTHONY MOORE,

Defendant.

_______________________________________/

**MOTION TO WITHDRAW AS COUNSEL (CONFLICT)**

COMES NOW, the Public Defender, by and through his undersigned Assistant Public Defender in and for Marion County, Florida, and hereby certifies a conflict, and respectfully requests this Court's Order relieving the Office of the Public Defender of the Fifth Judicial Circuit of Florida from further responsibility in the above cause.

As grounds for this Motion, your Petitioner states: The Office of the Public Defender has determined that interests are adverse to the interests of our client, Keith Boone, case number(s):15-CF-2377, and therefore has determined that a conflict of interest exists.

WHEREFORE, your Petitioner prays that this Motion to Withdraw as Counsel be granted and that substitute counsel be provided per Section 27.5303(1)(a), Florida Statutes (2015).

Respectfully submitted this 22nd day of November, 2016.

**Office of Michael A. Graves**
**Public Defender**
**Fifth Judicial Circuit**

*s/ FRANCES ANN MOUTON WATSON*
FRANCES ANN MOUTON WATSON
Assistant Public Defender
Florida Bar No. 106517
204 N. W. 3Rd Avenue
Ocala, FL 34475-6634
(352) 671-5454
E-Service Email: E-Marion@Pdo5.org
Other Email: fmouton@pdo5.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been furnished to the State Attorney's Office, 110 NORTH WEST 1ST AVENUE, SUITE 5000, OCALA, FL 34475, by hand, mail and/or e-service delivery, this 22nd day of November, 2016.

*s/ FRANCES ANN MOUTON WATSON*

2016 DEC -6 AM 10:53
CLERK CIRCUIT COURT
MARION COUNTY, FL

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT, IN AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA CASE NO. 16-CF-002869-A

vs.

JOHN ANTHONY MOORE,

Defendant.

______________________________/

**ORDER SUBSTITUTING COUNSEL (CONFLICT)**

THIS CAUSE having come before the Court upon the Motion to Withdraw as Counsel (Conflict) for the above named Defendant filed by the Office of the Public Defender, and the Court, being fully advised in the premises, finds that the Motion should be granted and a substitution of counsel should be approved at once; it is therefore

ORDERED AND ADJUDGED as follows:

1. The Office of the Public Defender is hereby relieved of any further responsibility in connection with this case.

2. Under the authority of Section 27.5303(1)(a), Florida Statutes (2012), Criminal Conflict Regional Counsel, Fifth District Of Florida, 307 N.w. 3Rd Street, Ocala, Florida 34475, a member in good standing of the Florida Bar and practicing before this Court, is hereby appointed as substitute counsel for this Defendant, and shall be compensated for services as provided in Section 27.5304, Florida Statutes (2012).

3. The conflict attorney shall IMMEDIATELY file a Notice of Appearance with a copy furnished to the assigned judge.

4. Substitute counsel is authorized to incur court reporter fees and transcription costs, expert fees and other due process costs pursuant to Fifth Circuit Administrative guidelines.

5. Copies hereof shall be furnished to the newly appointed counsel; the Office of the Public Defender; the Office of the State Attorney; and to the above named Defendant, by the Clerk of the Circuit Court.

DONE AND ORDERED in Ocala, Marion County, Florida, on this 5 day of December, 2016.

ROBERT W HODGES
CIRCUIT JUDGE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been furnished to Criminal Conflict Regional Counsel, Fifth District Of Florida, 307 N.w. 3Rd Street, Ocala, Florida 34475, the Office of the Public Defender, 204 N. W. 3Rd Avenue, to the State Attorney's Office, 110 North West 1St Avenue, Suite 5000, Ocala, FL 34475, and to the above named Defendant at 700 N. W. 30Th Avenue
Ocala, FL 34475, by hand, mail and/or e-service delivery, this 5 day of December, 2016.

JUDICIAL ASSISTANT

Exhibit - G

# Exhibit – G

Exhibit - G

CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA
vs.
JOHN ANTHONY MOORE JR
DOB: 03/14/1980
RACE: Black
GENDER: Male

Case Number: 16CF002869AX

# COURT MINUTES

Judge: ANTHONY MICHAEL TATTI
State Attorney:
Defense Attorney: FRANCES ANN MOUTON-WATSON

Event Date: 12/06/2016
Hearing Type: ARRAIGNMENT
Defendant Not Present

Arrest Data:

| Date: | Booking #: | Agency Case #: | OBTS #: |
|---|---|---|---|
| 11/03/2016 | S16036486 | S16036486 | 4201247921 |

| | | | | |
|---|---|---|---|---|
| 1 | 782.04.2 | MURDER IN THE SECOND DEGREE WITH A FIREARM | Felony Life | 11/03/2016 |
| 2 | 782.04.2 | ATTEMPT SECOND DEGREE MURDER WITH FIREARM | Felony First Degree | 11/03/2016 |
| 3 | 790.23.1a | POSSESSION OF FIREARM BY CONVICTED FELON | Felony Second Degree | 11/03/2016 |

**MOTIONS/WAIVERS:**

Plea Not Guilty

**CONTINUANCES:**

REG CNSL PRTRL CONF on 03/22/2017 at 01:00 PM with ROBERT WILLIAM HODGES at XX in COURTROOM 3A

PD PRETRIAL CONF on 03/22/2017 at 01:45 PM with ROBERT WILLIAM HODGES at XX in COURTROOM 3A

PRO SE PRTRL CONF on 03/22/2017 at 01:45 PM with ROBERT WILLIAM HODGES at XX in COURTROOM 3A

PRETRIAL CONF on 03/22/2017 at 09:00 AM with ROBERT WILLIAM HODGES at XX in COURTROOM 3A

JURY SELECTION on 04/03/2017 at 09:00 AM with ROBERT WILLIAM HODGES at XX in COURTROOM 3A

| **PROSECUTOR PHASE:** | **COURT PHASE/PLEA/DISPOSITION:** |
|---|---|

**SENTENCE/PROVISIONS/ADDITIONAL SENTENCE NOTES:**

*Copies to SAO/Probation/MCJ ___________
*NCOP – Not a Condition of Probation

**MONETARY OBLIGATIONS:**

| Amount | Description | Balance |
|---|---|---|
| 50.00 | AFFIDAVIT OF INDIGENT STATUS | 50.00 |

**DOCKETS:**

| **FTA/BOND:** | **COMPLIANCES:** |
|---|---|

I HEREBY ACKNOWLEDGE receipt of a copy of this form and understand that I must comply with all applicable conditions noted above.

Filed in open court on December 06, 2016.

Deputy Clerk

Defendant's Signature

832 NW 15TH AVE
OCALA, FL 34475
Mailing Address

Exhibit - H

# Exhibit – H

Exhibit - H



Office of
**Criminal Conflict and Civil Regional Counsel**
FIFTH DISTRICT OF FLORIDA

(352) 732-1230 TELEPHONE (352) 732-1228 FAX

## TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Judge HODGES | Natalie for MICHAEL REITER |
| | DATE: |
| HAND DELIVER | 12/06/2016 |
| CASE: | |
| JOHN ANTHONY MOORE | 2016-CF-2869-A |

2016 DEC -8 AM 10:34

**NOTES/COMMENTS:**
We have been appointed to represent the above referenced defendant, however there is a conflict, therefore we must withdrawal from representation. Enclosed for your review is a Motion/Order to allow the Regional Conflict Counsel to withdraw from the above case.

Should you have any questions, please contact our office at the number mentioned above.

THIS MEMO MAY CONTAIN PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE.

THANK YOU.

**IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA**

STATE OF FLORIDA,
Plaintiff,
Vs.

CASE NO.: 2016-CF-2869-A

JOHN ANTHONY MOORE,
Defendant.
_____________________________/

**MOTION TO WITHDRAW**

**COMES NOW,** the undersigned counsel and moves this Court to enter an Order permitting undersigned counsel to withdraw from representation of the Defendant, JOHN ANTHONY MOORE and files this Motion to Withdraw, and alleges the following in support thereof:

1. That undersigned counsel was appointed to represent the Defendant in the above-styled matter.
2. The Regional Counsel previously represented the Victim, Keith Boone, in Criminal Case No.: 2013-CF-3926-A.

**WHEREFORE,** the Defendant by and through undersigned counsel respectfully requests that this Honorable Court grant this motion and appoint another conflict attorney to represent the Defendant.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that the foregoing document has been furnished to: **Office of the State Attorney,** eservicemarion@sao5.org, 110 NW 1st Ave., Ocala, FL 34475, by email, the Defendant, Marion County Jail, OCALA, FL 34475, by mail, this 6 day of December, 2016.

/S/ Jeffrey D. Deen
**Jeffrey D. Deen**
**Regional Counsel**
Florida Bar No.: 457574
Office of Regional Criminal Conflict & Civil Regional Counsel, 5th District
Rccmarion@rc5state.com
307 N.W. 3rd Street
Ocala, Florida 34475
Phone No. 352-732-1230
Fax No. 352-732-1228

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT IN AND FOR MARION COUNTY, FLORIDA

Case No: 2016-CF-2869-A

STATE OF FLORIDA,
Plaintiff,

vs.

JOHN ANTHONY MOORE,
Defendant.
_______________________________/

**CERTIFICATION OF CONFLICT BY OFFICE OF REGIONAL CRIMINAL AND CIVIL CONFLICT, 5TH DISTRICT**

The Office of Regional Criminal Conflict and Civil Counsel hereby certifies that a conflict does in fact exist based upon one or more of the following and therefore withdrawal of this office from this case is appropriate:

____ 1. Conflict of interest involving codefendants.

____ 2. This office previously represented a witness involved in the current case.

____ 3. The attorney assigned to this case previously represented a codefendant or material witness in this case.

____ 4. This office has material and irreconcilable differences with the client.

☒ 5. Other reasons requiring withdrawal. Specifically: The Regional Counsel, 5th District, previously represented victim, Keith Boone, in case no.: 2013-CF-3926-A.

____ 6. The office cannot act on behalf of one client without materially affecting the representation of another client, Thomas v State 785 So 2d 626 (FLA 2d DCA, 2001).

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY,** that the foregoing document has been furnished to: The Marion County Clerk of Court, this 6 day of December, 2016.

/S/ Jeff Deen

**Jeff Deen, Regional Counsel**
Office of Regional Criminal Conflict & Civil Conflict, 5th District, FL. Bar. No. 457574
101 Sunnytown Road, Suite 310
Casselberry, Florida 32707
(407) 389-5140
(407) 389-5139

Exhibit - I

# Exhibit – I

Exhibit - I

C/O MCJ
A 0031374

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

STATE OF FLORIDA,
Plaintiff,
Vs.

Case No.: 2016-CF-2869-A

JOHN ANTHONY MOORE,
Defendant.
_______________________________/

**ORDER ALLOWING THE OFFICE OF CRIMINAL CONFLICT AND CIVIL REGIONAL COUNSEL TO WITHDRAW**

**THIS CAUSE** having come to be heard this date upon Motion of the Office of Criminal Conflict and Civil Regional Counsel, to withdraw from further representation of the above-named Defendant, and the Court having been fully advised in the premises, it is hereby

**ORDERED AND ADJUDGED** that the Office of Criminal Conflict and Civil Regional Counsel, is hereby allowed to withdraw from further representation of the Defendant in the above-styled cause and ENEID BANO is hereby appointed to represent the Defendant in this cause.

**IT IS FURTHER ORDERED** that the Office of Criminal Conflict and Civil Regional Counsel shall forward all discovery materials received in this matter to the newly appointed attorney within three (3) days of the date of this Order. If no discovery has yet been received, the Office of Criminal Conflict and Civil Regional Counsel shall immediately notify the newly appointed attorney.

**DONE AND ORDERED** at Marion County Courthouse, Ocala, Florida, this 7 day of December, 2016.

[signature]
Robert Hodges

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by Facsimile and U.S. Mail to the following on this 23RD day of DECEMBER, 2016.

Office of the State Attorney
(Via Inter-Office Mail)

Michael Reiter, Assistant Regional Counsel
(Via-Inter-Office Mail)

Defendant
Marion County Jail
OCALA, FL 34475

[signature] Gardner
~~Judicial Assistant~~ DEPUTY CLERK

CC: ENEID BANO
274 WILSHIRE BLVD
SUITE 237
CASSELBERRY, FL 32707

Filing # 50661845 E-Filed 01/01/2017 07:04:58 PM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

Case No.: 2016-CF-2869-A

STATE OF FLORIDA

VS.

JACK ANTHONY MOORE,
Defendant.
_______________________________/

**NOTICE OF APPEARANCE/WAIVER OF ARRAIGNMENT/PLEA OF NOT GUILTY AND REQUEST FOR JURY TRIAL/DEMAND FOR DISCOVERY/REQUEST FOR COPY OF CHARGES**

**NOTICE OF APPEARANCE/WAIVER OF ARRAIGNMENT**

COMES NOW, Eneid Bano Esq., of the Bano Law Firm P.L. and files this Notice of Appearance and Waiver of Arraignment in this case on behalf of the above-named Defendant.

**PLEA OF NOT GUILTY AND REQUEST FOR JURY TRIAL**

The Defendant, by and through the undersigned counsel pursuant to the Provisions of Rules 3.160 and 3.251, Florida Rules of Criminal Procedure, enters a Plea of Not Guilty and requests a JURY TRIAL.

**DEMAND FOR DISCOVERY**

The above-named Defendant, by and through the undersigned counsel, respectfully demands that the Office of the State Attorney, within fifteen (15) days from the filing of this document, disclose to the Defense counsel and permit him to inspect, copy, test and photograph or record those items and matters included within Rule 3.220(b)(1)(A) through (K) and (4) inclusive, Florida Rules of Criminal Procedure. Further, written demand is made for disclosure of any material information with the State's possession or control which tends to negate guilt of the accused as to the offense charged under Rule 3.220(b)(2), Fla. R. Crim. P., and for material information concerning punishment pursuant to the decision of the United States Supreme Court in the case *Brady vs. Maryland,* 373 U.S. 83,, S. Ct. 1194, Led 2d 215 (1963); specifically any information available to the State concerning Defendant's prior record of criminal convictions.

Electronically Filed Marion Case # 16CF002869AX 01/01/2017 07:04:58 PM

**REQUEST FOR COPY OF CHARGES**

Please forward to the undersigned counsel at the indicated address photocopies of the charges in this case and photocopies of all discoverable materials in your file.

The Clerk of the Court is requested to supply a complete copy of any Information, Indictment or Charging Instrument which is filed and pertaining to the above captioned matter, and to forward the same to the undersigned attorney.

It is further requested that the Clerk of the above captioned Court promptly notify the undersigned attorney of the time and date of any hearings, appearances, or trials pertaining to the above captioned cause to insure the prompt appearance of the Defendant before the Court.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by U.S. Mail/email/fax/ hand delivery to the Office of the State Attorney, at 19 N. W. 1st Avenue Ocala, Florida 34475 on this 1st day of January, 2017.

ENEID BANO, ESQUIRE
Florida Bar No. 84007
274 Wilshire Blvd. Suite 237
Casselberry, FL 32707
Tel: 407 437-4398
Fax:407 567-7906
banolaw@gmail.com
Attorney for the Defendant

Exhibit - J

# Exhibit – J

Exhibit - J

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

Case No.: 2016-CF-2869-A

STATE OF FLORIDA

VS.

JOHN ANTHONY MOORE,
Defendant.
_______________________________/

**MOTION TO DISMISS THE INFORMATION**

COMES NOW the Defendant, by and through undersigned counsel pursuant to Rule 3.190 (b), (c) and 3.140 (b), (d) and (g) Fla.R.Crim.P. to allow him to plead this motion to dismiss and to dismiss all counts of the Information in the above-styled case and as grounds the Defendant states the following:

1. The State of Florida (hereinafter "State") had originally charged the Defendant via Information on December 5, 2016 with Count I Murder in the Second degree with a firearm, count II Attempted Second Degree Murder with a Firearm and count III Possession of a Firearm by a Felon.
2. The State of Florida then filed an Amended Information on May 9, 2017 charging the Defendant with Count I Murder in the Second degree with a firearm, count II Attempted Second Degree Murder with a Firearm and count III Possession of a Firearm by a Felon.
3. The Defendant understands that pretrial motions to dismiss should be filed before or at arraignment and that said motion is filed after the arraignment and is asking the Court to use its discretion under Rule 3.190 (c) to accept the motion and allow for it to be argued on the merits based on good grounds being shown.
4. As grounds, the Defendant asserts that while he was charged via Information on December 5, 2016 and was arraigned on December 6, 2016, the Office of the Public Defender had filed a motion to withdraw due to a conflict of interest on November 28, 2016.

5. The Defendant was not present at arraignment in front of Judge Tatti according to the court minutes and the plea of not guilty at arraignment previously entered by the Office of the Public Defender should be invalid due to the conflict in interest and the pending motion to withdraw.
6. The Office of Criminal Regional and Conflict Counsel was appointed on 12/5/2016 and filed a motion to withdraw on 12/6/2016.
7. Undersigned counsel, Eneid Bano was appointed on December 7, 2016 and the order was not mailed to undersigned counsel until December 23, 2016 according to the certificate of service from the clerk.
8. Eneid Bano Esq. filed a notice of appearance, plea of not guilty and request for discovery on January 1, 2017 as a matter of practice.
9. The first discovery response was not sent out until January 6, 2017.
10. While the Defendant understands that under Florida Rule of Criminal Procedure 1.340 (g), " No objection to an Information on the ground that it was signed or verified, as herein provided, shall be entered after the Defendant pleads to the merits." a plea of not guilty on the information by Eneid Bano was not done until after the arraignment.
11. The Defendant through no fault of his own did not have conflict free counsel until well after the arraignment.
12. Undersigned counsel could not have filed this motion prior to arraignment.
13. Therefore, in the interest of justice, the Court should entertain hearing the motion to dismiss filed by the Defendant even though it was filed after the arraignment as it contains fundamental errors.
14. The Information should be dismissed for several independent reasons.
15. The Information is invalid because ASA Toby Hunt on December 5, 2016 before e-filing the Information, failed to take the required oath before affixing the signature to the Information. The Information is therefore subject to dismissal. See Morffy v. State, 534 So. 2d 733 (Fla. App. 3rd Dist. 1988).

16. The following day on December 6, 2016, ASA Toby Hunt filed another information in paper form with the Clerk of Court, which is not in compliance with Florida Rule of Judicial Administration 2.520 and 2.525.

18. The State of Florida also failed to obtain a sworn testimony from a material witness before filing the Information on December 5, 2016. The Information filed is not based upon sworn testimony from a material witness who witnessed any criminal acts as required under Florida Rule of Criminal Procedure 3.140 (g).

19. The only eyewitness of the incident, Keith Boone testified at the adversary preliminary hearing on December 1, 2017 that he did not recall being sworn when he met with State Attorney Toby Hunt when he met with him on December 2016 at the State Attorney's Office.

20. Moreover, Detective Steckman does not mention in his probable cause affidavit that he ever placed Keith Boone under oath when he was gathering information from him at the hospital.

21. The trial court lacked subject matter jurisdiction because the Information was not based upon the sworn testimony from a material witness before the filing of December 5, 2016. Therefore, the Information should be dismissed. See State v. Weinberg, 780 So. 2d 214 (Fla, 5th DCA, 2001); State v Gonzalez, 212 So. 3d 1094 (Fla. 5th DCA, 2017).

22. The arrest warrant also invalid as the supporting affidavit is defective due to the lack of an oath. The author of the probable cause affidavit testified under oath that he did not swear to the affidavit before a person authorized to administer oaths, nor did he swear under oath before the Judge who issued the arrest warrant.

23. "An arrest affidavit must be sworn to before a peron authorized to administer oaths." See Crain v. State, 914 So. 2d 1015 (Fla. 5th DCA, 2005). Additionally, section 933.06 of the Florida Statutes states in part, " The Judge must, before issuing the warrant, have the application of some person for said warrant duly sworn to and subscribed." See State v. Tolmie, 421 So. 2d 1087, 1088 (Fla, 4th DCA 1982).

24. Indeed, there is such an importance to the oath requirement that a complaint nto so sworn to is subject to dismissal . See. U.S. v. Asdrybal-Herrera, 470 F. Supp. 939, 941-942 (N.D. Ill. 1979).
25. The arrest affidavit is fatally defective on several grounds.
26. First it was not sworn to before a person authorized to administer oaths. See Collins v. State, 465 So. 2d 1266 (Fla. 2nd DCA, 1985). The Fourth Amendment to the United States Constitution and article 1 section 12 of the Florida Constitution provide that the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall ot be violated. See also Fla. Stat 933.04.
27. Detective Steckman misrepresented facts and deliberately led the only alleged eyewitness by improperly suggesting the Defendant as the perpetrator in the crime. Detective Steckman's omissions and misrepresentations in his probable cause affidavit were improperly relied on by the judge to sign an arrest warrant.
28. The Florida Constitution provides that "no person shall be deprived of life, liberty or property without due process of law. " Art 1, section 9. Fla. Constitution. The State is violating that section by requiring a person to stand trial and defend himself against charges that it knows are based upon false and inconsistent statements. Governmental misconduct violates a Defendant's due process rights under the Florida Constitution requires dismissal of the criminal charges. State v. Glosson 462 So. 2d 1082 (Fla. 1985).
29. The Information filed in this cause fails to state the essential facts constituting the offense charged, in violation of Rule 3.140 (d)(1), Fla.R.Crim.P.
30. There are no fingerprints or DNA tying the Defendant to the alleged crime.
31. Nothing else in the discovery suggests or even remotely points to the Defendant doing any of the acts which would be necessary for him to be convicted of what the State alleges in the Information.
32. The Information filed herein is vague and indefinite, in violation of Rule 3.140 (b) Fla.R.Crim.P. and the Defendant cannot prepare his defenses thereto.
33. The Information filed herein is not supported by facts sufficient to establish a prima facia case of guilt as to the offense charged.

34. Any waivers of speedy trial by the defense should be invalidated due to the defective information and the case should be dismissed.
35. The Defendant requests a hearing.

WHEREFORE, Defendant respectfully requests this Court to grant this Motion to Dismiss the Information against Defendant in the above styled-cause along with any other relief the court deems appropriate and in the interests of justice.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a truc and corrcct copy of thc forcgoing has bccn furnishcd by U.S. Mail/email/fax/hand delivery to the Office of the State Attorney on this 12th day of February, 2018.

ENEID BANO, ESQUIRE
Florida Bar No. 84007
274 Wilshire Blvd. Ste. 237
Casselberry, FL 32707
Tel: 407 437-4398
Fax:407 567-7906
banolaw@gmail.com
Attorney for the Defendant

Exhibit - K

# Exhibit – K

Exhibit - K

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
OF THE STATE OF FLORIDA, IN AND FOR MARION COUNTY

STATE OF FLORIDA CASE NO. 2016-CF-2869-A

vs.

JOHN ANTHONY MOORE,

Defendant.
_______________________________/

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INFORMATION**

THIS CAUSE came before the Court for hearing on March 19, 2018, on the Defendant's Motion to Dismiss the Information, filed February 12, 2018. The Court reviewed the Defendant's motion, as well as the State of Florida's Motion to Strike or Deny the Defendant's Motion to Dismiss the Information, filed March 14, 2018. Florida Rule of Criminal Procedure 3.140(g) (2018) provides, in pertinent part, as follows "... No objection to an information on the ground that it was not signed or verified, as herein provided, shall be entertained after the defendant pleads to the merits." WHEREFORE, based upon the foregoing, the Defendant's Motion to Dismiss the Information is DENIED.

Dated this 26th day of March, 2018.

**STEVEN G. ROGERS**
Circuit Court Judge

cc: Office of the State Attorney, via e-service
Eneid Bano, Esq., via e-service

Exhibit - L

# Exhibit – L

Exhibit - L

**Eneid Bano Esq.**
Attorney at Law
Casselberry: 274 Wilshire Blvd. Suite 237
Casselberry, FL 32707
Orlando: 390 N. Orange Ave. Suite 2300
Orlando, FL 32801
www.yourorlandolegal.com
www.banolaw.com
banolaw@gmail.com
Tel: 407 437 4398
Fax: 407 567 7906

Federal & State Practice

4/18/2018

John Moore Booking #0031347
Marion County Jail
700 NW 30th Ave.
Ocala, FL 34475

Dear Mr. Moore,

See attached copies of the orders on the motion to dismiss and motion to suppress. I have received and reviewed your letter about the writ of prohibition and I do not find the filing of a writ of prohibition with the DCA to be appropriate in here as there is no good faith basis to pursue it. If you were to be convicted at trial, you can appeal the ruling on the motions that were denied on appeal. As I had previously explained to you in person and on the letter that we were outside the time limits to filing of a motion to dismiss based on the grounds we discussed and Florida Rule of Criminal Procedure 3.140 (g) which states in part "No objections to an information on the ground that it was signed or verified, as herein provided, shall be entertained after the defendant pleads to the merits." I filed the motion on your behalf nonetheless based on the arguments that we discussed, and the Judge denied it as such. I would also like you to refer to the case I had previously included in my previous letter to you about the timeliness.

As far as filing a Franks motion, I regret to tell that I cannot file that in good faith either as a Franks hearing is usually done in cases where officers intentionally mislead or with reckless disregard for the truth misled the judge into signing a warrant. In Franks, v Delaware, 438 U.S. 154 (1978), the Court states

> "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory, and must be supported by more than a mere desire to cross examine. The allegation of deliberate falsehood or of reckless disregard must point out specifically with supporting reasons the portion of the warrant affidavit that is claimed to be false. It also must be accompanied by an offer of proof, including affidavits or sworn or otherwise reliable statements of witnesses or a satisfactory explanation of their absence. If these requirements

as to allegations and offer of proof are met, and if, when material that is subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."

In your case, the first Judge found probable cause and then after the lengthy adversary preliminary hearing we had the Judge again found probable cause. We have no proof of any deliberate falsehood on the part of the officers. We may have inconsistent statements on their part and we can point all that out to the jury when we go to trial. Even if we were to allege that they are made in reckless disregard for the truth and the Judge were to see it that way, the State still has the statement of Keith Boone saying you shot and killed his cousin and you shot him. We do not have a search warrant that is basis the of the prosecution. This is not a case where the entirety of the State's case is based on evidence derived from a search warrant that was obtain by deliberate falsehood or reckless disregard for the truth, but instead we a probable cause warrant for your arrest.. Their case is based on the testimony of a witness who is pointing you out both in court and out of court as the alleged perpetrator. Whether Keith Boone is being truthful is again a question of fact to be considered by the jury. The State can proceed against you based on the statement of Keith Boone.

I would like to remind you that even though you are the client, I am in charge of the strategy and as officer of the Court I have an obligation not to file frivolous pleadings that I do not have a good faith basis for. At this point, we are looking at getting Keith Boone's medical records and looking into the remaining bullets in the residence across the street and once we get those, we can go to trial. I know you have mentioned Nelson hearings and bar complaints against me as well as you have advised me you were or had filed complaints against the arresting officers and the state attorneys, but I cannot let you threaten me with that in order to manipulate me into filing frivolous pleadings or cause unnecessary delays in the case because you do not wish to go to trial. You are mistaken in your beliefs that you will get the case dismissed short of trial by using me as a tool to file frivolous motions and you filing bar complains against the prosecutors and myself and also against the arresting officer's with the integrity review board and Pam Bondi's office. If you want to do a Nelson hearing, let me know and I will gladly set it for a hearing.

Finally, I got the CDs for the adversary preliminary hearing and the motions we had and I am in the process of getting them transcribed. I will send you the transcripts as soon as I get them.

Sincerely,

Eneid Bano, Esq.
Florida Bar # 84007

IN THE CIRCUIT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

FILED CIVIL DIVISION 2017 OCT 30 PM 3:33 CLERK CIRCUIT COURT MARION COUNTY, FL

STATE OF FLORIDA,
Plaintiff,

v. Case NO: 2016-CF-2809

JOHN MOORE,
Defendant.

Filed in the Office of Circuit Court Marion County, Florida ON Oct. 31 2017 David R. Ellspermann, Clerk BY [signature] D.C.

**MOTION FOR COURT ORDER SETTING NELSON HEARING**

The undersigned Defendant, John Moore, pro se, pursuant to the applicable Florida Rules of criminal Procedure and Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973), and respectfully moves this Honorable Court for an order setting a date, time, and place for a Nelson hearing in regards to the competency of court-appointed counsel, Eneid Bano, Esq., and in support thereof, would show the following:

1. On December 7, 2016 this Court appointed Eneid Bano, Esq. to represent the Defendant in the above-styled cause.

2. On February 13, 2017 the undersigned mailed Court-appointed counsel a Direction to Counsel requesting, among other things, that counsel work with the undersigned "to achive my expected Objectives" and comply with reasonable request[s] for documentation." Available for the Court's review

upon request.

3. On or about March 9, 2017 court-appointed Counsel visited the undersigned at the Marion County Jail. During said meeting, Counsel advised the undersigned that the motion for an adversary preliminary hearing is for Federal Courts and not proper for State Courts.

4. On March 20, 2017 the undersigned mailed a Second Direction to Counsel to court-appointed Counsel. Therein, the undersigned cited Fla. R. Crim. P. 3.133 and attached a copy of the rule thereto. The undersigned directed Counsel a second time to file a motion for an adversary preliminary hearing in the instant case. Available for the Court's review upon request.

5. On June 9, 2017 Court-appointed Counsel visited the undersigned at the Marion County Jail. At this second meeting, the undersigned requested that Counsel file a motion for an adversary preliminary hearing, mail the rest of the Discovery to the undersigned, and research the possibility of filing a motion to dismiss charges. Counsel advised the undersigned that he would send the complete Discovery to the undersigned and would look into filing a motion to dismiss. Counsel totally ignored undersigned's request to file a motion for an adversary preliminary hearing.

6. On July 13, 2017 the undersigned mailed

Counsel a letter advising counsel that he has not received the Discovery as Counsel promised to send at the June 9, 2017 meeting. The undersigned also requested information from counsel about the filing of a motion to dismiss charges. Available for the Court's review upon request.

7. On August 28, 2017 the undersigned mailed Court-appointed counsel a postcard stating "I have continually asked you for my complete Discovery and Depositions, but to no avail. Can you please send me my complete Discovery and Depositions? You can bring it on your next visit or you can furnish it by U.S. mail!" Available for the court's review upon request.

8. On September 20, 2017 the undersigned mailed Court-appointed counsel a letter concerning the 12/05/16 Information in the above-styled cause. The undersigned closed the letter by putting counsel on notice that in the event counsel didn't furnish the undersigned with a complete copy of the Discovery as counsel promised to do so on several occasions and file a motion to dismiss and/or a motion for an adversary preliminary hearing within 21 days of service of the letter, the undersigned would file a motion for Court order setting Nelson hearing. Available for the Court's review upon request.

9. As of today's date, the undersigned has

not received a reply from Court-appointed counsel nor has the undersigned received a complete copy of the Discovery and Depositions. A check of the Court Docket Summary shows that counsel filed a motion for continuace until January 18, 2018, but has failed to file a motion to dismiss and/or a motion for an adversary preliminary hearing. Court-appointed counsel has not done any of the things the undersigned requested counsel to do, including the things counsel agreed to do on several different occasions. Due to Court-appointed counsel's failure to perform any of the duties and obligations placed upon him by said appointment and the apparent lack of interest in the instant case, the undersigned requests this Court to set a Nelson inquiry in the above-styled cause.

10. The undersigned avers that Court-appointed counsel is in violation of the Rules Regulating the Florida Bar Rule 4-1.1, Rule 4-1.3, and Rule 4-1.4. Furthermore Mr. Bano has acted incompently with regard to this case. Court-appointed counsel has neglected to do any preparation with this case in the ten (10) Months he has been assigned, has neglected to file the motion to dismiss he promised to file and provide the undersigned with the rest of the Discovery, and, among other thing, has failed to comply with the undersigned's reasonable requests as shown in correspondence.

11. The undersigned feels that Court-appointed Counsel's inaction, dishonesty, and lack of interest in this instance has created an irreconcilable conflict of interest which prevents Mr. Bano from further representing the undersigned in any manner with regard to the instant case.

12. The undersigned will be filing with the Florida Bar a complaint regarding the actions-inactions-of Mr. Bano addressed herein.

13. The undersigned avers that since this Court has previously determined that the undersigned has a need and right to court-appointed counsel then that right to counsel includes the right to effective represention by such counsel. **See** Brown v. State, 113 So. 3d 134 (Fla. 1st DCA 2013) (holding that "An indigent's right to Court-appointed counsel necessarily includes the right to effective representation by counsel").

14. This motion is filed in good faith and not for the purpose to delay.

**WHEREFORE**, for these reasons, the undersigned pro se Defendant, respectfully requests this Honorable Court for an order setting a time, date, and place for a Nelson hearing with input from himself and Court-appointed

Counsel, Mr. Bano.

Respectfully Submitted

[signature]

John Moore # 0031374
Marion County Jail
700 N.W. 30th Avenue
Ocala, Florida 34475
Defendant - Pro Se

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for Court Order Setting Nelson Hearing has been furnished by U.S. Mail to Eneid Bano, Esq., Court appointed counsel, 282 Wilshire Blvd., Suite 209, Casselberry, Florida 32707-5349 and Rebecca Fletcher, ASA, Office of the State Attorney, 110 N.W. 1st Avenue, Suite 5000, Ocala, Florida 34475, on this 25 day of October, 2017.

[signature]

John Moore # 003374
Defendant - Pro Se

Exhibit - M

# Exhibit – M

Exhibit - M

4

# CALL FOR SERVICE

11/10/2016

**Agency** OPD Ocala Police Department **Incident #** 201600213567 **Case #**

**Log**

dispatch 911

| Date/Time | Officer Id | | Log Entry |
|---|---|---|---|
| 10/17/2016 19:42:1 | 5321ah | Hardin, Alexia | male shot in front of the family dollar |
| 10/17/2016 19:42:2 | 5321ah | Hardin, Alexia | laying in the street |
| 10/17/2016 19:42:2 | 5321ah | Hardin, Alexia | did not see who shot him |
| 10/17/2016 19:42:3 | 5321ah | Hardin, Alexia | b/m |
| 10/17/2016 19:43:0 | 5321ah | Hardin, Alexia | person with the gun is gone |
| 10/17/2016 19:43:0 | 5321ah | Hardin, Alexia | adv they drove by |
| 10/17/2016 19:43:1 | 5321ah | Hardin, Alexia | unk what kind of veh |
| 10/17/2016 19:43:2 | 5016ke | Escaravage, Katelyn | CAD2CAD Transfer Initiated |
| 10/17/2016 19:43:2 | 5016ke | Escaravage, Katelyn | CAD2CAD Transfer Initiated |
| 10/17/2016 19:43:2 | CAD2CA | | OPD is not configured to be transferred |
| 10/17/2016 19:43:2 | CAD2CA | | OPD is not configured to be transferred |
| 10/17/2016 19:43:4 | 5016ke | Escaravage, Katelyn | middle of the roadway - |
| 10/17/2016 19:43:4 | 5016ke | Escaravage, Katelyn | unk susp |
| 10/17/2016 19:44:1 | 5321ah | Hardin, Alexia | caller was in her house when it occd |
| 10/17/2016 19:44:1 | 5321ah | Hardin, Alexia | occd approx 5 mins ago |
| 10/17/2016 19:44:1 | 5016ke | Escaravage, Katelyn | ENDCE |
| 10/17/2016 19:44:2 | 5016ke | Escaravage, Katelyn | DISPATCH CadCode: 27D02G (Client Agency) |
| 10/17/2016 19:44:3 | 5016ke | Escaravage, Katelyn | ENDKQ CadCode: 27D02G (Client Agency) |
| 10/17/2016 19:44:3 | 5321ah | Hardin, Alexia | caller adv she heard 5-6 shots |
| 10/17/2016 19:44:4 | 5016ke | Escaravage, Katelyn | Chest and leg |
| 10/17/2016 19:44:5 | 5016ke | Escaravage, Katelyn | unk how many times |
| 10/17/2016 19:44:5 | 5321ah | Hardin, Alexia | caller adv he is bleeding from torso |
| 10/17/2016 19:45:0 | 3358kf | Friberg, Kirk | Caller 352-239-0344 Hope Dewlen said there was a mnale bent over in the road bleeding. Did not stop. Did not see the s/35 |
| 10/17/2016 19:45:2 | 5321ah | Hardin, Alexia | very loud in background |
| 10/17/2016 19:45:3 | 5016ke | Escaravage, Katelyn | witness Tyrone px 352-470-3426 - just heard and saw the person running in the road |
| 10/17/2016 19:46:1 | 3358kf | Friberg, Kirk | caller 352-598-9276 - 1037 Robert Pete - (Customer reported s/35) - no outer info |
| 10/17/2016 19:46:3 | 3358kf | Friberg, Kirk | ** CLEAR TO ENTER - NEED EMS HOT |
| 10/17/2016 19:47:1 | 3715kc | Czechowicz, Karen | 205a adv s35 to the chest going in and out of consciousness |
| 10/17/2016 19:47:1 | 3715kc | Czechowicz, Karen | no susp desc |
| 10/17/2016 19:47:3 | 5016ke | Escaravage, Katelyn | COMPLETE |
| 10/17/2016 19:49:5 | 5016ke | Escaravage, Katelyn | 911 hu px 3524842054 |
| 10/17/2016 19:50:5 | 5016ke | Escaravage, Katelyn | 911 hu px 352-792-7832 - just saw the vict fall into roadway - did not hear any shots |
| 10/17/2016 19:51:3 | 3715kc | Czechowicz, Karen | 204a going to block traffic on NW 10th st |
| 10/17/2016 19:51:5 | 5016ke | Escaravage, Katelyn | 911 hu 352-216-4230 did not see anything just heard shots fired |
| 10/17/2016 19:52:2 | 3715kc | Czechowicz, Karen | 209a going to block traffic on NW 7th St |
| 10/17/2016 19:52:3 | 3358kf | Friberg, Kirk | Caller Kim Flax - 352-300-7130 - 827 nw 15th ave Across street from 827 next to the bbq place is where shooting occurred |
| 10/17/2016 19:53:0 | 3715kc | Czechowicz, Karen | 203a at 907 NW MLK - poss scene |
| 10/17/2016 19:54:1 | 3715kc | Czechowicz, Karen | male who is at the hospital was picked up from 827 NW 15th Ave |
| 10/17/2016 19:54:4 | 5016ke | Escaravage, Katelyn | 911 hu px 352-361-8491 - heard gunshots from inside his house |
| 10/17/2016 19:55:1 | 3715kc | Czechowicz, Karen | 210a going to 827 NW 15th Ave |
| 10/17/2016 19:55:4 | 3715kc | Czechowicz, Karen | 208a following amublance to hospital |
| 10/17/2016 19:57:4 | 3715kc | Czechowicz, Karen | 203a adv 907 NW MLK Ave is not a crime scene |
| 10/17/2016 19:58:3 | 3715kc | Czechowicz, Karen | 205a @ 827 NW 15th Ave - there is a crime scene with a veh s35 to it |
| 10/17/2016 19:59:2 | 3715kc | Czechowicz, Karen | bolo:: older model maroon impala 2010-2012 tinted windows ls eb - this veh is at ORMC per 207a - s6 is with this vehicle |
| 10/17/2016 19:59:4 | 3715kc | Czechowicz, Karen | actual address is 832 NW 15th Ave |
| 10/17/2016 20:01:4 | 3715kc | Czechowicz, Karen | Removed Unit - 209A |
| 10/17/2016 20:03:0 | 3715kc | Czechowicz, Karen | GRCT45 maroon chev impala |

Handwritten notes: Lt. Brian Young; Sgt. Buchbinder; Casey Eades (Sgt.); 7 minute window period; Arnold; Garthica; Messenger; Arnold; Barth

1603648б

| Complaint/Arrest Affidavit Continuation | Court Case No. 16-CF-2869 | Agency Case No. 0-16-213567 |
|---|---|---|
| Defendant Name: Last / First / Middle | | Date of Birth |
| Moore John A | | 03-14-80 |

## FIRST APPEARANCE FINDINGS & ORDERS

Based upon the foregoing Affidavit and/or Sworn Testimony of ______________________________ the undersigned finds and determines:

☑ As to charges(s) A, B, C, ____, ____, that there was at the time of arrest and is probable cause to believe the defendant has committed the offense with which he/she is accused and it is hereby Ordered and Adjudged that defendant is to be detained or post bond as otherwise affixed pending further proceedings.

☐ As to charges(s) ____, ____, ____, ____, ____, that there is a lack of evidence that the defendant committed the offense with which he/she is accused, and it is hereby Ordered and Adjudged that the Sheriff or Chief of Police having custody is directed to forthwith release defendant from custody on defendent's own recognizance, subject to defendant appearing at all subsequent court proceedings upon proper notice.

☐ As to charges(s) ____, ____, ____, ____, ____, that it is hereby Ordered arid Adjudged the matter of probable cause is hereby continued until the next First Appearance Hearing after date hereof, at which Hearing, the Arresting Agency shall present any further proof of probable cause that it may possess.

RELEASE ORDER:

The above named Defendant was brought before the undersigned on this date at ______ o'clock, ____ .M. for a first appearance hearing and the undersigned thereupon informed him/her of the charge against him/her and provided him/her with a copy thereof and also adequately advised him/her that (1) he/she was not required to say anything and that anything he/she did say might be used against him/her (2) if he/she was financially unable to afford an attorney that the Court would appoint one to represent him/her, and (3) he/she had the right to communicate with his/her attorney, his/her family, or his/her friends, and if necessary reasonable means would be provided to enable him/her to do so: and the undersigned having considered all available relevant factors necessary to determine whether bail is necessary to assure Defendant's future appearance, and found that same is ________, necessary, it is upon consideration thereof ORDERED AND ADJUDGED that the Defendant

☐ ~~Be released on his/her own recognizance upon the condition that he/she appear as agreed below.~~ NONE

☑ Be admitted to bail in the amount of $ NONE as to charge A, $ NONE as to charge B, $ NONE as to charge C $______ as to charge D, and $______ as to charge E, upon the condition that he/she appear as agreed below.

SPECIAL CONDITIONS OF BAIL

☐ The defendant may not consume or possess alcohol.

☐ The defendant may not operate a motor vehicle.

☐ The defendant must comply with any other written provisions.

FILED ... ORIGINAL

[signature] JUDGE

PD Appt

REFUSAL OF APPOINTMENT OF COUNSEL

( ) I hereby represent to the County that I do not desire the services of the Office of the Public Defender and that I will employ private counsel.

AGREEMENT TO APPEAR

I hereby acknowledge receipt of a copy of the above and I agree and promise to appear in Courtroom 4A of the Marion County Courthouse, in Ocala, Florida, on the 6 day of Dec 20 16, at 900 o'clock, A .M. and at such other times as the Court may order, and also agree to notify the Clerk of the Court, in writing, of my new address should I move from the address below.

DATED: 11/4 20 16

SWORN TO AND SUBSCRIBED BEFORE ME THIS ______ DAY OF ______________, 20____

(X) ______________________ Defendant

______________________ Address

______________________ Deputy Clerk/Judge

MCSO Form 261B Rev. Jun. 00

Exhibit - N

# Exhibit – N

Exhibit - N



**Ocala Police Department**
**402 S. Pine Avenue**
**Ocala, FL 34471**
**352-369-7000**

**INVESTIGATIVE LEADS REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: Sergeant Buchbinder**

On Monday, October 17th 2016, I was assigned as the on call supervisor for the Ocala Police
Department Investigations Bureau. I was contacted via my department issued cellular phone and
informed there were officers on scene at a shooting incident in the northwest quadrant of the city.
I was briefed that two individuals had been shot, and the on call detective (M. Steckman) was
notified and was responding to the incident location. While responding to the scene, I contacted
my chain of command (Captain C. Sirolli) and briefed them on the details provided to me.
Captain Sirolli advised me that he would meet with me at the scene, as he was responding as
well.

Upon arrival in the 900 block of NW 16th Avenue (Martin Luther King Boulevard), the roadway
in the northbound lanes was blocked by marked patrol vehicles. There were several areas in the
roadway that were marked with evidence cones that appeared to be blood evidence. I requested
the field evidence technician to delay processing until the entire scene could be assessed.

I walked to 832 NW 15th Avenue and met with Captain Sirolli and Detective Steckman. There
were two vehicles parked in the front yard of this address that were struck by gunfire and had
obvious damage. Both vehicles, an older model Ford sedan, and a green Ford Expedition, were
parked in the east side of this location facing west.

I was briefed that one of the subjects who was shot had fled from this area and ultimately
collapsed in the 900 block of NW 16th Avenue where he was located by responding officers.
This was later determined to be B/M Jordan "KeKe" Davis. The second individual who was shot
was transported to the hospital by private vehicle. This was later determined to be B/M Keith
Boone. I was informed that officers were in contact with the two people who had driven Boone
to the hospital in a red passenger vehicle (Impala).

I was advised that the individual responsible for the property at 832 NW 15th Avenue is B/F
Sharon Scott. When I arrived at this residence, Captain Sirolli was speaking with Scott and
several others who may have present during this incident. The status of the men who were shot
during this incident was at that time unknown. I had requested Sgt. M. Spicer respond to the
hospital and attempt to gather information related to this case, as well as make contact with
family and/or friends of the victims in this incident.

While assessing the scene at 832 NW 15th Avenue, I heard Mrs. Scott making statements that she
didn't know who was shooting. She added that moments before the shooting began, a red
vehicle, possibly an Impala had driven past the house traveling north along NW 15th Avenue.
There were other people in the front of this residence that stated there may have been a "drive
by" shooting. Captain Sirolli and Officer Gauthier were present with this group of individuals.



**Ocala Police Department**
**402 S. Pine Avenue**
**Ocala, FL 34471**
**352-369-7000**

**INVESTIGATIVE LEADS REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: Sergeant Buchbinder**

Based on these developing leads, I requested the officers at the hospital remain with the individuals who transported the second shooting victim (Boone) to the hospital. I verified that the only evidence present on NW 16th Avenue where Mr. Davis was located was blood evidence. I was informed by FEO Ballas that swabs had been collected of each area of blood and photographs had been taken. I requested NW 16th Avenue (MLK) be opened to through traffic.

Based on my observation of the bullet strikes to the two vehicles parked in the eastern portion of the yard on this property, it appeared that the damage caused by the projectiles was at an angle. Upon closer examination, the damage to the vehicles appeared consistent with a gun being fired at the vehicles from the south corner of the house (832 NW 15th Avenue). On this side of the residence, there is a small side yard that is unlit and a privacy fence separating the parcel from the adjoining property. I obtained a metal detector from FEO Balls and began sweeping the grassy area along this side portion of the house. Lt. B. Young and Captain Sirolli were also looking for items of potential evidence. There were numerous casings located in this area that were marked with paper by Lt. Young. There was also a hammer found on the ground in this area that was noted. These items were properly marked with evidence cones, photographed and collected.

The owner of the vehicles that were hit by projectiles parked in the yard, 832 NW 15th Avenue (Sharon Scott) granted permission for officers to recover any bullets or fragmented projectiles from the vehicles. I was present when the hood of the sedan was opened and upon looking inside the engine compartment, I observed what appeared to be a spent projectile laying on top of one of the engine components. This was photographed and collected by the evidence technician.

As the examination of the scene progressed, it was discovered that the house directly across the street (to the east), 827 NW 15th Avenue, was struck with projectiles. Numerous holes were observed along the front wall of this residence. They were also photographed accordingly. I remained at the scene on NW 15th Avenue until the evidence technician completed collection and processing.

Typed by J. Buchbinder.
11/04/2016.



Ocala Police Department
402 S. Pine Avenue
Ocala, FL 34471
352-369-7000

**SUPPLEMENTAL REPORT NARRATIVE**
**Incident #: 201600213567**
**Officer: C. Sirolli**

On October 17th 2016, I responded to a shooting call with a victim still on scene at NW MLK and NW 10th Street, near the Family Dollar store. I spoke to Sgt. Jamie Buchbinder on the phone prior to my arrival and was briefed as to what was currently happening or what he was told was happening because he too was not on scene, but enroute.

By the time I arrived on scene, medics had already taken the victim, later identified to me as Jordan Davis, to the hospital (ORMC). I then went over to 832 NW 15th Avenue and spoke to Detective Steckman. He said that the woman on the porch, Ms. Scott, said a maroon car drove by and did the shooting. I then proceeded to the porch at 832 NW 15th Avenue and was asking everyone seated there, if they could a full account as to what occurred and Ms. Scott said she had already told an officer what happened (Detective Steckman). By this time, Sgt. Buchbinder approached me and Detective Steckman in the yard of Ms. Scott while we looked at the bullet holes in the two vehicles (green Ford Expedition and a Ford Crown Victoria) hit on the driver's side.

I then proceeded to the roadway and spoke to a group of people present there. I asked if anyone saw what happened, and some said the people in a red or maroon vehicle did the shooting (no one would give names). I then preceded to the home across the road from 832 NW 15th Avenue to 827 NW 15 Avenue. There, I observed several bullet holes in the home; no one in the home was injured.

End of statement as typed by Captain C. Sirolli

Exhibit - O

# Exhibit –O

Exhibit - O

CASE #

JOHN A. MOORE CIRCUIT COURT
MARION COUNTY 2016 CF 2869

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | 49 | 03/22/2017 | Event JURY SELECTION scheduled on 04/10/2017 at 0900 AM - Judge ROBERT HODGES presiding | |
| | 47 | 03/22/2017 | DEFENDANT PRESENT WITH ATTORNEY | |
| | 46 | 03/01/2017 | Payment received $5.00 Receipt Number XX 190955 | |
| | 45 | 03/01/2017 | Assessment 2 assessed at sum $5.00 | |
| | 44 | 02/17/2017 | CORRESPONDENCE OR MEMORANDUM - DIRECTION TO COUNSEL; FILED BY DEFENDANT | 5 |
| | 43 | 01/10/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #1 | 1 |
| | 42 | 01/06/2017 | STATES DISCOVERY EXHIBIT | 6 |
| | 41 | 01/03/2017 | CLERK SERVICE DOCUMENT | 3 |
| | 40 | 01/01/2017 | NOTICE OF APPEARANCE WAIVER OF ARRAIGNMENT PLEA OF NOT GUILTY, REQUEST FOR JURY TRIAL, DEMAND FOR DISCOVERY AND REQUEST FOR COPY OF CHARGES - ILED BY ENEID BANO | 2 |
| | 38 | 12/14/2016 | ORDER SETTING TRIAL | 3 |
| | 39 | 12/08/2016 | ORDER ALLOWING THE OFFICE OF CRIMINAL CONFLICT AND CIVIL REGIONAL COUNSEL TO WITHDRAW | 4 |
| | 37 | 12/06/2016 | COURT MINUTES | 2 |
| | 36 | 12/06/2016 | ORDER SUBSTITUTING COUNSEL | 2 |
| | 35 | 12/06/2016 | INFORMATION FILED BY STATE ORIGINAL | 2 |
| | 34 | 12/06/2016 | MOTION TO WITHDRAW AS COUNSEL-FILED BY: REGIONAL COUNSEL | 3 |
| | 33 | 12/06/2016 | CERTIFICATION OF CONFLICT -FILED BY: REGIONAL COUNSEL | 1 |
| | 32 | 12/06/2016 | Event JURY SELECTION scheduled on 04/03/2017 at 0900 AM - Judge ROBERT HODGES presiding | |
| | 31 | 12/06/2016 | Event PRO SE PRTRL CONF scheduled on 03/22/2017 at 0145 PM - Judge ROBERT HODGES presiding | |
| | 30 | 12/06/2016 | Event PD PRETRIAL CONF scheduled on 03/22/2017 at 0145 PM - Judge ROBERT HODGES presiding | |
| | 29 | 12/06/2016 | Event REG CNSL PRTRL CONF scheduled on 03/22/2017 at 0100 PM - Judge ROBERT HODGES presiding | |
| | 28 | 12/06/2016 | Event PRETRIAL CONF scheduled on 03/22/2017 at 0900 AM - Judge ROBERT HODGES presiding | |
| | 27 | 12/06/2016 | PLEA NOT GUILTY | |
| | 26 | 12/06/2016 | DEFENDANT NOT PRESENT | |
| | 25 | 12/05/2016 | Prosecutor phase: Action of FILED with status of Same entered for CNT 3 | |
| | 24 | 12/05/2016 | Prosecutor phase. Action of FILED with status of Amended entered for CNT 1, CNT 2 | |
| | 23 | 12/05/2016 | INFORMATION EFILED BY STATE | 2 |
| | 22 | 12/01/2016 | SUBPOENA RETURNED SERVED | 1 |
| | 21 | 11/28/2016 | MOTION TO WITHDRAW AS COUNSEL (CONFLICT)-FILED BY: PUBLIC DEFENDER | 2 |
| | 20 | 11/10/2016 | NOTICE OF APPEARANCE - FILED BY PUBLIC DEFENDERS OFFICE | 1 |
| | 19 | 11/10/2016 | WRITTEN PLEA OF NOT GUILTY | 1 |
| | 18 | 11/10/2016 | NOTICE OF DISCOVERY | 2 |
| | 16 | 11/09/2016 | CASE HISTORY WORKSHEET | 4 |
| 15 | 9 | 11/09/2016 | Event ARRAIGNMENT scheduled on 12/06/2016 at 0900 AM - Judge ANTHONY TATTI presiding | |
| 14 | 8 | 11/09/2016 | Event FIRST APPEARANCE scheduled on 11/04/2016 at 0800 AM - Judge R MCCUNE presiding | |
| 13 | 17 | 11/04/2016 | Assessment 1 assessed at sum $50.00 | |
| 12 | 15 | 11/04/2016 | ORDER APPOINTING PUBLIC DEFENDER | 1 |
| 11 | 14 | 11/04/2016 | AFFIDAVIT OF INDIGENT STATUS ORIGINAL | 1 |
| 10 | 13 | 11/04/2016 | FIRST APPEARANCE ORDER ORIGINAL | 1 |
| 9 | 12 | 11/04/2016 | ARREST AFFIDAVIT ORIGINAL | 4 |
| 8 | 11 | 11/03/2016 | Case Status set to OPEN | |
| 7 | 10 | 11/03/2016 | BENCH WARRANT SERVED ORIGINAL | 4 |
| 6 | 7 | 11/03/2016 | Active Process BENCH WARRANT disposition on 11/03/2016 | |
| 5 | 80 | 10/21/2016 | Prosecutor: REBECCA ANN FLETCHER Assigned | |
| 4 | 48 | 10/21/2016 | Prosecutor: TOBY STEFAN HUNT Assigned | |
| 3 | 6 | 10/21/2016 | NOTICE OF CONFIDENTIAL FILING | 1 |
| | 2 | 10/21/2016 | Judge HODGES ROBERT WILLIAM Assigned | |
| | 1 | 10/21/2016 | Case 422016CF002869CFAXXX Filed with Clerk on 10/21/2016 | |

**Judge Assignment History**

| Assigned Date | Withdraw Date | Judicial Officer | Type |
|---|---|---|---|
| 10/16/2019 | - | DETERMINED, TO BE | |
| 01/01/2018 | 03/15/2019 | ROGERS, STEVEN G | |

# Clerk of the Circuit Court and Comptroller, David R. Ellspermann

## MARION County

## Case Abstract Filing

**User Authorized UCN Types:** AP,CA,CC,CF,CJ,CO, CP,CT,DP,DR,GA,IN, MH,MM,MO,SC,TR,XX

Case Type:
Selected Case Style: All
Selected Case Number:
Selected UTC Number:
Location: All
Case File Begin Date: 10/21/2016
Case File End Date: 10/21/2016
Requesting User Name: tamiw

### Case Data:

**UCN:** 422016CF002869CFAXXX
**Case Status:** REOPENED
**Clerk Case Number:** 16CF002869AX
**Clerk File Date:** 10/21/2016
**Judge:** STEVEN G ROGERS
**Location:** XX

### Primary Parties:

| Party Type: | Name: | Attorney Type: | Attorney: |
|---|---|---|---|
| Defendant | MOORE, JOHN | Private Attorney | ENEID BANO JR |

### Filing Information:

| File Date: | Filing Type: | Disposition Date: | SRS Disposition: |
|---|---|---|---|

### Progress Docket

| Docket Date: | Docket Description |
|---|---|
| 1 10/21/2016 | Case 422016CF002869CFAXXX Filed with Clerk on 10/21/2016 |
| 2 10/21/2016 | Judge: HODGES , ROBERT WILLIAM Assigned |
| 3 10/21/2016 | Active Process BENCH WARRANT |
| 4 10/21/2016 | BENCH WARRANT ISSUED |
| 5 10/21/2016 | Case Status set to ACTIVE PROCESS |
| 6 10/21/2016 | NOTICE OF CONFIDENTIAL FILING |
| 7 10/21/2016 | Prosecutor: TOBY STEFAN HUNT Assigned |
| 8 10/21/2016 | Prosecutor: REBECCA ANN FLETCHER Assigned |
| 9 11/03/2016 | Active Process BENCH WARRANT disposition on 11/03/2016 |
| 10 11/03/2016 | BENCH WARRANT SERVED ORIGINAL |
| 11 11/03/2016 | Case Status set to OPEN |
| 12 11/04/2016 | ARREST AFFIDAVIT ORIGINAL |
| 13 11/04/2016 | FIRST APPEARANCE ORDER ORIGINAL |
| 14 11/04/2016 | AFFIDAVIT OF INDIGENT STATUS ORIGINAL |
| 15 11/04/2016 | ORDER APPOINTING PUBLIC DEFENDER |
| 16 11/04/2016 | Assessment 1 assessed at sum $50.00 |
| 11/09/2016 | Event FIRST APPEARANCE scheduled on 11/04/2016 at 0800 AM - Judge R MCCUNE presiding. |
| 11/09/2016 | Event ARRAIGNMENT scheduled on 12/06/2016 at 0900 AM - Judge ANTHONY TATTI presiding. |
| 11/09/2016 | CASE HISTORY WORKSHEET |
| 11/10/2016 | NOTICE OF DISCOVERY |

| | |
|---|---|
| 11/10/2016 | WRITTEN PLEA OF NOT GUILTY |
| 11/10/2016 | NOTICE OF APPEARANCE - FILED BY PUBLIC DEFENDERS OFFICE |
| 11/28/2016 | MOTION TO WITHDRAW AS COUNSE L (CONFLICT)-FILED BY: PUBLIC DEFENDER |
| 12/01/2016 | SUBPOENA RETURNED SERVED |
| 12/05/2016 | INFORMATION EFILED BY STATE |
| 12/05/2016 | Prosecutor phase: Action of FILED with status of Amended entered for CNT: 1, CNT: 2 |
| 12/05/2016 | Prosecutor phase: Action of FILED with status of Same entered for CNT: 3 |
| 12/06/2016 | DEFENDANT NOT PRESENT |
| 12/06/2016 | PLEA NOT GUILTY |
| 12/06/2016 | Event PRETRIAL CONF scheduled on 03/22/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 12/06/2016 | Event REG CNSL PRTRL CONF scheduled on 03/22/2017 at 0100 PM - Judge ROBERT HODGES presiding. |
| 12/06/2016 | Event PD PRETRIAL CONF scheduled on 03/22/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 12/06/2016 | Event PRO SE PRTRL CONF scheduled on 03/22/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 12/06/2016 | Event JURY SELECTION scheduled on 04/03/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 12/06/2016 | CERTIFICATION OF CONFLICT -FILED BY: REGIONAL COUNSEL |
| 12/06/2016 | MOTION TO WITHDRAW AS COUNSE L-FILED BY: REGIONAL COUNSEL |
| 12/06/2016 | INFORMATION FILED BY STATE ORIGINAL |
| 12/06/2016 | ORDER SUBSTITUTING COUNSEL |
| 12/06/2016 | COURT MINUTES |
| 12/08/2016 | ORDER ALLOWING THE OFFICE OF CRIMINAL CONFLICT AND CIVIL REGIONAL COUNSEL TO WITHDRAW |
| 12/14/2016 | ORDER SETTING TRIAL |
| 01/01/2017 | NOTICE OF APPEARANCE WAIVER OF ARRAIGNMENT, PLEA OF NOT GUILTY, REQUEST FOR JURY TRIAL, DEMAND FOR DISCOVERY, AND REQUEST FOR COPY OF CHARGES - ILED BY ENEID BANO |
| 01/03/2017 | CLERK SERVICE DOCUMENT |
| 01/06/2017 | STATES DISCOVERY EXHIBIT |
| 01/10/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #1 |
| 02/17/2017 | CORRESPONDENCE OR MEMORANDUM - DIRECTION TO COUNSEL; FILED BY DEFENDANT |
| 03/01/2017 | Assessment 2 assessed at sum $5.00. |
| 03/01/2017 | Payment received: $5.00 Receipt Number XX 190955 |
| 03/22/2017 | DEFENDANT PRESENT WITH ATTORNEY |
| 03/22/2017 | Event JURY SELECTION scheduled on 04/10/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 03/22/2017 | COURT MINUTES |
| 03/23/2017 | CORRESPONDENCE OR MEMORANDUM - DIRECTION TO COUNSEL; FILED BY DEFENDANT |
| 03/27/2017 | Updated Event JURY SELECTION on 04/03/2017 0900 AM - RESCHEDULED |
| 03/28/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #2 |
| 03/29/2017 | NOTICE TO APPEAR |
| 03/30/2017 | SUBPOENA RETURNED SERVED |
| 03/30/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #3 |
| 03/30/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #4 |
| 03/31/2017 | NOTICE OF INTENT |
| 03/31/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #5 |
| 04/03/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #6 |
| 04/04/2017 | MOTION TO COMPEL FINGERPRINTS-FILED BY: STATE ATTORNEY |

| | |
|---|---|
| 04/04/2017 | ORDER TO COMPEL FINGERPRINTS |
| 04/04/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #7 |
| 04/04/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #8 |
| 04/05/2017 | SUBPOENA RETURNED NOT SERVED |
| 04/05/2017 | SUBPOENA RETURNED SERVED |
| 04/05/2017 | SUBPOENA RETURNED SERVED |
| 04/05/2017 | SUBPOENA RETURNED SERVED |
| 04/05/2017 | SUBPOENA RETURNED SERVED |
| 04/05/2017 | WITNESS LIST |
| 04/05/2017 | NOTICE OF TAKING DEPOSITION |
| 04/06/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #9 |
| 04/06/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #10 |
| 04/06/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #11 |
| 04/06/2017 | SUBPOENA RETURNED NOT SERVED |
| 04/07/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #12 |
| 04/07/2017 | MOTION TO CONTINUE TRIAL - FILED BY DEFENSE ATTORNEY |
| 04/07/2017 | WITNESS LIST |
| 04/10/2017 | DEFENDANT PRESENT WITH ATTORNEY |
| 04/10/2017 | Event PRETRIAL CONF scheduled on 06/01/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 04/10/2017 | Event REG CNSL PRTRL CONF scheduled on 06/01/2017 at 0100 PM - Judge ROBERT HODGES presiding. |
| 04/10/2017 | Event PD PRETRIAL CONF scheduled on 06/01/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 04/10/2017 | Event PRO SE PRTRL CONF scheduled on 06/01/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 04/10/2017 | Event JURY SELECTION scheduled on 06/12/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 04/10/2017 | HEARING RESULTS: DEFENSE MOTION TO CONTINUE TRIAL THAT WAS FILED ON 4/7/17 IS GRANTED. |
| 04/10/2017 | AMENDED INFORMATION ORIGINAL |
| 04/10/2017 | COURT MINUTES |
| 04/10/2017 | WAIVER OF SPEEDY TRIAL |
| 04/11/2017 | MOTION TO COMPEL DNA SAMPLES-FILED BY: STATE ATTORNEY |
| 04/12/2017 | ORDER TO COMPEL DNA SAMPLES |
| 04/12/2017 | SUBPOENA RETURNED SERVED |
| 04/12/2017 | Event HEARING scheduled on 04/24/2017 at 0830 AM - Judge ROBERT HODGES presiding. |
| 04/12/2017 | NOTICE OF HEARING |
| 04/12/2017 | NOTICE OF TAKING DEPOSITION |
| 04/13/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #13 |
| 04/13/2017 | ORDER SETTING TRIAL |
| 04/25/2017 | SUBPOENA RETURNED NOT SERVED |
| 04/27/2017 | SUBPOENA RETURNED NOT SERVED |
| 05/01/2017 | NOTICE OF INTENT |
| 05/02/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #14 |
| 05/02/2017 | SUBPOENA RETURNED NOT SERVED |
| 05/02/2017 | SUBPOENA RETURNED SERVED |
| 05/02/2017 | SUBPOENA RETURNED SERVED |
| 05/02/2017 | SUBPOENA RETURNED SERVED |
| 05/03/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #15 |
| 05/03/2017 | NOTICE OF INTENT |

# Case Abstract Filing

| | |
|---|---|
| 05/10/2017 | AMENDED INFORMATION EFILED BY STATE |
| 05/10/2017 | AMENDED INFORMATION ORIGINAL 2ND |
| 05/22/2017 | NOTICE OF TAKING DEPOSITION |
| 05/24/2017 | SUBPOENA RETURNED SERVED |
| 06/01/2017 | DEFENDANT PRESENT WITH ATTORNEY |
| 06/01/2017 | Event PRETRIAL CONF scheduled on 08/09/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 06/01/2017 | Event REG CNSL PRTRL CONF scheduled on 08/09/2017 at 0100 PM - Judge ROBERT HODGES presiding. |
| 06/01/2017 | Event PD PRETRIAL CONF scheduled on 08/09/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 06/01/2017 | Event PRO SE PRTRL CONF scheduled on 08/09/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 06/01/2017 | Event JURY SELECTION scheduled on 08/21/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 06/01/2017 | COURT MINUTES |
| 06/08/2017 | ORDER SETTING TRIAL |
| 06/09/2017 | Updated Event JURY SELECTION on 06/12/2017 0900 AM - RESCHEDULED |
| 06/16/2017 | SUBPOENA RETURNED SERVED |
| 07/11/2017 | MOTION TO APPOINT INVESTIGATOR-FILED BY: DEFENSE ATTORNEY |
| 07/24/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #16 |
| 07/31/2017 | MOTION TO INCUR COSTS FOR DEPOSITION TRANSCRIPTS-FILED BY: DEFENSE ATTORNEY |
| 08/01/2017 | ORDER GRANTING APPOINTMENT OF INVESTIGATOR |
| 08/08/2017 | ORDER AUTHORIZING THE DEFENSE TO INCUR COSTS FOR DEPOSITION TRANSCRIPTS |
| 08/08/2017 | MOTION TO CONTINUE PTC-FILED BY: DEFENSE ATTORNEY |
| 08/08/2017 | ORDER ON MOTION TO CONTINUE PTC |
| 08/10/2017 | Event PRETRIAL CONF scheduled on 09/13/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 08/10/2017 | Event REG CNSL PRTRL CONF scheduled on 09/13/2017 at 0100 PM - Judge ROBERT HODGES presiding. |
| 08/10/2017 | Event PD PRETRIAL CONF scheduled on 09/13/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 08/10/2017 | Event PRO SE PRTRL CONF scheduled on 09/13/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 08/15/2017 | Updated Event JURY SELECTION on 08/21/2017 0900 AM - RESCHEDULED |
| 08/18/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #17 |
| 08/22/2017 | Assessment 3 assessed at sum $2.00 |
| 08/22/2017 | Payment received: $2.00 Receipt Number XX 242108 |
| 09/21/2017 | Event PRETRIAL CONF scheduled on 10/18/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 09/21/2017 | Event REG CNSL PRTRL CONF scheduled on 10/18/2017 at 0100 PM - Judge ROBERT HODGES presiding. |
| 09/21/2017 | Event PD PRETRIAL CONF scheduled on 10/18/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 09/21/2017 | Event PRO SE PRTRL CONF scheduled on 10/18/2017 at 0145 PM - Judge ROBERT HODGES presiding. |
| 09/21/2017 | Event JURY SELECTION scheduled on 10/30/2017 at 0900 AM - Judge ROBERT HODGES presiding. |
| 09/26/2017 | NOTICE OF TAKING DEPOSITION |
| 10/02/2017 | ORDER SETTING TRIAL |
| 10/13/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #18 |
| 10/16/2017 | SUBPOENA RETURNED NOT SERVED |
| 10/17/2017 | ORDER ON MOTION TO CONTINUE PTC |
| 10/17/2017 | MOTION TO CONTINUE PTC-FILED BY: DEFENSE ATTORNEY |

| | |
|---|---|
| 10/18/2017 | Updated Event PRETRIAL CONF on 10/18/2017 0900 AM - RESCHEDULED |
| 10/18/2017 | Updated Event PD PRETRIAL CONF on 10/18/2017 0145 PM - RESCHEDULED |
| 10/18/2017 | Updated Event PRO SE PRTRL CONF on 10/18/2017 0145 PM - RESCHEDULED |
| 10/18/2017 | Updated Event REG CNSL PRTRL CONF on 10/18/2017 0100 PM - RESCHEDULED |
| 10/18/2017 | Updated Event JURY SELECTION on 10/30/2017 0900 AM - RESCHEDULED |
| 10/18/2017 | Event PRETRIAL CONF scheduled on 01/11/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 10/18/2017 | Event PRO SE PRTRL CONF scheduled on 01/11/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 10/18/2017 | Event PD PRETRIAL CONF scheduled on 01/11/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 10/18/2017 | Event REG CNSL PRTRL CONF scheduled on 01/11/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 10/18/2017 | Event JURY SELECTION scheduled on 01/29/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 10/30/2017 | MOTION FOR ADVERSARY PRELIMINARY HEARING FILED BY ENEID BANO, ESQUIRE |
| 10/30/2017 | NOTICE OF HEARING ON NELSON HEARING AND MOTION FOR ADVERSARY PRELIMINARY HEARING |
| 10/31/2017 | Event HEARING scheduled on 12/01/2017 at 0130 PM - Judge ROBERT HODGES presiding. |
| 10/31/2017 | MOTION- FOR COURT ORDER SETTING NELSON HEARING; FILED BY DEFENDANT |
| 11/06/2017 | Assessment 4 assessed at sum $4.00 |
| 11/06/2017 | Payment received: $4.00 Receipt Number XX 263721 |
| 11/14/2017 | Updated Event JURY SELECTION on 01/29/2018 0900 AM - RESCHEDULED |
| 11/14/2017 | Event JURY SELECTION scheduled on 01/22/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 11/17/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #19 |
| 11/21/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #20 |
| 11/21/2017 | WITNESS LIST |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/27/2017 | SUBPOENA RETURNED SERVED |
| 11/28/2017 | NOTICE OF FILING DEPOSITIONS (PGS 1-15) |
| 11/28/2017 | NOTICE OF FILING DEPOSITIONS (PGS 1-19) |
| 12/01/2017 | DEFENDANT PRESENT WITH ATTORNEY |
| 12/01/2017 | HEARING RESULTS: DEFENDANT'S MOTION FOR NELSON HEARING IS DENIED.<br><br>DEFENSE MOTION FOR ADVERSARIAL PRELIMINARY HEARING - COURT TO RESERVE RULING |
| 12/01/2017 | STATE WITNESS LIST: KEITH BOONE; BRENDON FERGUSON (OPD); DUSTIN TODD (OPD); ANDREW ROCAFORT (OPD); JAMIE BUCHBINDER (OPD); |
| 12/01/2017 | DEFENSE WITNESS LIST: ALEXIA HARDIN (OPD); JESSICA GAGO-CHUQUILLANQUI; BRIAN YOUNG (OPD); AARON MESSENGER (OPD); CAROL BALLAS (OPD); MIGUEL GAUTHIER (OPD); MATTHEW STECKMAN (OPD) |
| 12/01/2017 | Event HEARING scheduled on 12/08/2017 at 0300 PM - Judge ROBERT HODGES presiding. |
| 12/01/2017 | COURT MINUTES |
| 12/01/2017 | NOTICE TO APPEAR |

| | |
|---|---|
| 12/01/2017 | EVIDENCE LIST |
| 12/03/2017 | MOTION FOR ORDER TO TRANSPORT -FILED BY: DEFENSE ATTORNEY |
| 12/04/2017 | SUBPOENA RETURNED SERVED |
| 12/07/2017 | AFFIDAVIT OF SERVICE |
| 12/07/2017 | AFFIDAVIT OF SERVICE |
| 12/07/2017 | AFFIDAVIT OF SERVICE |
| 12/08/2017 | MOTION TO SUPPRESS -FILED BY: DEFENSE ATTORNEY |
| 12/08/2017 | MOTION TO AUTHORIZE ADDITIONAL EXPENDITURE FOR INVESTIGATIVE COSTS-FILED BY: DEFENSE ATTORNEY |
| 12/08/2017 | HEARING RESULTS: ADVERSIAL PRELIMINARY HEARING HELD, COURT FINDS THERE IS PROBABLE CAUSE AS TO THIS CASE. WITNESSES SWORN AND TESTIFIED: CARMEN SIROLLI-OPD, TREVOR BARTH-OPD. JAMARE RUSH. |
| 12/08/2017 | DEFENDANT PRESENT WITH ATTORNEY |
| 12/08/2017 | COURT MINUTES |
| 12/08/2017 | ORDER ON MOTION TO AUTHORIZE ADDITIONAL EXPENDITURE FOR INVESTIGATIVE COSTS |
| 12/18/2017 | SUPPLEMENTAL DISCOVERY EXHIBIT #21 |
| 01/08/2018 | MOTION- MOTION TO INCUR COSTS-FILED BY: DEFENSE ATTORNEY |
| 01/10/2018 | ORDER ON MOTION TO CONTINUE PTC |
| 01/10/2018 | MOTION TO CONTINUE PTC-FILED BY: DEFENSE ATTORNEY |
| 01/11/2018 | Updated Event PD PRETRIAL CONF on 01/11/2018 0130 PM - RESCHEDULED |
| 01/11/2018 | Updated Event PRO SE PRTRL CONF on 01/11/2018 0900 AM - RESCHEDULED |
| 01/11/2018 | Updated Event PRETRIAL CONF on 01/11/2018 0900 AM - RESCHEDULED |
| 01/11/2018 | Updated Event REG CNSL PRTRL CONF on 01/11/2018 0130 PM - RESCHEDULED |
| 01/11/2018 | Updated Event JURY SELECTION on 01/22/2018 0900 AM - RESCHEDULED |
| 01/11/2018 | Event PD PRETRIAL CONF scheduled on 03/23/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 01/11/2018 | Event REG CNSL PRTRL CONF scheduled on 03/23/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 01/11/2018 | Event PRETRIAL CONF scheduled on 03/23/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 01/11/2018 | Event PRO SE PRTRL CONF scheduled on 03/23/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 01/11/2018 | Event JURY SELECTION scheduled on 04/02/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 01/24/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT #22 |
| 02/12/2018 | MOTION- MOTION TO DISMISS THE INFORMATION-FILED BY: DEFENSE ATTORNEY |
| 02/18/2018 | NOTICE OF HEARING ON MOTION TO SUPPRESS AND MOTION TO DISMISS THE INFORMATION |
| 02/19/2018 | Event HEARING scheduled on 03/19/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 03/14/2018 | MOTION TO STRIKE OR DENY THE DEFENDANTS MOTION TO DISMISS AS UNTIMELY FILEC FILED BY STATE ATTORNEY |
| 03/19/2018 | DEFENDANT PRESENT WITH ATTORNEY |
| 03/19/2018 | Event PRETRIAL CONF scheduled on 05/24/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 03/19/2018 | Event PRO SE PRTRL CONF scheduled on 05/24/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 03/19/2018 | Event PD PRETRIAL CONF scheduled on 05/24/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 03/19/2018 | Event REG CNSL PRTRL CONF scheduled on 05/24/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 03/19/2018 | Event JURY SELECTION scheduled on 06/11/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 03/19/2018 | HEARING RESULTS: MOTION TO DISMISS INFORMATION IS DENIED. MOTION TO SURPRESS COURT RESERVES RULING. COURT ORDERS TRANSCRIPT OF TODAYS HEARING. DEFENSE WITNESSES: DETECTIVE TODD, MATT STECKMAN |

| | |
|---|---|
| 03/19/2018 | COURT MINUTES |
| 03/19/2018 | EVIDENCE LIST |
| 03/26/2018 | Updated Event JURY SELECTION on 04/02/2018 0900 AM - RESCHEDULED |
| 03/26/2018 | ORDER DENYING MOTION TO DISMISS THE INFORMATION |
| 03/26/2018 | ORDER DENYING MOTION TO SUPPRESS |
| 03/29/2018 | ORDER SETTING PRETRIAL CONFERENCE |
| 05/14/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 23 |
| 05/14/2018 | MOTION TO INCUR COSTS FOR HEARING TRANSCRIPTS FILED BY DEFENSE ATTORNEY |
| 05/17/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 24 |
| 05/22/2018 | ORDER AUTHORIZING THE DEFENSE TO INCUR COSTS FOR DEPOSITION TRANSCRIPTS |
| 05/22/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 25 |
| 05/24/2018 | DEFENDANT PRESENT WITH ATTORNEY |
| 05/24/2018 | Event PRETRIAL CONF scheduled on 06/29/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 05/24/2018 | Event PRO SE PRTRL CONF scheduled on 06/29/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 05/24/2018 | Event PD PRETRIAL CONF scheduled on 06/29/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 05/24/2018 | Event REG CNSL PRTRL CONF scheduled on 06/29/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 05/24/2018 | Event JURY SELECTION scheduled on 07/16/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 05/24/2018 | COURT MINUTES |
| 05/31/2018 | Updated Event JURY SELECTION on 06/11/2018 0900 AM - RESCHEDULED |
| 05/31/2018 | ORDER SETTING PRETRIAL CONFERENCE |
| 05/31/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 26 |
| 06/18/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 27 |
| 06/19/2018 | Event JURY SELECTION scheduled on 07/16/2018 at 0830 AM - Judge STEVEN ROGERS presiding. |
| 06/19/2018 | Updated Event JURY SELECTION on 07/16/2018 0900 AM - RESCHEDULED |
| 06/26/2018 | SUBPOENA RETURNED SERVED |
| 06/28/2018 | SUBPOENA RETURNED NOT SERVED |
| 06/29/2018 | DEFENDANT PRESENT WITH ATTORNEY |
| 06/29/2018 | HEARING RESULTS: CASE REMAINS AS SET |
| 06/29/2018 | COURT MINUTES |
| 07/03/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/03/2018 | SUBPOENA RETURNED SERVED |
| 07/05/2018 | MOTION FOR ORDER TO TRANSPORT FILED BY DEFENSE ATTORNEY |
| 07/06/2018 | ORDER SETTING HEARING |
| 07/09/2018 | Event HEARING scheduled on 07/16/2018 at 0815 AM - Judge STEVEN ROGERS presiding. |
| 07/09/2018 | ORDER TO TRANSPORT INMATE FOR TRIAL (5 CERTIFIED COPIES SENT TO MCJ; 1 CERTIFIED COPY SENT TO DOC) |
| 07/10/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 28 |
| 07/10/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 29 |
| 07/11/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 30 |
| 07/11/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 31 |
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |

| | |
|---|---|
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/12/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/12/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 32 |
| 07/13/2018 | MOTION IN LIMINE #1 HEARSAY TESTIMONY REGARDING "DRIVE BY SHOOTING" FILED BY STATE ATTORNEY |
| 07/13/2018 | MOTION IN LIMINE #2 REGARDING PHOTO LINEUP PROCEDURE FILED BY STATE ATTORNEY |
| 07/13/2018 | MOTION IN LIMINE #3 FILED BY STATE ATTORNEY |
| 07/13/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 33 |
| 07/13/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 34 |
| 07/14/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 35 |
| 07/14/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 36 |
| 07/14/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 37 |
| 07/16/2018 | DEFENDANT PRESENT WITH ATTORNEY |
| 07/16/2018 | HEARING RESULTS: NELSON HEARING HELD. COURT FINDS COUNSEL HAS NOT BEEN INEFFECTIVE. MOTION TO DISMISS COUNSEL IS DENIED. MOTION TO SEVER COUNT 3 IS GRANTED. JURY SELECTED AND SWORN. |
| 07/16/2018 | Event JURY TRIAL scheduled on 07/19/2018 at 0830 AM - Judge STEVEN ROGERS presiding. |
| 07/16/2018 | COURT MINUTES |
| 07/16/2018 | ORDER DENYING MOTION TO DISMISS COUNSEL |
| 07/16/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 39 |
| 07/16/2018 | ARREST AFFIDAVIT ORIGINAL |
| 07/16/2018 | CORR/MEMO FROM SHERIFFS OFFICE |
| 07/16/2018 | JURY PANEL USAGE REPORT |
| 07/16/2018 | JURORS SELECTED FOR VOIR DIRE |
| 07/17/2018 | NOTICE TO APPEAR |
| 07/18/2018 | MOTION IN LIMINE 4 FILED BY STATE ATTORNEY |
| 07/18/2018 | EVIDENCE TRANSFER RECEIPT |
| 07/19/2018 | DEFENDANT PRESENT WITH ATTORNEY |
| 07/19/2018 | HEARING RESULTS: STATE'S MOTIONS IN LIMINE ARE GRANTED. ***NOTE TO MCJ- PLEASE TRANSPORT DEFENDANT FOR JURY TRIAL BY 8:00AM TOMORROW MORNING, PER JUDGE ROGERS*** |
| 07/19/2018 | Event JURY TRIAL scheduled on 07/20/2018 at 0830 AM - Judge STEVEN ROGERS presiding. |
| 07/19/2018 | COURT MINUTES |
| 07/19/2018 | JURORS AND WITNESSES WORKSHEET |
| 07/19/2018 | EVIDENCE LIST |
| 07/20/2018 | DEFENDANT PRESENT WITH ATTORNEY |
| 07/20/2018 | Event PRETRIAL CONF scheduled on 09/13/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 07/20/2018 | Event PRO SE PRTRL CONF scheduled on 09/13/2018 at 0900 AM - Judge STEVEN ROGERS presiding. |
| 07/20/2018 | Event PD PRETRIAL CONF scheduled on 09/13/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 07/20/2018 | Event REG CNSL PRTRL CONF scheduled on 09/13/2018 at 0130 PM - Judge STEVEN ROGERS presiding. |
| 07/20/2018 | Event JURY SELECTION scheduled on 09/24/2018 at 0830 AM - Judge STEVEN ROGERS presiding. |
| 07/20/2018 | HEARING RESULTS: MOTION FOR JOA IS DENIED. MOTION FOR MISTRIAL IS DENIED. RENEWED MOTION FOR JOA IS DENIED. DEFENDANT IS FOUND GUILTY AS CHARGED IN COUNTS 1 AND 2. SENTENCING AS TO COUNT 1 AND COUNT 2 IS DEFERRED. |
| 07/20/2018 | SUBPOENA RETURNED SERVED |
| 07/20/2018 | SUBPOENA RETURNED SERVED |
| 07/20/2018 | SUBPOENA RETURNED SERVED |

| | |
|---|---|
| 07/20/2018 | SUBPOENA RETURNED SERVED |
| 07/20/2018 | COURT MINUTES |
| 07/20/2018 | VERDICT |
| 07/20/2018 | JURY INSTRUCTIONS |
| 07/20/2018 | EVIDENCE RECEIPT |
| 07/24/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/24/2018 | SUBPOENA RETURNED NOT SERVED |
| 07/27/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 42 |
| 07/30/2018 | NOTICE OF HEARING |
| 07/30/2018 | SUPPLEMENTAL DISCOVERY EXHIBIT 42 |
| 07/31/2018 | Event SENTENCING scheduled on 08/14/2018 at 0130 PM - Judge STEVEN ROGERS presiding |
| 08/01/2018 | ORDER SETTING PRETRIAL CONFERENCE |
| 08/08/2018 | NOTICE OF DEFENDANTS QUALIFICATION AS A PRISON RELEASEE REOFFENDER AND REQUIRED SENTENCING TERM PURSUANT TO F.S. 77.5082 |
| 08/13/2018 | ORDER FINDING PROBABLE CAUSE (EMAILED TO THE MARION COUNTY JAIL 8/13/18 9:30AM) |
| 08/14/2018 | Defendant entered a plea of Not Guilty/Deny for CNT: 1, CNT: 2 |
| 08/14/2018 | Defendant entered a plea of Not Guilty/Deny CNT: 1, 2 |
| 08/14/2018 | Verdict of GUILTY for CNT: 1, CNT: 2 |
| 08/14/2018 | Court Action: ADJUDICATED GUILTY CONVICTED for CNT: 1, CNT: 2 |
| 08/14/2018 | Credit time served for 0.0 year(s) 0.0 month(s) 655 day(s) - CNT: 1 |
| 08/14/2018 | Sentence Imposed date: 08/14/2018 - CNT: 1, CNT: 2 |
| 08/14/2018 | Judge at Sentencing: ROGERS, STEVEN G - CNT: 1, CNT: 2 |
| 08/14/2018 | Life in State Prison Facility - DOC - CNT: 1 |
| 08/14/2018 | HEARING RESULTS: DEFENDANT FOUND GUILTY BY JURY ON 7/20/2018. PD IS APPOINTE FOR PURPOSES OF APPEAL. |
| 08/14/2018 | CONCURRENT AS TO EACH COUNT |
| 08/14/2018 | PRISON RELEASEE REOFFENDER - THE DEFENDANT HAS BEEN SENTENCED AS A PRISON RELEASEE REOFFENDER PURSUANT TO THE PROVISIONS OF SECTION 775.082(8) F.S. AS TO COUNTS 1 & 2 |
| 08/14/2018 | COST FOR INCARCERATION IS ORDERED AT A RATE OF $50.00 PER DAY AS A CIVIL RESTITUTION LIEN AND THE DEFENDANT'S DRIVERS LICENSE SHALL NOT BE SUSPENDED FOR FAILURE TO PAY THE CIVIL LIEN. THIS IS NOT TO EXCEED $250,000.00 |
| 08/14/2018 | Maximum Confinement in State Prison Facility - DOC for 30 year(s) 0.0 month(s) 0.0 day(s) - CNT 2 |
| 08/14/2018 | Credit time served for 0.0 year(s) 0.0 month(s) 655 day(s) - CNT: 2 |
| 08/14/2018 | Minimum Confinement in State Prison Facility - DOC for 0.0 year(s) 0.0 month(s) 0.0 day(s) - CNT 2 |
| 08/14/2018 | Prosecutor phase: Action of NOLL PROS with status of Same entered for CNT: 3 |
| 08/14/2018 | Assessment 5 assessed at sum $5,000.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 6 assessed at sum $5,000.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 7 assessed at sum $325.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 8 assessed at sum $250.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 9 assessed at sum $93.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 10 assessed at sum $93.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 11 assessed at sum $5,000.00 |

| | |
|---|---|
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 12 assessed at sum $13.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Assessment 13 assessed at sum $13.00 |
| 08/14/2018 | Compliance PAY FINE has been created with due date of 09/13/2018 |
| 08/14/2018 | Case Status set to CLOSED |
| 08/14/2018 | EVIDENCE LIST |
| 08/14/2018 | COURT MINUTES |
| 08/14/2018 | NOTICE OF INTENT TO COLLECT |
| 08/14/2018 | ORDER APPOINTING PUBLIC DEFENDER |
| 08/14/2018 | ORDER |
| 08/14/2018 | CLERKS COMMITMENT CHECKLIST |
| 08/14/2018 | COMMITMENT TO DEPARTMENT OF CORRECTIONS ORIGINAL |
| 08/14/2018 | JUDGMENT ORIGINAL |
| 08/14/2018 | CHARGE/COSTS/FEE PAGE ORIGINAL |
| 08/14/2018 | SENTENCING PAGE ORIGINAL |
| 08/14/2018 | FELONY SPECIAL PROVISIONS PAGE ORIGINAL |
| 08/14/2018 | SENTENCING SCORESHEET |
| 08/16/2018 | RECORDED MONETARY LIEN |
| 08/17/2018 | NOLLE PROSEQUI |
| 09/06/2018 | Updated Event PRO SE PRTRL CONF on 09/13/2018 0900 AM - REMOVED |
| 09/06/2018 | Updated Event PRETRIAL CONF on 09/13/2018 0900 AM - REMOVED |
| 09/06/2018 | Updated Event PD PRETRIAL CONF on 09/13/2018 0130 PM - REMOVED |
| 09/06/2018 | Updated Event REG CNSL PRTRL CONF on 09/13/2018 0130 PM - REMOVED |
| 09/06/2018 | Updated Event JURY SELECTION on 09/24/2018 0830 AM - REMOVED |
| 09/12/2018 | NOTICE OF APPEAL |
| 09/12/2018 | JUDICIAL ACTS TO BE REVIEWED |
| 09/12/2018 | DIRECTIONS TO THE CLERK |
| 09/12/2018 | DESIGNATION TO COURT REPORTER |
| 09/12/2018 | MOTION- TO PROCEED WITHOUT COSTS AND TO DIRECT THE STATE TO PAY COURT REPORTER FEES; FILED BY DEFENSE ATTORNEY |
| 09/12/2018 | AFFIDAVIT OF INDIGENT STATUS ORIGINAL |
| 09/12/2018 | Reopened for OFFENSE OTHER on 09/12/2018 |
| 09/12/2018 | Case Status set to REOPENED |
| 09/17/2018 | ACKNOWLEDGMENT OF NEW CASE NUMBER 5D18-2946 |
| 10/08/2018 | DESIGNATION TO COURT REPORTER |
| 10/09/2018 | REPORTER'S ACKNOWLEDGMENT |
| 10/15/2018 | ORDER FROM 5TH DCA EXTENSION OF TIME TO FILED RECORD DUE DECEMBER 17, 201 |
| 11/20/2018 | NOTICE OF INQUIRY |
| 11/21/2018 | CORR/MEMO FROM CLERKS OFFICE |
| 11/29/2018 | TRANSCRIPT OF ADVERSARIAL PRELIMINARY HEARING PGS 1-64 |
| 11/29/2018 | TRANSCRIPT OF NELSON HEARING AND ADVERSARIAL PRELIMINARY HEARING PGS 1-16 |
| 11/29/2018 | TRANSCRIPT OF SENTENCING PGS 1-42 |
| 11/29/2018 | TRANSCRIPT OF MOTION TO SUPPRESS PGS 1-63 |
| 11/29/2018 | TRANSCRIPT OF JURY TRIAL PGS 1-235 |
| 11/29/2018 | TRANSCRIPT OF JURY TRIAL PGS 1-402 |
| 11/29/2018 | TRANSCRIPT OF JURY TRIAL PGS 403-483 |